# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

MIXSON, et al.,

    *Plaintiffs*,

  v.

C. R. BARD, INC., et al.,

    *Defendants*.

Case No.: 1:21-cv-00030-AW-GRJ

## PLAINTIFFS' TRIAL MEMORANDUM

Plaintiffs anticipate several areas of contested law that the Court must decide, relating to the appropriate jury instructions to give in the context of a claim for negligent design defect. First, Plaintiffs propose that they are entitled to an instruction regarding negligence in addition to design defect. Second, in the alternative, any design defect instruction should be based on the consumer expectations test rather than the risk/utility test. Third, a "state of the art" instruction is not appropriate. Finally, Plaintiffs propose that that Defendants will not have sufficient evidence of Mr. Mixson's alleged negligence and failure to mitigate damages to submit that issue to the jury.

**A) Plaintiffs are entitled to a negligence instruction on their design defect claim.**

The risk/utility and consumer expectations tests apply with respect to strict liability. In the context of negligent design defect, however, the Court should instruct on basic negligence principles focused on "reasonable care", i.e., the conduct of the manufacturer.

In Florida, the standard for judging whether a medical device is defectively designed is "far from clear" and "in a state of flux." *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1343 n.5 (11th Cir. 2020). The starting point, however, is that a manufacturer must use reasonable care to design a device that is reasonably safe:

> In Florida, as elsewhere, negligence is defined as the failure to observe, for the protection of another's interest, such care and precaution as the circumstances demand, or the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances. . . Applying this definition to the concept of negligence in product design, a manufacturer is held to a standard of reasonable care in the design of its products, so that they will be reasonably safe for use in a foreseeable manner.

*Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir. 1984) (internal quotations and citations omitted). *See also Godelia v. Doe*, 881 F.3d 1309, 1318 (11th Cir. 2018) ("manufacturer must use reasonable care in design and manufacture of its product to eliminate unreasonable risk of foreseeable injury") (quoting *Ford Motor Co. v. Evancho*, 327 So. 2d 201, 204 (Fla. 1976)). In other words, Bard was negligent in

designing the G2 filter if it was not reasonably careful. Although stated in terms of "defective design," this standard does not require any additional tests to determine anything more than that users were exposed to "unreasonable risk."

A product is defective when it is "unreasonably dangerous." Fla. Std. Jury Instr. (Civ.) 403.7 (strict liability). Based on *Ford*, a product is unreasonably dangerous if it confers "unreasonable risk." *Ford Motor Co.*, 327 So. 2d at 204. It is true that some district courts have merged the standards for strict liability design defect (where the focus is not on conduct, but on the product) and negligent design defect (where the focus is properly on the company's conduct), but the standard Florida jury instructions differentiate between the two standards; the former calling for the consumer expectations or risk/utility tests, and the latter focusing on reasonable care. *Compare*, Fla. Std. Jury Instr. (Civ.) 403.7 (strict liability: product "fails to perform as safely as an ordinary consumer would expect . . . or . . . the risk of danger in the design outweighs the benefits") (cleaned up) *with* Fla. Std. Jury Instr. (Civ.) 403.9 (Negligence: "failure to use reasonable care, which is the care that a reasonably careful [*designer*] [manufacturer] [seller] [importer] [distributor] [supplier] would use under like circumstances.") (emphasis added).

While some courts presume the strict liability standards also apply in the negligence context, there are few cases evaluating this issue in the absence of a strict

3

liability claim. To the contrary, where negligence is considered separately, the test does not include strict liability principles. *E.g. Flaherty v. E-Go Bike, LLC*, No. 2:21-cv-728-SPC-MRM, 2022 U.S. Dist. LEXIS 26204, at *11 (M.D. Fla. Feb. 11, 2022) ("The elements of negligence in a product liability case are (1) the manufacturer was under a legal duty to design and manufacture a product reasonably safe for use, (2) the manufacturer breached that duty, (3) the plaintiff suffered an injury that is legally caused by the manufacturer's breach, and (4) the plaintiff suffered damages.") (internal citation and quotation removed); *Hummel v. Tamko Bldg. Prods.*, 303 F. Supp. 3d 1288, 1299 (M.D. Fla. 2017) (same); *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1361 (11th Cir. 2020) (*Ford* case, Florida standard instruction on negligence, and other authority "strongly suggests that negligent design under Florida law may be proven by reference to general negligence principles. In other words, **a plaintiff need not wedge his case into the risk-utility mold**") (Tjoflat, J., dissenting, emphasis supplied).

While many district courts have stated as an additional test that a plaintiff must prove that the product is "defective or unreasonably dangerous," the authority for this proposition does not stand up to scrutiny. The cases asserting this requirement cite as authority *Marzullo v. Crosman Corp.*, 289 F. Supp. 2d 1337, 1342 (M.D. Fla. 2003) or a case that relies on *Marzullo* without any additional

analysis.[1] *Marzullo*, in turn, relied on a single Florida Third District case, which provides no authority for the proposition that is now relied on without analysis – *Siemens Energy & Automation v. Medina*, 719 So. 2d 312, 315 (Fla. 3d DCA 1998). In *Siemens*, the issue was whether a claim based on negligent failure to warn had been erroneously submitted to the jury. The court found that the verdict could have

---

[1] *E.g.*, *Scala v. Eisai, Inc.*, No. 5:21-cv-210-ACC-PRL, 2021 U.S. Dist. LEXIS 240028, at *6 (M.D. Fla. Dec. 14, 2021) (citing *Krywokulski*); *Krywokulski v. Ethicon, Inc.*, No. 8:09-CV-980-T-30MAP, 2010 U.S. Dist. LEXIS 4513, at *9 (M.D. Fla. Jan. 21, 2010) (citing *Marzullo*) *Dillon v. Sunbelt Rentals, Inc.*, No. 19-cv-80697-SINGHAL/Matthewman, 2020 U.S. Dist. LEXIS 160313, at *8 (S.D. Fla. Aug. 30, 2020) (same); *Zenith Ins. Co. v. Bos. Sci. Corp.*, No. 3:20-cv-1121-BJD-MCR, 2021 U.S. Dist. LEXIS 162033, at *36 (M.D. Fla. July 2, 2021) (citing *Sullivan*); *Sullivan v. Bos. Sci. Corp*, No. 1:19-cv-188-AW-GRJ, 2020 U.S. Dist. LEXIS 137586, at *6 (N.D. Fla. June 23, 2020) (citing *Maruzllo*); *Bahrami v. Home Depot U.S.A., Inc.*, Civil Action No. 17-23500-Civ, 2019 U.S. Dist. LEXIS 621, at *6 (S.D. Fla. Jan. 3, 2019) (citing *Leoncio*); *Leoncio v. Louisville Ladder, Inc.*, No. 13-21837-CIV, 2014 U.S. Dist. LEXIS 186417, at *8 (S.D. Fla. Apr. 8, 2014) (citing *Marzullo*); *Brown v. DePuy Orthopaedics, Inc.*, 978 F. Supp. 2d 1266, 1272 (M.D. Fla. 2013); *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1277 (S.D. Fla. 2020) (citing *Cooper*); *Cook v. MillerCoors, LLC*, 829 F. Supp. 2d 1208, 1217 (M.D. Fla. 2011) (same); *Cooper v. Old Williamsburg Candle Corp.*, 653 F. Supp. 2d 1220, 1226 (M.D. Fla. 2009) (citing *Marzullo*); *Travelers Prop. Cas. Co. of Am. v. Charlotte Pipe & Foundry Co.*, No. 6:11-cv-19-Orl-28GJK, 2012 U.S. Dist. LEXIS 38836, at *9 (M.D. Fla. Mar. 22, 2012) (same); *Gwaltney v. Intermetro Indus. Corp.*, No. 8:08-CV-1281-T-17TBM, 2009 U.S. Dist. LEXIS 139085, at *6 (M.D. Fla. Aug. 19, 2009) (same); *Romer v. Corin Grp., PLC*, No. 2:18-cv-19-FtM-99MRM, 2018 U.S. Dist. LEXIS 152752, at *11 (M.D. Fla. Sep. 7, 2018) (citing *Colville*); *Colville v. Pharmacia & Upjohn Co. LLC*, 565 F. Supp. 2d 1314, 1320 (N.D. Fla. 2008) (citing *Marzullo*); *Anderson v. Techtronic Indus. N. Am.*, No. 6:13-cv-1571-Orl-41TBS, 2015 U.S. Dist. LEXIS 194099, at *24 (M.D. Fla. Apr. 14, 2015) (citing *Pinchinat*); *Pinchinat v. Graco Children's Prods.*, 390 F. Supp. 2d 1141, 1149 (M.D. Fla. 2005) (citing *Marzullo*).

been based only on the failure to warn claim because the jury found that there was no design defect. It concluded, without citation to any other authority, that "Because the jury found in its verdict that Siemens did not manufacture a defective product, this precluded any findings of strict liability or negligence based on a defective product and indicates that the jury's verdict against Siemens was solely based on a negligent failure to warn." *Siemens Energy & Automation v. Medina*, 719 So. 2d 312, 315 (Fla. Dist. Ct. App. 1998). There is no dispute that even under negligence principles, a plaintiff must prove that a product is defective. But the court provided no definition for how a product defect is proven in a negligent design defect claim. Nor did it have occasion to because the holding rested on the principle that the jury had found no design defect—whatever the definition. The leap from this holding to the requirement that a plaintiff prove both negligence and strict-liability design defect elements is more than this case supports. In other words, the Court should not, under Florida law, require as proof that a product is defective that a plaintiff satisfy the consumer expectations or risk/utility tests from the strict liability context. One must look to the cases reviewed above, such as *Witt* and *Ford*, and the distinctions made in the Florida jury instructions to determine the definition of a product defect under Florida law.

Notably, Florida cases do not generally state that in the negligence context, a plaintiff must prove, in addition to the traditional elements of negligence, that a product is defective under the consumer expectations or risk/utility tests. To the contrary, Florida courts rely on the traditional elements of negligence:

> While the elements of strict liability and negligence are similar, strict liability focuses on the reasonable expectations of *the consumer*. . . . To prevail on a products liability claim based on negligence, a plaintiff must establish: (1) a duty or obligation recognized by the law requiring the defendant to protect others from unreasonable risks; (2) a breach of that duty; (3) a reasonably close casual connection between the conduct and the resulting injury; and (4) actual loss or damages.

*Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. Dist. Ct. App. 2022). "The question turns on what is reasonable care and what is reasonable safety." *Light v. Weldarc Co.*, 569 So. 2d 1302, 1303 (Fla. Dist. Ct. App. 1990). *See Jozwiak v. Stryker Corp.*, No. 6:09-cv-1985-Orl-19GJK, 2010 U.S. Dist. LEXIS 17221, at *13-14 (M.D. Fla. Feb. 26, 2010) (requiring allegation of product defect for strict liability count but not negligence count; "The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others.") (citing *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992)).

On the facts here, the G2 filter is defective (i.e., unreasonably dangerous) if Defendants failed to use "reasonable care" to ensure that the filter was "reasonably

safe." *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir. 1984). The filter is not reasonably safe if it fails more frequently than other available products, or fails to incorporate design features that would reduce the frequency or severity of risk. In other words, there is no requirement to prove risk/utility or consumer expectations; and even if the benefits outweigh the risks Plaintiffs can prove negligent design defect by proving that Bard did not exercise reasonable care in reducing risk.

**B) In the alternative, a medical device is negligently designed if it is not "reasonably safe" or if it fails to perform as reasonably expected.**

If the Court determines that it must instruct the jury on design defect, then it should use the "consumer expectation" instruction under *Aubin v. Union Carbide Corp.*, 177 So.3d 489, 498 (Fla. 2015).

Plaintiffs have found no authority that analyzed whether the *Aubin* decision instructs on whether a medical device is *de facto* too complex for the consumer expectations test as modified to refer to the learned intermediary. Plaintiffs submit that an analysis of the *Aubin* decision and the cases it expressly disapproved of indicates that the consumer expectation test is appropriate for the G2 filter. In the alternative, Plaintiff proposes that the relevant Florida jury instructions be modified to refer to the reasonable expectations of physicians who implant IVC filters. With that modification, any concern that the G2 filter is more difficult to form expectations about than the complex products designed and manufactured today is

alleviated because doctors are trained to evaluate the specific risks and benefits of IVC filters. The risk/utility test is therefore not required.

First, as to the anticipated argument that the Florida Supreme Court might conclude that medical devices are too complex for a "consumer expectations" test (even if modified to refer to a learned intermediary), Defendants have not explained how other modern devices are simpler than IVC filters. Cases on this issue suggest that they are not, and that the consumer expectations test is appropriate. For example, cases have involved seat belts, (where courts have ordered new trials for failure to give a consumer expectations instructions), asbestos (at issue in *Aubin*) and fungicide (at issue in a case disapproved of by *Aubin*).

Starting with seat belts, ordinary consumers obviously use seatbelts every day, but that does not mean they understand how they are designed, or precisely under which forces they will offer protection or reduce the risk or severity of injury. Yet courts deem the consumer expectations test appropriate. In the *Force* case (relied on by Defendants, but decided before *Aubin*), the Florida District Court of Appeals was faced with the same argument made here—that "Ordinary consumers are ill-equipped to decide what minimum safety to expect from seatbelts." *Force v. Ford Motor Co.*, 879 So. 2d 103, 109 (Fla. Dist. Ct. App. 2004). Yet the court ordered a new trial for failure to provide a consumer expectation instruction. *Id.* The 11th

Circuit followed *Force* in another seatbelt case, ordering a new trial where the district court denied the plaintiff's request for a consumer expectation instruction. *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1312-14 (11th Cir. 2005) (also pre-*Aubin*, and also relied on by Defendants).

In the context of medical devices, consumer-patients rely on doctors, who explain the purpose of the filter, and thereby set expectations for how they will perform. Specifically, here, the implanting physician testified that Mr. Mixson would have been given "informed consent" by a resident doctor, who was trained to "be able to tell the patient the risk and benefits and get the informed consent that way." **Exhibit A**, Goei Deposition, 94:18-19. A reasonable consumer-patient, therefore, is able to form reasonable expectations about the performance of the filter, just as a reasonable consumer-driver can form expectations about the performance of a seatbelt without necessarily understanding all of the performance standards, characteristics, and other particulars. Defendants here have not explained how the purported complexity of the filter is greater than that of a seatbelt, or what precisely a seatbelt user understands about a seatbelt that he or she would not understand about a filter after discussing it with a doctor. In both scenarios, a reasonable consumer would understand that the device will not offer perfect protection, yet would not know precisely when or how often it would fail. Indeed, modern seatbelts likely have

more parts, probably have more testing, and regulation, and may have more complex machines assembling them from a greater number of materials than IVC filters. Defendants' complexity argument and attempt to distinguish *Force* and *Tran* should be rejected.

Turning to asbestos, the product at issue in *Aubin*, it is even more complex than seatbelts (and IVC filters). Unlike the G2 filter, "ordinary" consumers using asbestos likely do not have experts helping to explain the risks and benefits of the product. There are, however, "learned intermediaries" involved, just as in medical device cases; thus, any attempt to carve out medical devices from *Aubin* merely because they involve learned intermediary doctors should be rejected. *Aubin*, 177 So. 3d. at 494 ("we approve the Third District's holding that the jury could be instructed on the learned intermediary doctrine"). Yet the *Aubin* court approved of a consumer expectation instruction that did not refer to any learned intermediary because the focus, even with a complex product such as asbestos, should be on the "end user's knowledge":

> a jury would be reasonably misled by such a jury instruction that strongly implies that a learned intermediary's specific knowledge about a defect, rather than the end user's knowledge, is the focus of Florida's strict liability law. Likewise, the factor that the jury should consider whether Union Carbide had access to the learned intermediary's customers is misleading, as neither the caselaw nor the Second Restatement have recognized that manufacturers must have direct access to the end user.

*Id.* at 518-519 (approving Second Restatement's consumer expectation standard: "It's defective by design if it does not act as a reasonable consumer would expect it to act.") Moreover, Defendants have not explained how its IVC filter is any more complex than the asbestos at issue in *Aubin*. The design evidence in *Aubin* demonstrated a complex manufacturing process for the sub-product at issue (SG-210 Calidria):

> Union Carbide specifically mined the short fiber form of chrysotile asbestos and subjected this asbestos to a "proprietary manufacturing process" in order to yield "essentially a pure asbestos fiber content" that had a unique shape and physical structure. Union Carbide then created different grades based on the asbestos, including a resin grade for nonaqueous markets and a standard grade. SG-210 Calidria was distinctive in that it was subjected to the centrifuge process twice, which was significant to the manufacturing process, given that the more times chrysotile asbestos passed through this system, the more the fibers were pulled apart from each other, thereby increasing the efficiency of the product. This material, unlike raw asbestos, was specifically designed to be incorporated into such products as joint compounds and texture sprays.

*Id.* at 513. The end products were joint compounds and texture sprays that the plaintiff did not even know contained asbestos. *Id.* at 495. Yet even though a reasonable consumer presumably would not have any expectation about the asbestos contained in the products, the *Aubin* court held that the consumer expectations test applied in design defect claims. *Id.* at 510. Here, again, Defendants have not explained how patients who are taught about the G2 filter by doctors who are trained

to evaluate the risks and benefits are less-well equipped to form expectations about the G2 performance than are users of asbestos-containing products.

A review of the case specifically disapproved in *Aubin* (which was relied on by many of the pre-*Aubin* cases that Defendants cite), indicates that the *Aubin* court did not conclude that the complexity of a product would change this holding. *Id.* at 512 ("We . . . disapprove of the Third District's decisions in [*Union Carbide Corp. v. ]Aubin* [97 So. 3d 886 (Fla. 3d DCA 2012) ("Aubin 3d Dist.")], *Kohler*, and *Agrofollajes*, which adopted and applied the Third Restatement.")

Notably, *Agrofollajes* involved a fungicide that had a complex design; the plaintiff alleged, as one theory:

> Benlate DF broke down into DBU. Under the DBU theory, the plaintiffs claimed that Benlate DF was exposed to heat and moisture, which caused the benomyl in Benlate DF to produce two molecules "MBC" and "BIC." The plaintiffs claimed that when the BIC molecule is exposed to heat and moisture, butylamine is formed. Butylamine then bonds with BIC molecules remaining in the product to form dibutylurea (DBU). The plaintiffs alleged that DBU acted as an herbicide to damage plants. In addition, the plaintiffs claimed that the DBU increased as the Benlate DF aged and that Benlate's exposure to hot and humid climates, such as in Costa Rica, accelerate the breakdown process.

*Agrofollajes v. E.I. Du Pont de Nemours & Co.*, 34 Fla. L. Weekly 2578 *13-14 (Dist. Ct. App. 2009). It cannot be argued that any reasonable user of the fungicide had reasonable expectations about the temperatures and moisture levels at which

various molecules would form harmful byproducts. Under these facts, a distinction for medical devices does not make sense.

The cases relied on by Defendants also do not support Defendants' position. Those cases were generally decided before *Aubin*, and many relied on disapproved cases. They therefore did not have the benefit of *Aubin's* explanation rejecting the Third Restatement test because it "eliminates consideration of consumer expectations, the linchpin of the Second Restatement." *Id.* at 507.

The key case Defendants rely on—*Cavanaugh*— is distinguishable in three ways. *Cavanaugh v. Stryker Corp.*, 308 So. 3d 149, 156 (Fla. Dist. Ct. App. 2020). *First*, although the claims in *Cavanaugh* included negligent design, the court specifically distinguished *Aubin*, in which the entire discussion involved the test for strict liability. The *Aubin* court rejected the Third Restatement's approach precisely because it blurred the distinction between strict products liability and negligence claims. *Aubin*, 177 So. 3d at 506. The *Cavanaugh* case should therefore be read to apply to strict liability claims, and even then, only with a particular class of medical devices, as explained below.

*Second*, the court specifically noted that the proposed instruction was not accurate and potentially misleading under the "specific facts" of the case. *Id.* The court did not create a blanket rule that medical devices as a category were too

14

complex. Quite the opposite: it noted "we do not hold that complexity alone is necessarily enough to preclude the application of the consumer expectations test." *Id.* at 155 n. 4 (quoting *Jackson v. Gen. Motors Corp.*, 60 S.W.3d 800, 806 (Tenn. 2001) for the proposition that the consumer expectations test is appropriate where "familiarity of the product's performance by consumers is sufficient to allow consumers to form reasonable expectations of the product's safety"). *Cavanaugh* described the *Aubin* rule as holding that "a plaintiff may elect to prove a design defect claim under the consumer expectations test in *any case where an ordinary consumer could form expectations about the product at issue*." *Id.* at 155 (emphasis added). That is precisely the case here, where, as noted above, doctors explain the risks and benefits of the G2 filter to patients. In contrast to the facts here, however, the consumers did not actually use the Neptune 2 device at issue in Cavanaugh; the Neptune 2 was available only "incident to" a medical procedure "'intended to collect and dispose of surgical fluid waste.'" *Id.* at 150. "[T]he Neptune 2 was never marketed to ordinary consumers. Ordinary consumers would not be purchasing the Neptune 2 and would not have formed expectations regarding the product." *Id.* at 155.

  *Finally*, the *Cavanaugh* case was reviewed under an abuse of discretion standard. *Id.* The appeals court affirmed the trial court because "The Plaintiff's

proposed instruction as written would have been misleading to the jury." The court had no occasion to consider a consumer expectation test absent the strict liability claim, nor modified to refer to the learned intermediary, which, the court signaled, it likely would have agreed to: "the standard instruction would need to be modified in order to inform the jury that the relevant expectations are those of the health care professional." *Id.* In sum, the while the *Cavanaugh* court leaves open the possibility that a court may decline to give the consumer expectations test in limited circumstances, that rule should apply where there is both a strict liability claim and a product that is not used by a patient, neither of which applies here. Even then, it would likely be appropriate to give Plaintiffs' alternative-proposed instruction—the consumer expectations test modified to refer to the learned intermediary.

The *Tillman* case is even less instructive because the court relied on the three cases expressly disapproved of in *Aubin*, and decided the consumer expectation issue in the context of a denial of summary judgment, so that result was not outcome-determinative. *Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1338 1344, 1345 (M.D. Fla. 2015) (citing *Aubin (3d Dist.), Agrofollajes*, and *Kohler*, noting design defect definition in "state of flux," and denying summary judgment under risk/utility test without analyzing outcome under consumer-expectation test). *See also Rydzewski v. Depuy Orthopaedics, Inc.*, No. 11-80007-Civ, 2012 U.S. Dist. LEXIS

187963, at *9 (S.D. Fla. Aug. 13, 2012) (similarly pre-*Aubin*, denying summary judgment, so not outcome determinative, and without argument by plaintiff that consumer expectation test applied); *In re Fosamax Prods. Liab. Litig.*, 742 F. Supp. 2d 460, 470 n.4 (S.D.N.Y. 2010) (relying on earlier decision—*In re Fosamax*, 2010 U.S. Dist. LEXIS 33260, 2010 WL 1257299, at *6 n.4—which in turn relied on disapproved of *Agrofollajes*, and in context of denying rule 50 motion, so not outcome determinative).

To the extent Defendants claim that *Aubin* did not address prior case law that suggested that the consumer expectation test does not apply where a product's design is beyond the ability of a reasonable consumer to comprehend, that contention is contradicted by the record. The *Agrofollajes* case was specifically disapproved of, in which the defendants objected "that the 'consumer expectation' test could not be used as an independent basis for finding a product defective, especially in the case of a complex product like Benlate." *Agrofollajes* 34 Fla. L. Weekly 2578 at *59. Surely the designs of both SG-210 Calidria (*Aubin*) and Benlate DF (*Agrofollajes*) could be characterized as beyond the ability of a reasonably consumer to comprehend.

Importantly, *Aubin* approved the standard consumer expectation instruction and disapproved of *Agrofollajes*—in which the product was alleged to be complex—

without finding that the language should be modified for learned intermediaries. This makes sense because it is the expectations of the <u>users</u> of products (and those injured by them), whether complex medical devices, or other, that is important, and that the *Aubin* court was concerned with. *Id.* at 506 (quoting Wisconsin case favorably that explained risk/utility test "increases the burden for injured consumers not only by requiring proof of the manufacturer's negligence, but also by adding an additional— and considerable—element of proof to the negligence standard."); *Id.*at 518 ("end user's knowledge, is the focus of Florida's strict liability law").

The defendant in *Aubin* made precisely the argument Defendants make here— in fact more strongly—that an ordinary consumer of its product could not form any expectations about the product at issue. *Aubin*'s holding that the consumer expectations test applied, therefore, should be read to apply even when there is a purportedly "complex" product at issue.

On the facts here, a reasonable patient-consumer could reasonably expect that the G2 filter would be no less safe than other available options, and the jury could find that the G2 filter is defective if it failed to perform to that standard. The consumer expectations test is, therefore, an appropriate instruction in the case at bar.

To the extent the court disagrees, then Plaintiffs respectfully request that the court grant an instruction modified to refer to the reasonable expectations of

implanting physicians. Recently, a court in this District predicted that the Florida Supreme Court would permit the consumer expectation test, modified to refer to the reasonable expectations of doctors who use filters as learned intermediaries. It concluded that the argument that medical devices are complex does not alone mean Florida has abandoned that test for medical devices:

> [T]he aforementioned cases cited by [Defendant] were decided before *Aubin*, and there, the Florida Supreme Court reversed an appellate court decision for requiring plaintiff to provide evidence of a reasonable alternative design and adopting the risk utility test to the exclusion of the consumer expectation test. In its decision, the Florida Supreme Court emphasized the role manufacturers play "in crafting the image of a product and establishing the consumers' expectations for that product, a portrayal which in turn motivates consumers to purchase that particular product." And because of this, the consumer expectation test—as opposed to the risk utility test—rightfully places the burden on manufacturers, not injured consumers. Furthermore, the Florida Supreme Court has "rejected applying legal principles that are inconsistent with this general philosophy."
>
> The parties do not cite—nor is the Court aware of—any case post-*Aubin* that does not utilize the consumer expectation test for medical devices. However, [Defendant's] argument is not without merit. Medical device manufacturers generally do not market their products to "ordinary consumers." Rather, medical device manufacturers promote and advertise their products to intermediaries, such as hospitals, physicians, and other trained medical professionals. However, this, alone, does not warrant departure from the consumer expectation test. Merely relying on who a manufacturer markets its products to does not overcome one of the main policy justifications in *Aubin*—maintaining the burden on the manufacturer as opposed to the injured consumer. Therefore, the Court must consider the ordinary consumer's expectation in its design defect analysis.

*Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1271 (S.D. Fla. 2020) (quoting *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 498 (Fla. 2015) (citations omitted and cleaned up). To the extent the Court does not agree that the standard consumer expectations test can be given, Plaintiff respectfully requests the test be modified to refer to the reasonable expectations of a doctor who implants IVC filters.

**C) State-of-the art instruction not applicable**

The state-of-the art instruction proposed by Defendants is not appropriate here because it applies to strict liability, not design defect. "[T]he Court has not come across a product liability case founded only in negligence that states such an instruction is required. Rather, this instruction appears where the products liability action is based on both strict liability and negligence counts or where only a strict liability claim is before the jury." *Crawford v. Itw Food Equip. Grp.*, No. 3:16-cv-1421-J-25PDB, 2019 U.S. Dist. LEXIS 234170, at *26 (M.D. Fla. Feb. 13, 2019).

**D) Defendants have insufficient evidence of alleged negligence and failure to mitigate by Mr. Mixson.**

Defendants propose to have the jury consider whether Mr. Mixson was contributorily negligent and failed to mitigate his damages. Plaintiffs, however, anticipate that Defendants will not have presented sufficient evidence for the jury to consider this issue, beyond speculation. Defendants propose that Mr. Mixson should have had the filter removed sooner, but have no evidence that any doctor told him

that another attempted percutaneous removal was prescribed. To the contrary, Mr. Mixson's doctors told him at various times in between 2007 and 2013 "not [to] worry about the filter anymore," (**Exhibit B**, Morris report, p. 16), "The filter is not retrievable percutaneously at this point and surgical removal requires IVC replacement therefore, I would leave filter as is and not pursue any attempts at removal unless clinically indicated by development of complications from the filter." (Morris Report, p. 9). His surgeon also told him: "the IVCF was turned sideways and the surgery to remove it could potentially be fatal." (Morris Report, p. 6). In November 2008, "Dr. Streiff stated that, 'At this late date another attempt to remove the filter is not advisable.'" (Morris Report, p. 6). In 2009, he was told: "The risks of excising such a filter are considerable as the magnitude of surgery is quite significant." (Morris Report, p. 7). Dr. Morris also opined that it was reasonable for Mr. Mixson to not remove the filter. He also explained that "Mr. Mixson should have been referred to a center that had experience at removing IVCFs using complex techniques, such as the use of endobronchial forceps." (Morris Report, p. 16). This last statement illustrates the problem with Defendants' contention that the jury should evaluate Mr. Mixson's alleged negligence in not removing the filter. How could Mr. Mixson have known, or the jury conclude, that his doctors should have referred him to a specialist? No such specialist is even identified by Dr. Morris, who

is using 20/20 hindsight. (It is implied that Dr. Kuo may be a specialist who could potentially make another removal attempt, but the evidence relied on is from a paper published in 2020).

Because the decision to remove the filter involves a complex medical decision, the jury should not be permitted to speculate about whether Mr. Mixson was negligent or should have mitigated damages when he followed his doctors' advice. In the absence of competent expert testimony on this point, comparative negligence and mitigation instructions should not be submitted to the jury.

Likewise, no doctor or expert opined that Mr. Mixson was not reasonably prudent in his level of activity. Without expert opinion that Mr. Mixson should take steps to avoid any trauma to the filter, whether he should do so would involve impermissible speculation by the jury. So too with the issue of causation: whether his falls contributed to the filter malfunction is not supported by expert opinion. Mr. Mixson's actions were reasonably foreseeable, and Defendants can properly be held responsible for those actions.

To the extent the Court finds that a mitigation of damages instruction is appropriate, the version proposed by Bard uses an incorrect standard. Under Florida law, there is no duty to mitigate damages, so the statement to that effect should be stricken, and the version proposed by Plaintiffs used in its place.

DATED this 1st day of March, 2023.

/s/ *Ramon Rossi Lopez*
Ramon Rossi Lopez
(CA Bar No. 86361)
Admitted *Pro hac Vice*
LOPEZ McHUGH LLP
120 Vantis Dr. Ste. 430
Aliso Viejo, CA  92656
(949) 737-1501 - Telephone
(949) 737-1504 - Facsimile
rlopez@lopezmchugh.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of March, 2023, I caused to be served through the ECF system a true and legible copy of the foregoing document upon the following:


*/s/ Ramon Rossi Lopez*
Ramon Rossi Lopez