# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

JOSEPH CATLIN MIXSON

     Plaintiff,

v.

C. R. BARD, INC. and BARD
PERIPHERAL VASCULAR, INC.,

     Defendants.

Case No.: 1:21-cv-00030-AW-MJF

## FINAL PRETRIAL ORDER

The Parties, Plaintiff Joseph Catlin Mixson ("Plaintiff") and Defendants C. R. Bard, Inc. ("C. R. Bard") and Bard Peripheral Vascular, Inc. ("BPV") (C. R. Bard and BPV are collectively referred to herein as "Bard" or "Defendants"), pursuant to the Court's Order for Pretrial Conference (Docs. 56, 85), file this Joint Final Pretrial Statement.

### A.   BASIS OF FEDERAL JURISDICTION

The Court has original jurisdiction under 28 U.S.C. § 1332(a)(1) because the Parties are of diverse citizenship and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.  Plaintiffs are citizens and residents of Florida; C. R. Bard, Inc. is a citizen of New Jersey; and Bard Peripheral Vascular, Inc. is a citizen of Arizona.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

**B.   CONCISE STATEMENT OF THE NATURE OF THE ACTION**

**The parties proposed statement of the case to be read to the jury is Doc. 154.**

This is a product-liability action by Joseph Mixson to recover for injuries and damages allegedly caused by a Bard G2® Filter (a prescription medical device) that was implanted in Mr. Mixson on September 18, 2007.

Virginia Mixson's claims are dismissed pursuant to an agreement of the parties. (Doc. 150).

Plaintiff's only remaining claim is one for negligent design.  Plaintiff alleges and must prove that Bard was negligent in its design of the G2 Filter, that there was a design defect with the G2 Filter as a result of that negligence, and that the alleged design defect and negligence proximately caused Plaintiff's alleged injuries.

Bard denies that (1) it negligently designed the G2 Filter, (2) the G2 Filter was defective in design as a result of that negligence, (3) any alleged negligence and defect proximately caused Plaintiff's alleged injuries, and (4) Plaintiff has suffered any injuries or damages caused by the G2 Filter.

C.    **B**RIEF **G**ENERAL **S**TATEMENT OF **E**ACH **P**ARTY'S **C**ASE

1.    **Plaintiff's Brief Statement of the Case**

This case involves a G2 filter that could not be removed, migrated, tilted, perforated Mr. Mixson's IVC with struts penetrating into his spine, duodenum, and near his aorta, and then fractured.

Mr. Mixson was serving in the Army in Iraq in 2007 when his convoy was hit by a roadside bomb. Mr. Mixson was fortunately blown from the truck, which caught fire, but suffered substantial injury; his legs were amputated in the Green Zone in Baghdad. From Iraq, he transferred to Brooke Army Medical Center in Texas, where the G2 filter was implanted on September 18, 2007.

At the time of implantation, the G2 filter was cleared for and indicated for permanent placement. Defendants also marketed another permanent filter (the Simon Nitinol Filter, or SNF filter) that had been on the market since the 1990's and had long track record with few device failures. Although the SNF filter was designed for permanent placement, it, like the G2 filter, could be removed percutaneously.

Mr. Mixson's doctors attempted to remove his filter on October 1, 2007. That attempt was unsuccessful. Another attempt was made on May 28, 2008, also unsuccessful. In the intervening years, Mr. Mixson continued to have the filter evaluated. His doctors told him in 2007 "not worry about the filter anymore." In July 2008 he was told "the IVCF was turned sideways and the surgery to remove it could

3

potentially be fatal." In November, he was told, "At this late date another attempt to remove the filter is not advisable." In July 2009, Dr. Freezor wrote: "The risks of excising such a filter are considerable as the magnitude of surgery is quite significant." By November 2013, doctors explained: "The filter is not retrievable percutaneously at this point and surgical removal requires IVC replacement therefore, I would leave filter as is and not pursue any attempts at removal unless clinically indicated by development of complications from the filter." Defendants' expert conceded that it was reasonable for Mr. Mixson to leave his filter in place and not to monitor it.

In addition to the inability to remove the filter, and potentially fatal outcome from continued attempts, Mr. Mixson's filter malfunctioned in other ways. It migrated downwards. The head embedded into his IVC, and multiple struts perforated his IVC. Multiple struts are interacting with his duodenum and may be penetrating it, one strut is near or in the aorta, and another strut has caused a reactive osteophyte (reaction of bone) of approximately 5mm in his spine. In addition, at some point between 2011 and 2013, a strut fractured.

Mr. Mixson complains of back pain, which is likely caused by the osteophyte, and also complains of intermittent pain when he twists. He has fear and anxiety that the filter or a fractured strut will cause his death either by migrating into his heart, or from complications if he undergoes further removal attempts.

4

Regarding whether Defendants acted reasonably in designing the G2 filter, Defendants knew of and concealed problems with its G2 filter in the months leading up to Mr. Mixson's implantation. They concluded in 2006 that the G2 filter migration was "critical" and may prevent the filter from stopping blood clots, and that migration posed an "unacceptable" risk. Defendants also concluded that migrations were accompanied by significant tilting and limb displacement, that the malpositioned struts may increase the likelihood of strut fracture or penetration with potential consequences leading to serious injury or death, and that these migrations may be asymptomatic, making this phenomenon not obvious (recognizable) to physician or patient.

Defendants also did not conduct any clinical testing of the G2 filter before marketing it. They relied on clinical and bench testing of the predecessor filter, the Recovery filter. By the time the G2 filter launched, Defendants knew or should have known that the design was defective based on the performance of the Recovery filter. The Recovery filter had more complications than all other filters on the market. Defendants believed that the high rate of fractures was caused by weakness at the weld. Fatigue testing was conducted before sterilization, which could weaken the device. The Recovery filter failed its migration bench testing, even at an acceptance criterion that Defendants understood was too low. It re-ran the test at a temperature above normal body temperature, which resulted in a statistically significantly better

result. Still, many individual results failed the acceptance criteria. The Recovery filter also performed worse on migration resistance testing than the SNF and competitor filters. Once on the market, the Recovery fracture rate was approximately 10 times higher than other filters on the market; Defendants predicted the filter would tilt in up to 30 percent of implantations. They determined that the migration and fracture rates were "unacceptable", which would require a redesign.

Although Defendants made changes to the G2 filter, they did not validate the design changes or conduct sufficient additional testing. They did not run several bench tests that had been performed on the Recovery filter, and one bench test failed its acceptance criteria. Plaintiff's engineering expert will testify that all of the testing was inadequate to ensure the filter was properly designed and would have acceptable performance. For example, the only fracture testing conducted resulted in a break after approximately 650 movements of a filter arm.

The performance of the G2 filter immediately after launch provided evidence that the design remained defective. At launch, Bard predicted the G2 filter would penetrate the IVC and cause patient injury 10 to 75 times more often than the SNF. In fact, perforation occurred 15 times more, and migration 115 times more. Bard's expert, interventional radiologist Dr. Moni Stein, was asked: "If Bard had internal information that the G2 . . . [was] not as safe and effective as the Simon Nitinol filter, can we agree that Bard should not, in your opinion, have brought those devices

6

to market?" He testified: "It's . . . an unlikely hypothesis, but I think that if the company had bad information of bad performance and serious safety concerns, bringing a product to the market would be outrageous." He believed there was no acceptable rate for filter fracture.

Defendants also had specific knowledge about unaddressed design issues. In January 2006, Defendants initially determined that they could change the G2 filter to improve caudal migration by the end of 2006 (at the expense of not addressing fracture and perforation), and that "major filter modifications" sufficient to address caudal migration, fracture, and perforation, could be designed, tested, and launched by early 2007. Instead, they decided to address a more visible deployment issue, and focus on a retrievability indication before addressing caudal migration.

Bard decided not to address caudal migration (and fracture and perforation) because if it did so, it would alert the FDA, and "the FDA will not give us approval for a device that has problems with caudal migration." Defendants' Senior Regulatory Affairs Specialist determined that if the FDA found out about this issue, it would cause the FDA to recall their filters currently on the market (i.e., the G2 filter). Ultimately, Bard's attempt to address caudal migration (the Meridian) was launched mid-2011, while its attempt to address perforation and fracture was launched in 2013.

In February 2006, Bard's medical director, Dr. Ciavarella, reviewed 9 caudal migration complaint reports, 70% of which were found tilted or in an anatomically suboptimal position "raising questions about primary effectiveness." The next month, Defendants' employees questioned whether a finite element analysis had been conducted on the G2 filter to evaluate that its design was proper. Defendants did not do a G2 finite element analysis, a basic design and engineering analysis to evaluate new designs.

Defendants also recorded more perforation with the G2 filter than with the Recovery. And the EVEREST study showed migrations in 66% of retrievals, a tilt rate of approximately 20%, and with just 48 patients evaluated, one fracture (i.e. 2%, or 20 times higher than represented).

Bard also understood by May 2006 that the Greenfield filter had added "caudal anchors" successfully. Caudal migration was prevented after a 30% rate before the redesign. Fracture would have been eliminated or reduced by "breaking, curving, or chamfering the edge" of the G2 cap, or by eliminating "fretting of the limbs with each other." Other design features borrowed from the Simon Nitinol Filter would have reduced perforation, tilt, and the severity of fracture, e.g., higher stiffness of the petals of the SNF compared to the arms of the Recovery and G2 filters; the fact that the SNF has 2 sleeves so it can tilt without the legs having to tilt very much, and making alternating strains in the petals of the SNF very small,

making fatigue fracture unlikely, petal arms make it less likely to perforate; and if a petal arm fractures, the pieces of the broken wire remain attached to the filter.

In response to Bard's contentions below, Plaintiff responds that although Defendants argue that the SNF and Greenfield filters were permanent, not only could the SNF filter be removed, but it would have been a safer and more effective alternative because it would have continued to provide protection to Mr. Mixson, whereas the G2 filter, which is tiled and fractured, is not properly positioned to prevent clots from reaching Mr. Mixson's lungs; it may, in fact, be putting Mr. Mixson at increased risk for blood clots.

According to Dr. Goei, in 2007, the safest, best designed filter was probably the Greenfield filter.

Defendants rely on published papers referred to as the "SIR Guidelines," to argue that the G2 filter performance was acceptable. But the information published in those guidelines is from the 1990s and is not relevant to the choices Dr. Goei had when implanting Mr. Mixson's filter. Moreover, there is no evidence that Dr. Goei was aware of the "guidelines" or relied on them. To the contrary, he testified that the rates listed there would not be acceptable to him. Likewise, the FDA's purported recognition that filter failures are " 'well known to the users' " is irrelevant for the same reasons, also irrelevant are Defendants' claims that the G2 filter was cleared for retrieval after Mr. Mixson retrieved his filter, and that purportedly "no regulatory

9

body or medical society has ever declared that the risks associated with the G2 Filter extended beyond those already known by the medical community."

Defendants argue filters are lifesaving devices, but present no evidence that the G2 filter saved lives. Moreover, that a filter might save someone's life is not relevant because it does not show Mr. Mixson's G2 filter provided any benefit to him.

At trial, Defendants will not be able to meet their burden of proof that Mr. Mixson was negligent or that any of his actions were a superseding cause of the filter failures.

## 2. Defendants' Brief Statement of the Case

### A. The G2 Filter Provides Life-Saving Protection from Blood Clots.

The G2 Filter is a life-saving prescription medical device. The filter is placed by surgeons and interventional radiologists in a patient's inferior vena cava ("IVC"). The G2 Filter and other IVC filters were developed to prevent large blood clots from causing pulmonary emboli ("PE"), a life-threatening event and well-recognized cause of sudden death.

The G2 Filter is constructed of a nickel-titanium alloy called Nitinol. It is conical in shape and consists of a main shaft and twelve struts (six "arms" and six "legs").

10



Once the G2 Filter is deployed, its arms and legs open and anchor into the walls of the IVC. It then acts to catch blood clots that could otherwise flow into the heart or lungs. IVC filters are indicated for use, among other reasons, to prevent pulmonary thromboembolism when anticoagulants are contraindicated or for emergent use if the anticipated benefits of conventional therapy, such as anticoagulation, are reduced.

    B.  <u>The G2 Filter, Like All IVC Filters, Carries Inherent, Well Known Risks that Are Associated with All IVC Filters.</u>

As with all implantable medical devices, IVC filters carry certain risks. The risks of filter tilt, perforation, migration, and fracture are well known in the medical community to occur in all types of IVC filters. For example, the Society of Interventional Radiology ("SIR"), which is the international organization for interventional radiologists, publishes guidelines relating to IVC filters. According to the SIR guidelines published in 2001 and again in 2003,[1] as a class of device, IVC

---

[1] *See* Clement Grassi et al., *Quality Improvement Guidelines for Percutaneous Permanent Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, 12 Journal of Vascular and Interventional Radiology 137, 139 (2001); Clement Grassi et al., *Quality Improvement Guidelines for Percutaneous Permanent*

filters have been reported to penetrate up to 41% of the time, migrate[2] up to 18% of the time, fracture up to 10% of the time, and tilt and have other insertion problems up to 50% of the time.  Similarly, since the mid-1990s, the FDA has recognized that the risks of perforation, tilt, fracture, and migration are associated with all brands of IVC filters, noting that these risks are "well known to the users" (i.e., doctors who implant IVC filters) and are "well characterized in the medical literature."[3] Notably, Bard's internal rates of complications for the G2 Filter for fracture, perforation, tilt, and migration are and have been well below 1%.

## C.   The Design and Regulatory History of the G2

Because the G2 Filter is a prescription medical device, Bard was required to obtain clearance from the United States Food and Drug Administration ("FDA") to market the G2 Filter through what is known as the 510(k) process, which is part of the Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic

---

*Inferior Vena Cava Filter Placement for the Prevention of Pulmonary Embolism*, 14 Journal of Vascular and Interventional Radiology S271, S273 (2003).

[2]The SIR Guidelines define migration a "change in the filter position compared to its deployed position (either cranial or caudal) more than 2 cm as documented by plain film imaging, CT, or venography."  In this case, both parties' experts agree that any movement was less than 2 cm.  As a consequence, there is not a true migration in this case.

[3]*See December 1996 FDA Memorandum Reclassification of Cardiovascular Intravascular Filters*, BPV-17-01-00262283-292.)

Act. The G2 was originally cleared by the FDA on August 29, 2005 as a permanent

filter. On January 15, 2008, the G2 Filter was cleared for optional retrieval.

Before making the G2 Filter available for physicians to prescribe and place in

their patients, Bard thoroughly and rigorously tested all aspects of the device. Bard's

regulatory expert will testify at trial that Bard complied with all applicable standards

and regulations in bringing the filter to market and at all times thereafter.

Additionally, the evidence at trial will show that the G2 Filter's complication rates

are low and no higher than other filters on the market as published in the medical

literature, and no regulatory body or medical society has ever declared that the risks

associated with the G2 Filter extended beyond those already known by the medical

community.

D. Plaintiff's Medical Course

Mr. Mixson (at age of 21) was implanted with a G2 Filter on September 18,

2007, at Brooke Army Medical Center in Texas. After bilateral leg amputations, Mr.

Mixson developed DVT and pulmonary embolism ("PE"), a potentially fatal

condition in which blood clots travel to the heart and lungs. The G2 was implanted

in his IVC to help prevent further PE. The implanting physician specifically wanted

a filter, such as the G2 Filter, that was designed to be retrieved so it could be removed when Plaintiff was no longer at risk for PE/DVT.[4]

Because Mr. Mixson had also sustained a skull fracture, he could not be placed on anticoagulants. Months later, on May 28, 2008, Plaintiff presented for planned removal of the filter through a minimally invasive procedure, but the filter could not be removed, as it was adhered to the caval wall. Plaintiff claims that the Filter was defective because, after placement, it allegedly tilted, perforated his IVC, could not be retrieved, and later fractured. However, the complications that Plaintiff allegedly experienced were well known and accepted risks associated with all IVC filters, not just the G2 Filter, given their life-saving nature.

As to his damages, Plaintiff's doctors have diagnosed no physical symptoms attributable to the Filter. Given his lack of symptoms relating to the G2 Filter and

---

[4] Plaintiff contends that Dr. Goei, the implanting physician, could have implanted the Bard Simon Nitinol Filter (SNF) as an alternative to the G2 Filter, but Dr. Goei, testified that he thought the SNF was inferior to the G2. Plaintiff also contends that the Greenfield Filter was an alternative because Dr. Goei testified he believed it to be the safest filter at the time. Dr. Goei, however, further testified that he specifically avoided the Greenfield for Mr. Mixson because it was not retrievable. Therefore, the SNF and Greenfield filters are not alternative options given that Dr. Goei specifically chose a filter that was designed to be retrievable, such as the G2, which was particularly beneficial for patients who are young such as Mr. Mixson. While it is true that there have been some instances of retrieval of the SNF, those instances are rare, complex, and recently developed procedures. Moreover, Plaintiff produced no expert testimony that either of these purported alternative options would have prevented his injuries, particularly given that the basis of his claim is that his filter cannot be retrieved and both the SNF and Greenfield were designed to be permanent filters. In short, based on the testimony of the implanting physician and the evidence in this case, it is undisputed that the SNF and Greenfield filters were not potential alternative options for Dr. Goei to implant in Mr. Mixson.

the "low probability" that he will develop eventual problems with the filter," his treating doctors have recommended against removal of the filter and routine surveillance of the filter through CT scans or other imaging.  If desired, Plaintiff's G2 Filter could potentially be retrieved through a minimally invasive procedure by one of the hospitals across the country, including in Florida, that specialize in complex filter retrieval. Bard's expert is expected to testify that both leaving the filter in place or pursuing retrieval are reasonable depending on Plaintiff's anxiety level regarding either option.

At trial, Plaintiff will not be able to meet his burden of proof that Bard negligently designed the G2 Filter, that the G2 Filter was defective in design as a result of negligence, that any alleged negligent design and design defect was the proximate cause of his injuries, or that Mr. Mixson suffered any injuries or symptoms relating to the complications he experienced with the G2 Filter.

### D.   TRIAL EXHIBITS LISTS.

The parties are to file their respective Amended Exhibit lists with Objections.

Order on the Parties' Stipulation Regarding Exhibits

The parties reserve the right to use demonstrative slide decks not yet prepared during opening and closing statements, to the extent allowed by the Court.

The Court finds that Parties shall exchange PowerPoint presentations and exhibits to be used in opening statements by 9:00 p.m. the night before the opening

statement is to be given and will provide the opposing party with any objections to those slides and exhibits by 7:00 a.m. on the day of opening statements.

The Court finds that the Parties shall exchange PowerPoint presentations and exhibits to be used in <u>closing</u> arguments by midnight the night before it is given, with clearly delineated updates allowed 2 hours prior to closing and will provide the opposing party any objections they have to those slides and exhibits by 7:00 a.m. on the day of closing statements.

The Court finds that the Parties shall exchange any demonstrative exhibits to be used with a witness by 9:00 p.m. on the day before the demonstrative exhibits will be used with the witness and will provide the opposing party with any objections they have to those exhibits by 7:00 a.m. on the day the witness will testify.

The Court accepts the Parties' stipulation that the opposing party will be allowed to add up to 25 exhibits that have not previously been disclosed in exhibit lists, and finds that any additional exhibit shall be disclosed to the opposing party not later than 7:00 p.m. the night before the exhibit is used.

### E.   WITNESS LISTS (INCLUDING REBUTTAL AND EXPERTS)

#### 1.   Parties' Agreements Regarding Witnesses:

The Court finds that that trial witnesses who will testify live at trial shall be named to the other party at least 48 hours before the witness is called to testify and

that exhibits to be used with each such witness shall be disclosed by 9:00 p.m. the evening before the witness is called to testify.

The Parties Proposed Procedure for Deposition designations and rulings (Doc. 151) is adopted by the Court.

The Court finds that the offering party shall provide to the opposing party the final portions of the transcript to be read/played, the final edited video of any deposition to be played, and the final edited transcripts applying all rulings and withdrawn testimony, and the exhibits the offering party intends to introduce through the deposition testimony by 7 p.m. the night before the witness is called and the deposition played or read. The Court further finds that no party has an obligation to review any deposition designation submitted after 10 p.m. until the following day.

Plaintiff's proposal to call Bard's witnesses in their case-in-chief remotely or, in the alternative, to leave Plaintiff's case open and have the ability to exceed the scope of direct examination is **DENIED**.

### 2. <u>The Parties' Deposition Designations</u>:

The Parties shall follow the procedure as outlined in Doc. 151.

Plaintiffs' request to display the transcript with the video depositions using colors to show the party that made the designation is DENIED.

**3.  Plaintiff's Witness Lists**:

    (a)    <u>Case Specific Fact Witnesses and Treating Physicians</u>

        **1. Plaintiff Joseph Mixson**

        **2. Virginia Mixson**
          Spouse of Mr. Mixson.

        **3. Joseph Johnson Mixson, Jr.**
          Mr. Mixson's father

        **4. Karon Mixson**
          Mr. Mixson's mother

        **5. Brady Screws**
          Mr.  Mixson's friend

        **6. Anthony Goei, M.D.**
          Dr. Goei is the physician who placed the subject filter
          and attempted to retrieve the device.

        **7. Sandra Jean-Charles, M.D.**
          Dr. Jean-Charles has been a treating physician of Plaintiff
          and provided treatment relating to his filter.

        **8. Salvatore Scali, M.D.**
          Dr. Scali has been a treating physician of Plaintiff and
          provided treatment relating to his filter.

        **9. Chris Siller**
          Mr. Siller sold G2 filters to Dr. Goei's hospital.

    (b)    <u>Defendant's corporate witnesses:</u>

        **1. Dr. Guillermo Altonaga**
        **2. Dr. David Ciavarella**
        **3. Dr. Krishna Kandarpa**
        **4. Janet Hudnall**

5.  **Robert Carr**
6.  **Natalie Wong**
7.  **Kimberly Romney**
8.  **Jack Sullivan**
9.  **Christopher Ganser**
10. **Michael James Kelly**
11. **Dr. Donna Bea Tillman**
12. **Dr. Christine Brauer**
13. **Len DeCant**
14. **Douglas Uelmen**
15. **Gin Schulz**
16. **John McDermott**
17. **Patrick McDonald**
18. **Robert Ferrera**
19. **Brian Hudson**
20. **Dr. Moni Stein**
21. **Jason Greer**
22. **Dr. Mark Moritz**
23. **Dr. Frederick Rogers**
24. **Dr. Frank Lynch**
25. **Thomas E. Ferrari**
26. **David Micky Graves**
27. **Mary Edwards**
28. **John Weiland**
29. **Robert Cortelezzi**
30. **Brian Barry**
31. **Brooke Gillette**
32. **Alison Walsh**
33. **Dr. Murray Asch**
34. **Daniel Orms**
35. **Alex Tessmer**
36. **Mark Wilson**
37. **Carol Vierling**

(c)   Plaintiff Expert Witnesses

1. **Derek Muehrcke, M.D**
   Case-specific cardiothoracic surgeon.

     **2. Robert McMeeking Ph. D.**
       Engineer

     **3. Dr. Robert Ritchie**
       Engineer

     **4. Rebecca Betensky Ph. D.**
       Biostatistics

     **5. Dr. David Garcia**
       Hematology

     **6. Dr. Tom Kinney**
       Interventional radiology

**4.   Defendants' Witness Lists:**

(a)   Case Specific Fact Witnesses and Treating Physicians[i]

     **1. Plaintiff Joseph Mixson**

     **2. Virginia Mixson**

     Spouse of Mr. Mixson.

     **3. Anthony Goei, M.D.**

     Dr. Goei is the physician who placed the subject filter and
     attempted to retrieve the device.

     **4. Sandra Jean-Charles, M.D.**
     Malcom Randall Veterans Affairs Medical Center

     Dr. Jean-Charles has been a treating physician of Plaintiff
     and provided treatment relating to his Filter.

**5. Salvatore Scali, M.D.**
Malcom Randall Veterans Affairs Medical Center

Dr. Scali has been a treating physician of Plaintiff and provided treatment relating to his Filter.

(b)   <u>Corporate and/or General Fact Witnesses</u>

**6. Robert Carr** (Corporate and Non-Retained Expert)

Mr. Carr is currently Vice President of International at BPV.

**7. Murray Asch, M.D.**

Dr. Asch is an Interventional Radiologist who was involved in a pilot study to assess the retrievability of the Recovery Filter.

**8. Andre Chanduzsko** (Corporate and Non-retained Expert)

Mr. Chanduszko is an employee of BPV working as a staff engineer.

**9. John Deford** (Corporate and Non-Retained Expert)

Dr. DeFord is former Senior Vice President of Science, Technology and Clinical Affairs of C. R. Bard.

**10. Holly Glass (subject to ruling on Motion in Limine)**

Ms. Glass was Vice President Government & Public Relations at C. R. Bard from 2002 through 2009.

**11. Chad Modra** (Corporate and Non-Retained Expert)

Mr. Modra is currently Leader, Strategic Project Management for BPV.

**12. Shari O'Quinn** (Corporate and Non-Retained Expert)

**13. Mike Randall** (Corporate and Non-Retained Expert)

Mike Randall is formerly the Director of Research and Development for BPV.

**14. Alex Tessmer (Subject to ruling on Motion in Limine)**

Mr. Tessmer is an employee of BPV and was previously employed by BPV as an engineer between 1997 and June 2005.

**15. John VanVleet** (Corporate and Non-retained Expert)

Mr. Van Vleet is a former employee of BPV. While at BPV, Mr. Van Vleet was the Vice President of Regulatory Affairs and Clinical Programs from 2007 through 2017.

**16. Natalie Wong (Corporate)**

Ms. Wong is an employee of BPV. She began working for the company in 2002 and has been the Quality Engineering Manager in Field Assurance.

(c)    <u>Expert Witnesses</u>

**1. Paul Briant, Ph.D., P.E.**

Dr. Briant is a mechanical engineer who specializes in mechanical engineering, solid mechanics, and finite element analysis (FEA) of structures, including medical devices. He is a Principal Engineer with Exponent, Inc.

**2. David Feigal, M.D.**

Dr. Feigal is Board Certified in Internal Medicine and has a Master's Degree in Public Health in the fields of epidemiology and biostatistics.

**3. Christine Brauer, Ph.D.**

Dr. Brauer is an expert in the field of regulatory affairs.

**4. Clement Grassi, M.D.**

Dr. Grassi is a medical doctor and is a Fellow of the Society of Interventional Radiology.

**5. Christopher Morris, M.D.**

Dr. Morris is currently an Attending Radiologist at the University of Vermont Medical Center and has more than two decades of clinical experience at a busy tertiary care referral center, including the placement and retrieval of IVC filters, and care and management of patients with IVC filters.

**6. Ronald A. Thisted, Ph.D.**

Dr. Thisted is a Professor in the Department of Public Health Sciences, the Department of Statistics, the Department of Anesthesia & Critical Care, the Undergraduate College, and the Committee on Clinical Pharmacology and Pharmacogenomics at the University of Chicago. He is an expert in the fields of statistics, biostatistics, mathematics, and epidemiology.

**7. All witnesses identified by Plaintiff.**

Defendants identify and reserve the right to call any witness identified on any Plaintiff's Witness List.

**F.  CONCISE STATEMENT OF THOSE FACTS THAT ARE ADMITTED AND WILL REQUIRE NO PROOF AT TRIAL TOGETHER WITH ANY RESERVATIONS DIRECTED TO SUCH ADMISSION**

(1)  The Defendants in this case are C. R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("BPV").

(2)  BPV is a wholly owned subsidiary of C. R. Bard, Inc., the parent company. Through this case and on the verdict form, the Defendants will be referred to collectively as "Bard" or "Defendants."

(3)  The product that is the subject of this lawsuit is a Bard G2 Filter designed, marketed, and sold by Bard.

(4)  The G2 Filter is a prescription medical device that is placed in the inferior vena cava, the largest vein in the human body, which leads to the heart.

(5)  The G2 Filter is intended to trap blood clots arising from the venous system in the pelvis and legs to aid in protecting against blood clots flowing into the lungs or heart.

(6)  The G2 Filter is conical in shape and consists of a main shaft to which twelve struts (six "arms" and six "legs") are attached.

(7)  The G2 Filter is constructed of a nickel-titanium alloy called Nitinol.

(8)  The G2 Filter was cleared for commercial availability through the 510(k) process outlined in the Food, Drug and Cosmetic Act ("FDCA"). [Plaintiff disputes the relevance of this evidence].

(9)  The FDA cleared the G2 Filter for commercial availability in the United States for use in patients as a permanent device on August 29, 2005. [Plaintiff disputes the relevance of this evidence].

(10)  The FDA cleared the G2 Filter for commercial availability in the United States for use in patients as a permanent device with the

option for percutaneous retrieval on January 15, 2008. [Plaintiff disputes the relevance of this evidence].

(11)   In September 2007, after undergoing bilateral leg amputations, Mr. Mixson developed deep vein thrombosis (DVT) and pulmonary embolism (PE).

(12)   Thereafter, on September 18, 2007, Mr. Mixson had a G2 Filter placed by Dr. Anthony Goei at Brooke Army Medical Center in Texas.

(13)   The Parties stipulate that Plaintiff's medical records and bills are authentic and satisfy the business records exception but reserve all other available objections.

## G.   CONCISE STATEMENT OF THOSE ISSUES OF LAW UPON WHICH THERE IS AGREEMENT

(1)   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

(2)   Venue is proper in this Court.

(3)   The Parties have entered a Stipulation Regarding Trial Evidentiary and Related Matters (Doc. 76) attached as **Exhibit C**. The Stipulation is adopted by the Court. The Parties shall comply with the Stipulation.

(4)   Based on the Court's summary judgment order relating to Defendants' motion for summary judgment, the only remaining claim in the case is one for negligent design. (Doc. 89).

(5)   MDL No. 2641 and Law of the Case:  Bard's entire line of retrievable IVC filters has been the subject of a multidistrict litigation created before the Honorable David G. Campbell, in the District of Arizona, known as the *In re: Bard IVC Filters Products Liability Litigation*, MDL 2641.

The history of the MDL and summaries of Judge Campbell's rulings on generic discovery and evidentiary issues are detailed in the Amended Suggestion of and Transfer Order (Doc. 4). The "Key Legal and Evidentiary Rulings" that Judge Campbell details beginning on page 16 should be the law of the case with respect to each case that has been remanded from the MDL, including this case. These rulings include federal preemption; privilege and work-product rulings; expert/Daubert rulings concerning many experts that Plaintiff identifies on his witness list; motions *in limine* that bear on generic issues applicable to the remanded cases, including this case; and deposition designations of various Bard corporate and expert witnesses (including one case, Sherr-una Booker, in which the plaintiff was treated with a G2 filter).

## H.   CONCISE STATEMENT OF THOSE ISSUES OF FACT THAT REMAIN TO BE LITIGATED

(1)   Whether Plaintiff is able to meet his burden of proving that the G2 Filter was negligently designed by Bard.

(2)   Whether Plaintiff must prove and is able to meet his burden of proving that the G2 Filter was defective in design as a result of that negligence.

(3)   Whether Plaintiff is able to meet his burden of proving that any alleged negligence on the part of Bard in the design of the G2 Filter combined with a defect in the design with the G2 Filter as a result of that negligence, legally caused his injuries and damages (as opposed to other potential causes).

(4)   The nature and extent of the damages, if any, sustained by Plaintiff caused by the G2 Filter.

(5)   Whether Plaintiff failed to mitigate his damages.

**I.**     <u>ISSUES OF LAW RESOLVED BY THE COURT AT THE PRETRIAL CONFERENCES</u>

(1)     The legal standard for a negligent design in a case involving a prescription medical device under Florida law:

The Court finds that to prevail under Florida law on a negligent design claim involving a complex prescription medical product like the G2, Plaintiff must prove the G2 was defective or unreasonably dangerous under the risk utility test <u>and</u> that such defect was both the result of Bard's negligence and the proximate cause of Plaintiff's injuries.

The jury will be instructed the "state of the art" defense Fla. Stat. §768.1257

The jury will be instructed using the phrase "preponderance of the evidence" as used in the 11th Circuit Pattern Instructions and not the phrase "greater weight of the evidence."

**J.**     <u>CONCISE STATEMENT OF ANY DISAGREEMENT AS TO THE APPLICATION OF RULES OF EVIDENCE OR OF THE FEDERAL RULES OF CIVIL PROCEDURE.</u>

| Filed | DKT | Motion | Ruling |
|-------|-----|--------|--------|
| 7/12/2022 | 59 | Defendants' Motion to Strike Opinions of Otherwise exclude Certain Opinions of Plaintiff's Expert Dr. Muehrcke | Based on the argument during the pretrial conference, the parties filed Doc. 154. |
| 9/26/2022 | 96 | Defendants' Motion *in limine* to Exclude Recovery Filter Migration Deaths | **Granted**. (Doc. 150) |
| 9/26/2022 | 97 | Defendants' Motion *in limine* to Exclude Evidence regarding | **Granted in part and denied in part.** All |

| | | | |
|---|---|---|---|
| | | Product Opportunity Appraisal Documents | financial information is excluded.  The Court will address the admissibility of the exhibit(s) (with financial information redacted) when it is offered at trial. (Doc. 150) |
| 9/26/2022 | 98 | Defendants' Motion *in limine* to Exclude Recovery Filter Marketing, Communications, and Other Irrelevant and Improper regarding Propensity Evidence | **Granted** as to exemplars. Other marketing material will be evaluated on a case by case basis at trial. (Doc. 150) |
| 9/26/2022 | 99 | Defendants' Motion *in limine* to Exclude Evidence regarding FDA Warning Letter | **Granted in part**– Plaintiff is not to introduce or mention Topics 3,7, and 8 of the Warning Letter. **Deferred in part** – Plaintiff is not to mention the Warning Letter until it is addressed by the Court outside the presence of the jury. (Doc. 150) |
| 9/26/2022 | 100 | Plaintiffs' Motion *in limine* to Exclude | **Granted** in part and **Denied** in |

| | | Defendants' FDA Evidence | part.  Bard's request for reconsideration remains under advisement. (Doc. 150) |
|---|---|---|---|
| 9/26/2022 | 101 | Plaintiffs' Motion *in limine* to Exclude Descriptions of Defendants' G2 IVC Filter as "Lifesaving" or "Life Extending" Devices and to Further Exclude That Its Presence in Plaintiff Had that Effect | **Denied** for the reasons stated on the record. (Doc. 150) |
| 9/26/2022 | 102 | Plaintiffs' Motion *in limine* to Preclude Bard from Introducing Internal Data Based on Reporting Rates of  Filter Complications | **Denied** for the reasons stated on the record. (Doc. 150) |
| 9/26/2022 | 103 | Plaintiffs' Motion *in limine*  to Exclude Evidence of Guidelines Created By Trade Associations, Societies, or Organizations | **Denied**. (Doc. 150) |
| 2/28/2022 | 132 | Defendants' Motion and Memorandum in support to Apply the Risk-Benefit Test as the Standard for Design Defect | **Granted** for the reasons stated on the record. (Doc. 150) |
| 3/21/2023 | 145 | Plaintiff's Motion to Reinstate Punitive Damages Claim | **Denied** for the reasons stated on the record. (Doc. 150) |

29

| 3/21/2023 | 147 | Defendants' Motion for Clarification or Reconsideration of the Court's Ruling on Doc. 100 | Under advisement. (Doc. 150) |
|---|---|---|---|

**K.** **STATEMENT AS TO WHETHER THIS IS NOW A JURY OR A NON-JURY CASE.**

The case shall be tried before a jury of 8.

**L.** **TIME LIMITS.**

Plaintiff shall have 31 hours to present his case, including opening statements and closing arguments.   Defendants shall have 29 hours to present their case including opening statements and closing arguments. The time limits include all direct and cross examination, deposition designations and sidebars as allocated by the Court.

**M.** **JURY QUESTIONNAIRE.**

The Parties proposed additional voir dire questions were filed at Doc. 157.

This 24th day of March, 2023.

Submitted by:

LOPEZ McHUGH LLP

*/s/ Joshua M. Mankoff*
Joshua M. Mankoff (admitted *pro hac vice*)
LOPEZ McHUGH LLP
214 Flynn Avenue
Moorestown, NJ 08057
T: (856) 273-8500
F: (856) 273-5802
Email: jmankoff@lopezmchugh.com

Ramon Rossi Lopez (admitted *pro hac vice*)
LOPEZ MCHUGH, LLP
120 Vantis Drive, Suite 430
Aliso Viejo, CA 92656
T: (949) 737-1501
F: (949) 737-1504
Email: rlopez@lopezmchugh.com


/S/ Mark S. O'Connor
Mark S. O'Connor (Admitted *pro hac vice*)
BEUS GILBERT MCGRODER PLLC
701 N. 44th Street
Phoenix, AZ 85008-6504
Telephone: (480) 429-3019
Facsimile: (480) 429-3100
Email: moconnor@beusgilbert.com

*Counsel for Plaintiff*

*/s/ Matthew B. Lerner*
Matthew Brian Lerner
Florida Bar No. 548618
matthew.lerner@nelsonmullins.com

Elizabeth C. Helm
Admitted *pro hac vice*
Email: kate.helm @nelsonmullins.com
James F. Rogers
Admitted *pro hac vice*
Email: jim.rogers@nelsonmullins.com

31

Dennis Andrew Hom
Admitted *pro hac vice*
dennis.hom@nelsonmullins.com
**NELSON    MULLINS    RILEY    &
SCARBOROUGH LLP**
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Tel: (404) 322-6000
Fax: (404) 322-6050

*Counsel for Defendants C. R. Bard, Inc., and
Bard Peripheral Vascular, Inc*

SO ORDERED

This ___ day of March, 2023.

_____
United States District Judge