# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF ARIZONA

 3                        No. MD-15-02641-PHX-DGC

 4    ***********************************

 5    IN RE BARD IVC FILTERS PRODUCTS

 6    LIABILITY LITIGATION

 7    ***********************************

 8

 9              DO NOT DISCLOSE

10      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11

12

13              Remote via Zoom Videotaped

14    Deposition of REBECCA A. BETENSKY, PhD, held

15    at the location of the deponent in Lenox,

16    Massachusetts, commencing at 9:07 a.m., on

17    the 10th of December, 2020, before Maureen

18    O'Connor Pollard, Registered Diplomate

19    Reporter, Realtime Systems Administrator,

20    Certified Shorthand Reporter.

21                        - - -

22

           GOLKOW LITIGATION SERVICES
23                 877.370.DEPS

              deps@golkow.com

24
```

```
1    APPEARANCES: ALL PARTIES APPEARED REMOTELY

2

3    FOR THE PLAINTIFFS:

4         JOSHUA MANKOFF, ESQ.
              LOPEZ MCHUGH LLP
5             1 International Plaza
              Philadelphia, Pennsylvania 19113
6             215-952-6910
              jmankoff@lopezmchugh.com
7
                    -and-
8
          RAMON ROSSI LOPEZ, ESQ.
9             LOPEZ MCHUGH LLP
              100 Bayview Circle
10            Newport Beach, California 92660
              949-737-1501
11            rlopez@lopezmchugh.com
12                  -and-
13       BEN C. MARTIN, ESQ.
              MARTIN BAUGHMAN
14            3141 Hood Street
              Dallas, Texas 75219
15            214-761-6614
              bmartin@martinbaughman.com
16
                    -and-
17
         MARK S. O'CONNOR, ESQ.
18            BEUS GILBERT PLLC
              701 N. 44th Street
19            Phoenix, Arizona 85008
              480-429-3000
20            moconnor@beusgilbert.com
21
22
23
24
```

```
 1   APPEARANCES (Continued):
 2   FOR THE DEFENDANTS:
 3     RICHARD B. NORTH, ESQ.
            NELSON MULLINS RILEY & SCARBOROUGH LLP
 4          201 17th Street NW, Suite 1700
            Atlanta, Georgia 30363
 5          414-322-6155
            richard.north@nelsonmullins.com
 6
                -and-
 7
       PHILIP M. BUSMAN, ESQ.
 8          NELSON MULLINS RILEY & SCARBOROUGH LLP
            101 Constitution Avenue, NW, Suite 900
 9          Washington, DC 20001
            202-689-2988
10          phil.busman@nelsonmullins.com
11               -and-
12     REBECCA A. OCARIZ, ESQ.
            GREENBERG TRAURIG
13          333 SE 2nd Avenue
            Miami, Florida 33131
14          305-579-0644
            ocarizr@gtlaw.com
15
16
     Videographer:  Jim Lopez
17
18
19
20
21
22
23
24
```

```
1                           INDEX
2      EXAMINATION                               PAGE
3      REBECCA A. BETENSKY, PhD
4      BY MR. MARTIN                              10
5      BY MR. MANKOFF                             92
6      BY MR. NORTH                              250
7
8
9            E X H I B I T S
10      NO.              DESCRIPTION                PAGE
11     Plaintiff 1        Rebecca A. Betensky's
                          Curriculum Vitae,
12                        Numbered 2448.001
                          through 2448.033.......   16
13
       Plaintiff 2        Ferrante, et al
14                        article, Tolerance of
                          high-dose (3,000
15                        mg/day) coenzyme Q10
                          in ALS................   62
16
17     Plaintiff 3        Pervez, et al
                          article, Remote
18                        Supervision of IV-tPA
                          for Acute Ischemic
19                        Stroke by
                          Telemedicine or
20                        Telephone Prior to
                          Transfer to a
21                        Regional Stroke
                          Center is Feasible
22                        and Safe..............   92
23
24
```

| 1  | Plaintiff 4  | Simon Nitinol Filter |     |
|    |              | - SNF/SL Filter Sets, |     |
| 2  |              | Design Failure Mode |     |
|    |              | and Effects Analysis, |     |
| 3  |              | Bates |     |
|    |              | BPVEFILTER-01- |     |
| 4  |              | 01725504 through |     |
|    |              | 5526, Trial Exhibit |     |
| 5  |              | 1763................... | 97 |
| 6  | Plaintiff 5  | 10/16/2003 Design |     |
|    |              | Failure Modes and |     |
| 7  |              | Effect Analysis for |     |
|    |              | the Recovery Nitinol |     |
| 8  |              | Filter, Bates |     |
|    |              | BPV-17-01-00037462 |     |
| 9  |              | through 7476, Trial |     |
|    |              | Exhibit 628........... | 99 |
| 10 |              |     |     |
|    | Plaintiff 6  | Summary table, |     |
| 11 |              | Exhibit B to Dr. |     |
|    |              | Betensky's report, |     |
| 12 |              | Trial Exhibit 641...... | 103 |
| 13 | Plaintiff 7  | Document titled |     |
|    |              | Recovery Filter |     |
| 14 |              | Adverse Events |     |
|    |              | (Migrations/Fractures), |     |
| 15 |              | Bates |     |
|    |              | BPVE-01-00436350, |     |
| 16 |              | Trial Exhibit 616...... | 109 |
| 17 | Plaintiff 8  | Chart of adverse |     |
|    |              | events, Trial Exhibit |     |
| 18 |              | 1940................... | 111 |
| 19 | Plaintiff 9  | Bard Standard |     |
|    |              | Operating Procedure, |     |
| 20 |              | Failure Mode and |     |
|    |              | Effects Analysis, |     |
| 21 |              | Bates |     |
|    |              | BPV-17-01-00190248 |     |
| 22 |              | through 272, Trial |     |
|    |              | Exhibit 5644.......... | 114 |
| 23 |              |     |     |
|    | Plaintiff 10 | Excel spreadsheet, |     |
| 24 |              | Trial Exhibit 665...... | 126 |

Plaintiff 11          Spreadsheets, Bates
                      BPVE-01-01054793
                      through 983, Trial
                      Exhibit 4306........... 146

Plaintiff 12          Dr. Betensky's
                      summary of analysis
                      and opinions on the
                      dataset, Trial
                      Exhibit 4498........... 159

Plaintiff 13          2/25/04 e-mail with
                      attachment, Bates
                      BPVE-01-00410985,
                      Trial Exhibit 2063..... 157

Plaintiff 14          Recovery Filter -
                      Femoral System,
                      Design Failure Mode
                      and Effects Analysis,
                      Bates
                      BPV-1-7-01-00139727
                      through 9749, Trial
                      Exhibit 5408........... 169

Plaintiff 15          Eclipse (Vail) Filter
                      System, Design
                      Failure Mode and
                      Effects Analysis,
                      Bates
                      BPV-17-01-00191123
                      through 1166, Trial
                      Exhibit 635........... 193

Plaintiff 16          Meridian (Eclipse
                      Anchors) Filter
                      System Design Failure
                      Mode and Effects
                      Analysis, Bates
                      BPVEFILTER-20-
                      00116514 through 577,
                      Trial Exhibit 637...... 203

    1

       Plaintiff 17          Denali Filter System,
    2                         Design Failure Mode
                              and Effects Analysis,
    3                         Bates
                              BPV-17-01-0211870
    4                         through 1950, Trial
                              Exhibit 636............   212
    5

       Plaintiff 18          Document titled
    6                         Filter Fracture
                              Complaints, Bates
    7                         BPVEFILTER-01-
                              00037664, Trial
    8                         Exhibit 614............   221

    9  Plaintiff 19          4/23/04 e-mail with
                              attachment, Bates
   10                         BPVE-01-00268632
                              through 658, Trial
   11                         Exhibit 1605...........   223

   12  Defense 1             Guidance for
                              Industry, Good
   13                         Pharmacovigilance
                              Practices and
   14                         Pharmacoepidemiologic
                              Assessment............   278
   15

       Defense 2             FDA MAUDE database
   16                         web page...............  282

   17

   18

   19

   20

   21

   22

   23

   24

```
 1                  P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now

 4       on the record.  My name is Jim Lopez.

 5       I'm a videographer for Golkow

 6       Litigation Services.

 7              Today's date is December 10th,

 8       2020, and the time is approximately

 9       9:07 a.m.

10              This remote video deposition is

11       being held in the matter of In Re:

12       Bard IVC Filters Products Liability

13       Litigation, MDL No. 02641, for the

14       United States District Court for the

15       District of Arizona.

16              The deponent is Dr. Rebecca

17       Betensky.

18              All parties to this deposition

19       are appearing remotely and have agreed

20       to the witness being sworn in

21       remotely.

22              Due to the nature of remote

23       reporting, please pause briefly before

24       speaking to ensure all parties are
```

1    heard completely.

2              Will counsel please identify

3    themselves.

4              MR. MARTIN:  Ben Martin.  I

5    represent the plaintiffs.

6              MR. MANKOFF:  Josh Mankoff

7    representing the plaintiffs.

8              MR. LOPEZ:  Ramon Lopez also

9    representing the plaintiffs.

10             MR. NORTH:  Richard North

11   representing the defendants.

12             MR. LOPEZ:  Phil Busman for the

13   defendants.

14             MS. OCARIZ:  Rebecca Ocariz for

15   the defendants.

16             THE VIDEOGRAPHER:  The court

17   reporter is Maureen Pollard, and she

18   will now swear in the witness.

19

20        REBECCA A. BETENSKY, PhD,

21   having been remotely duly identified and

22   sworn, was examined and testified as follows:

23             ///

24             ///

```
 1                      EXAMINATION

 2    BY MR. MARTIN:

 3          Q.     State your name, please.

 4          A.     Rebecca Betensky.

 5          Q.     Doctor, if you'll introduce

 6    yourself for the jury, please.

 7          A.     Sure.  I am Rebecca Betensky, I

 8    am a statistician.

 9          Q.     All right.  What do you

10    understand your role to be today?

11          A.     So I'm here today as an expert

12    in statistics and biostatistics, and my role

13    is to explain the data from a statistical

14    lens.

15          Q.     I'll ask you some questions

16    today about your background and your training

17    and education and experience to give the jury

18    an idea of your background and what you do.

19    Is that okay?

20          A.     Yes, it is.

21          Q.     All right.  Where did you go to

22    undergraduate school, Dr. Betensky?

23          A.     I went to Harvard College.

24          Q.     And where is Harvard?
```

```
 1          A.      Harvard is in Cambridge,
 2   Massachusetts.
 3          Q.      And what degree did you obtain?
 4          A.      I obtained a bachelor's degree,
 5   which Harvard calls an AB in mathematics.
 6          Q.      And did you graduate with
 7   honors?
 8          A.      I did.  I graduated with
 9   cum laude in mathematics.
10          Q.      And what was -- go ahead and
11   give the remainder of your educational
12   background that would be pertinent for us
13   today.
14          A.      So after my undergraduate
15   degree, I attended Stanford University where
16   I received a Ph.D in statistics.  And
17   following that, I did an additional ten
18   months of training as a postdoctoral fellow
19   at Stanford Medical School.
20          Q.      Would that be what we'd know as
21   a fellowship?
22          A.      Yes.
23          Q.      Could you tell us what a
24   fellowship is, and specifically what your
```

1   fellowship was at Stanford?

2       A.     So a fellowship is really an

3   additional short period of time following a

4   doctoral degree.  So in my case, it was a

5   little bit less than a year.  And the idea is

6   just to obtain additional training as a more

7   independent investigator, and to, you know,

8   to have an opportunity to master and become

9   expert in a field perhaps slightly different

10  from the field that was studied during the

11  Ph.D or doctoral degree.

12      Q.     And that fellowship was focused

13  on what exactly?

14      A.     So that fellowship -- in that

15  fellowship I focused on the analysis of

16  what's called correlated binary data.  And to

17  translate that, that just -- in my case that

18  was developing methods for analyzing breast

19  cancer and ovarian cancer outcomes in family

20  members that were ascertained on the basis of

21  one family member having ovarian cancer.

22      Q.     And did you obtain your

23  doctorate?

24      A.     I did.

1          Q.      That was at Stanford?

2          A.      That was at Stanford, yes.

3          Q.      Did your educational background

4    enable you to -- and experience enable you to

5    become a biostatistician?

6          A.      Yes.  So my training, as I

7    mentioned, was in statistics, so I was in a

8    department of statistics for my Ph.D.  Since,

9    subsequent to that, I have worked in the

10   departments of biostatistics.  And actually

11   the kind of work that I do is generally

12   always applied to biological data or

13   biomedical data or public health data or

14   health data in general, and so in that sense

15   I have also worked in biostatistics.

16         Q.      What is -- I believe that you

17   said your occupation was biostatistician, is

18   that right?

19         A.      Yes.  Sometimes I use the term

20   statistician and biostatistician

21   interchangeably.

22         Q.      I'm going to ask you about both

23   today.

24              What is a statistician?

```
 1              A.      So a statistician is someone
 2    who applies the methods and principles of
 3    statistics, the field of statistics, for use
 4    in interpreting data.
 5                      It also involves designing
 6    studies that will have proper characteristics
 7    to be able to make conclusions.  And it
 8    involves analyzing data that come from those
 9    studies, and it involves, in my case,
10    developing new methods for new situations for
11    which there currently may not be existing
12    methods that are appropriate.
13              Q.      And what is a biostatistician?
14              A.      So a biostatistician is a
15    statistician who primarily focuses on
16    applications in health.  So that could be
17    medicine, it could be public health, it could
18    be science.  So that's generally speaking.
19    It's just -- it's just referring to the areas
20    of application of statistics.
21              Q.      And is your primary focus now
22    on health, medicine, and public health with
23    respect to being a statistician?
24              A.      Yes, that has always been my
```

1    focus throughout my career.

2        Q.    All right.  What is your

3    occupation -- excuse me.

4            What is your position now,

5    nowadays?

6        A.    So I'm currently a professor of

7    biostatistics at the NYU School of Global

8    Public Health.  And I'm also the chair of the

9    biostatistics department at NYU, New York

10   University.

11            MR. MARTIN:  Thank you, Jimmy.

12       Q.    We've put on the screen the

13   first page of your CV, curriculum vitae,

14   sometimes called a resume.  So if I use the

15   term "resume" today, will you understand that

16   as being this list of your data and your

17   training, education, and experience?

18       A.    Yes.

19            MR. NORTH:  Mr. Martin, excuse

20           me one minute.  I'd like to enter an

21           objection on the record to the hearsay

22           nature of displaying the curriculum

23           vitae.  Thank you.

24            ///

1    BY MR. MARTIN:

2        Q.    And so what we'll do is go

3    through some of the resume, Dr. Betensky, to

4    assist the jury in understanding your

5    background.

6              And let me ask you first --

7    well, we'll do that in a bit.

8              MR. MARTIN:  So, Jimmy, if

9         you'll please turn to page 2 of this.

10        And we'll mark it as whatever the

11        exhibit number that will be

12        appropriate, and we can discuss that

13        at a break.

14             (Whereupon, Plaintiffs' Exhibit

15        Number 1 was marked for

16        identification.)

17    BY MR. MARTIN:

18        Q.    So this will be the first

19    exhibit in the deposition.

20             And I would turn your

21    attention, Dr. Betensky, we're going to go

22    kind of from the back forward chronologically

23    which will bring us from page 2 to page 1

24    actually on the subject of your professional

1    experience.

2              When did your professional

3    experience as a biostatistician begin?

4         A.    So when did my -- so I suppose

5    it began even before what's listed here.

6    After I graduated from Harvard, I spent a

7    year working in the Department of

8    Biostatistics at the Dana-Farber Cancer

9    Institute, one of the Harvard teaching

10   hospitals, and that really began my

11   experience in biostatistics.

12        Q.    All right.  And how long were

13   you in that position?

14        A.    About a year.

15        Q.    I see that you were assistant

16   professor in the Department of Preventative

17   Medicine and Statistics at Northwestern

18   University.  And also you were post-doctor

19   scholar as well at Stanford.

20              MR. NORTH:  Objection.

21        Leading.

22   BY MR. MARTIN:

23        Q.    By the way, Dr. Betensky, you

24   can refer to your deposition at any point

Do Not Disclose - Subject to Further Confidentiality Review

1   today.  And I'll tell you that what we'll do

2   at the start, given the objection, I'll just

3   kind of outline -- we're going to go through

4   from page 2 to page 1 on your professional

5   experience.  So if you'll pay attention to

6   those for the moment, and I'll ask you some

7   questions and let you answer them.  Okay?

8          A.     Okay.

9          Q.     So what was your position in

10  the years 1992 to 1993?

11         A.     So as I described earlier, that

12  was my postdoctoral fellowship year, so that

13  was right after I received my Ph.D from

14  Stanford.  I spent that slightly less than a

15  year, so maybe ten months, at Stanford, and

16  that was in the Division of Epidemiology,

17  which was in the Department of Health

18  Research and Policy at Stanford Medical

19  School.

20         Q.     What was your next position?

21         A.     So after my fellowship I took a

22  position as an assistant professor at

23  Northwestern University, and I had a joint

24  appointment between the Department of

Do Not Disclose - Subject to Further Confidentiality Review

1    Preventive Medicine, which was at

2    Northwestern Medical School, and the

3    Department of Statistics, which was part of

4    Arts and Sciences at Northwestern.

5         Q.    I see that in 1994 to 1999 you

6    were assistant professor in the Department of

7    Biostatistics at Harvard.  Could you tell the

8    jury what that position was?

9         A.    Yes.  So as a -- so the usual

10   progression as a faculty member in a tenure

11   track position, or a tenure track slot, is to

12   begin as an assistant professor, so that's

13   the most junior rank.  And so at Harvard

14   School of Public Health, which is where I

15   was, faculty hold the position of assistant

16   professor for approximately six years, five

17   or six years, and so, again, that's the most

18   junior position.  And the nature of the

19   position is like any other faculty level

20   position, which is to conduct research and to

21   teach, and to be involved in service to the

22   department of the school.

23        Q.    Did you serve as associate

24   biostatistician at Massachusetts General?

Do Not Disclose - Subject to Further Confidentiality Review

1          A.     Yes, I did.  So about six years

2     after I began at Harvard School of Public

3     Health, or actually maybe it was earlier than

4     that, it was probably four years, around 1998

5     or 1997 I began my first position at Mass

6     General Hospital, Massachusetts General

7     Hospital, and progressed through the ranks of

8     the position that they call biostatistician

9     there.  And so, again, I began as assistant

10     biostatistician, and then became associate

11     biostatistician, and then eventually full

12     biostatistician.

13          Q.     Dr. Betensky, in what city is

14     Massachusetts General Hospital?

15          A.     It's in Boston.

16          Q.     And what is Massachusetts

17     General Hospital?  Could you explain that to

18     the jury with respect to what it does

19     regarding the matters that you were involved

20     in, and also just describing, if you would, a

21     little bit about Massachusetts General?

22          MR. NORTH:  Objection to the

23          form.

24          A.     Sure.  Massachusetts General

1    Hospital is one of the Harvard Medical

2    School-affiliated teaching hospitals.  It's a

3    major academic medical center.  It's a top

4    hospital in the country with regard to

5    research and clinical patient care.

6             And on the research side, it's

7    a huge research enterprise at the hospital,

8    so many of the physicians are physician

9    scientists and spend much of their time

10   conducting research.  There are also many,

11   many people, many scientist who are not

12   clinicians who conduct research.

13             And so there's a group of

14   statisticians and biostatisticians who are

15   there and collaborate with the -- all of the

16   kinds of research that is conducted at the

17   hospital, and that was my involvement there.

18   I had many collaborations with many research

19   groups in many different clinical areas.

20   BY MR. MARTIN:

21        Q.     Do you believe that

22   Massachusetts General Hospital is one of the

23   top teaching hospitals in the country?

24             A.     Yeah, absolutely.  It's a top

1    teaching hospital, it's a top hospital for

2    patient care, definitely.

3         Q.    We're going to move to page 1

4    of your resume.  I see that you were

5    co-leader in the Biostatistics Program,

6    Dana-Farber/Harvard Cancer Center, and then

7    you were leader in 2005 to 2009.

8              First of all, is that correct?

9              MR. NORTH:  Objection.

10    Leading.

11    BY MR. MARTIN:

12         Q.    Okay.  Let me reask the

13    question.

14              What was the next position you

15    had in your professional experience?

16         A.    So one position that I held was

17    to lead or co-lead what was called the

18    Biostatistics Program of the

19    Dana-Farber/Harvard Cancer Center.

20         Q.    And what did that mean to your

21    position and that particular program?

22         A.    So let me give a little bit of

23    background.

24              So the National Cancer

Do Not Disclose - Subject to Further Confidentiality Review

1    Institute sponsors or funds what they call a

2    comprehensive cancer network, which are

3    institutions across the United States that

4    they fund, maybe 30 or 40 institutions, that

5    they fund to support cancer research at those

6    institutions, and Harvard obtained

7    competitively one of those funded centers,

8    and they called it the Dana-Farber/Harvard

9    Cancer Center.

10             One of the resources and

11   programs within that funded center was the

12   Biostatistics Program, so that was comprised

13   of maybe 30 statisticians who collaborated

14   with cancer researchers across the whole

15   Harvard system.

16             And the Biostatistics Program

17   was engaged in new methodological research to

18   support cancer studies.  And as part of the

19   program we had several activities, we had

20   lectures, seminars, a variety of different

21   kinds of activities, and so I was the leader

22   and co-leader of that program.

23        Q.    Dr. Betensky, have you ever

24   participated in any Harvard University

Do Not Disclose - Subject to Further Confidentiality Review

1    diversity programs, or programs to increase

2    diversity in the areas that you practice?

3         A.    Yes.  So much of my close to

4    25 years at Harvard I was very involved in

5    diversity efforts in the Department of

6    Biostatistics, and directed those programs

7    for many of those years.  And those involved

8    doing all kinds of things to improve the

9    diversity of our field, the diversity of

10   biostatistics, both the students and the

11   faculty.

12              And, for example, for many

13   years I directed a summer program that we had

14   for undergraduates from underrepresented

15   backgrounds.  So we would bring them to

16   Harvard, we would pay all of their expenses,

17   we would give them a stipend, and we taught

18   them biostatistics, we taught them

19   epidemiology, we taught that statistical

20   computing, and we involved them in research

21   projects, and also provided all kinds of

22   professional development activities.

23              So I started that many years

24   ago at Harvard, and continuing that in my new

Do Not Disclose - Subject to Further Confidentiality Review

1  role at New York University as well.

2        Q.     Dr. Betensky, what are

3  neurostatistics?

4        A.     So neurostatistics really means

5  the application of statistical principles and

6  methods to neuroscience and neurology.

7        Q.     And neuroepidemiology, what is

8  that?

9        A.     So similarly, it would be the

10 application of epidemiological methods to

11 neuroscience and neurology.

12       Q.     And have you participated in

13 training programs in neurostatistics and in

14 neuroepidemiology?

15       A.     Yes.  So the National

16 Institutes of Health, again the federal

17 agency that supports much of the biomedical

18 research in this country, also is very, very

19 concerned with supporting training of new

20 investigators in biomedical research in this

21 country, and so they have a mechanism for

22 supporting training at universities.  It's

23 called the T-32 mechanism.

24             And back in 2004 I applied for

Do Not Disclose - Subject to Further Confidentiality Review

```
 1    one of these training programs for -- to have

 2    at Harvard to support the training of Ph.D

 3    students and also neurologists in statistical

 4    methods and epidemiological methods.

 5               And I was awarded the grant in

 6    2004.  I had to renew it twice, these are

 7    five-year grants.  And it was a very, very

 8    successful program.  And many of those

 9    graduates have gone on to faculty positions

10    in these areas.

11         Q.    I see that you were director

12    for that program from 2004 to 2018, is that

13    right?

14         A.    Yes.

15         Q.    Now, your resume also indicates

16    that in 2007 you became a biostatistician at

17    Massachusetts General Hospital, and that you

18    continued in that position to just a couple

19    of years ago.

20               First of all, is that correct?

21               MR. NORTH:  Objection.

22         Leading.

23    BY MR. MARTIN:

24         Q.    Let me ask you it this way,
```

1     then, Dr. Betensky.

2              What was your next -- what was

3     your next position in addition to your

4     directorship in neurostatistics and

5     neuroepidemiology at Harvard?

6         A.     So this -- so I had been a

7     biostatistician at Mass General Hospital.  In

8     2007 is when I received tenure at Harvard

9     University, meaning, you know, a lifelong

10    promise of a faculty job, and the title of

11    full professor.  And so at -- you know,

12    concurrent with that I was also promoted to

13    the position of full biostatistician at Mass

14    General Hospital from my previous title of

15    associate biostatistician.

16        Q.     And that position lasted for

17    how long, and up to what year?

18        A.      So I remained at Mass General

19    Hospital as biostatistician up until 2018,

20    which is when I left Harvard and left Boston.

21    I will say that I do retain collaborations

22    with researchers at Mass General Hospital, I

23    am funded on grants, currently even, through

24    subcontracts from Mass General Hospital to

 1    New York University, and I continue to

 2    collaborate with some of my long-time

 3    collaborators there.

 4         Q.     What types of things did you do

 5    as a biostatistician at Massachusetts General

 6    Hospital, that hospital and that teaching

 7    institution, what did you do?

 8         A.     So I collaborated with

 9    physician scientists, and a whole variety of

10    them.  And my role was two-fold actually, was

11    to -- I was often involved in helping design

12    studies that they were conducting, in other

13    words calculating the number of subjects that

14    they needed in the studies, or helping design

15    the nature of the studies, how often would

16    subjects come in for evaluation, for example,

17    what would be a primary measurement on those

18    subjects.

19             And then following the study

20    completion I would analyze the data or work

21    with other statisticians to analyze the data.

22               I would then be involved in

23    writing the papers that we would write

24    describing the project.  We would -- I was

1    very much involved in writing about the

2    methods that we undertook in the design and

3    analysis of the study, as well as describing

4    the results, presenting the results in tables

5    and figures, interpreting the results.

6                    And then the other aspect of my

7    involvement was actually in designing new

8    statistical methods.  So as an example, I

9    worked for many years with a

10   neuropathologist, who is a pathologist who

11   focuses on the neurological system, and in

12   this case on the brain, and he was interested

13   in brain tumors, and he was interested in

14   using, for example, a new genomic technology

15   to try to understand the progression of

16   certain kinds of brain tumors.

17                    There were no statistical

18   methods available for analyzing the data from

19   this new technological assay, and so I

20   developed statistical methods for that, I

21   wrote papers in statistical journals on that,

22   and then I applied it to his data.

23                    So those are just some

24   examples.

1    Q.    How did your role as

2  biostatistician for those numbers of years at

3  Mass General and Harvard, how did those

4  duties and your responsibilities and your

5  work, how did that correlate at all with

6  public health or the health of individuals?

7    A.    So it was directly concerned

8  with health.  So, you know, it was all about

9  health.  So it was about disease and

10  understanding progression of disease,

11  understanding risk factors for disease,

12  understanding treatment and treatment effects

13  in various kinds of, you know, medical or

14  disease conditions.

15    Q.    Did those treatments -- did

16  that treatment include things such as

17  pharmaceuticals?

18    A.    Yes.

19    Q.    All right.  Have you ever been

20  associated or affiliated with MIT?

21    A.    Yes.  So Harvard and MIT have a

22  joint medical program, and so it's -- at MIT

23  this is supported by their Division of

24  Health, Sciences and Technology, which they

1    call HST, and so this is a very small track

2    of Harvard Medical School, and this is for

3    students who are more technical in their

4    backgrounds, maybe they're coming from

5    engineering backgrounds or computational

6    backgrounds or mathematical backgrounds, and

7    so this track of Harvard Medical School is

8    separate from the general Harvard Medical

9    School.  And these -- so I was involved in

10   their curriculum committee, and also I taught

11   the biostatistics course to these students

12   for several years.

13        Q.    Dr. Betensky, did you serve for

14   many years as a professor in the Department

15   of Biostatistics at Harvard School of Public

16   Health?

17        A.    Yes.  So altogether I was there

18   as a full faculty member for 24 years.  I was

19   given tenure in 2007 and promoted to full

20   professor in 2007.  I remain there now as an

21   adjunct professor, because I am now a primary

22   faculty member at a different institution,

23   which means that I obviously can't retain my

24   full position at Harvard, but I am an adjunct

Do Not Disclose - Subject to Further Confidentiality Review

1    professor with an appointment through 2024.

2         Q.    What is the Harvard School of

3    Public Health?

4         A.    So the Harvard School of Public

5    Health is actually now called the Harvard

6    T.H. Chan School of Public Health thanks to a

7    large donation from the Chan family.  So it's

8    one of the Harvard schools.  So there may be,

9    I don't know the number, maybe ten Harvard

10   schools altogether, including the law school,

11   the business school, the school of education,

12   divinity school, so public health is one of

13   the schools at Harvard.  And at Harvard, that

14   is where biostatistics resides.

15        Q.    And you were a director at

16   Harvard School of Public Health, a director?

17        A.    Of the -- so as I mentioned

18   earlier, I was -- I directed the diversity

19   programs in my Department of Biostatistics

20   for several years that I was there.

21        Q.    And I see you've had a

22   directorship in the Alzheimer's disease

23   research area, is that right?

24        A.    That's right.

Do Not Disclose - Subject to Further Confidentiality Review

1      Q.    And a director -- another

2   position you held was director of the

3   Biostatistics Program, and let me get this

4   right, Harvard Catalyst, Clinical and

5   Translational Science Center, at Harvard

6   University.

7            Could you describe what that

8   position was?

9      A.    Yes.  So very much like the

10  Dana-Farber/Harvard Cancer Center I described

11  earlier, the Harvard Catalyst is another

12  infrastructure organization at Harvard that

13  is funded jointly by the National Institutes

14  of Health, the federal organization, in

15  conjunction with the university which also

16  puts a lot of money into it.

17           And so again, this is a

18  network, they exist across the country.

19  There are probably 30 or 40 of them at the

20  major academic medical centers.  They go by

21  the name of Clinical and Translational

22  Science Centers.

23           Harvard called its version of

24  that the Harvard Catalyst, the idea being

1    that the infrastructure support would help

2    catalyze new research findings in medicine.

3              And part of that infrastructure

4    was biostatistics, and I directed that

5    Biostatistics Program, which meant I directed

6    a large consulting service that about 40

7    statisticians across Harvard provided to any

8    clinical investigator who had any project

9    that needed statistical support.

10             And I also organized training

11   and educational programs for those

12   statisticians, including short courses and

13   seminars.

14        Q.      Did that Biostatistics Program

15   that you described at Harvard, was it

16   involved in the area of public health and the

17   safety of patients?

18        A.      Absolutely.  I mean, it covered

19   everything.  So anything that -- you know,

20   Harvard is a huge place, I think there's

21   something like 10,000 faculty associated with

22   Harvard Medical School in some way or

23   another, so among those 10,000 individuals,

24   you know, any of that -- any -- certainly

1    they were doing -- many of them were involved

2    in safety analyses, and those absolutely

3    would come to the statisticians at the

4    Harvard Catalyst for support.

5        Q.    We're getting close to what you

6    do nowadays, and I'm going to ask you those

7    in just a few minutes.

8            So finishing up, were you

9    invited to become a visiting scholar at any

10   institution outside of the United States?

11       A.    Yes.  So in 2016 I spent a

12   semester at Tel Aviv University in their

13   Department of Statistics and Operations

14   Research, and I taught a course there.

15   They're a small country, and they are able to

16   have a program where statistics students from

17   the major universities in Israel can actually

18   travel to be together once a week.

19            And so I taught in that program

20   to students from the major university in

21   Israel.  It was -- I was located at Tel Aviv

22   University, but the students came from Hebrew

23   University, from University of Haifa, and

24   from many other places, and I taught a course

1    in clinical trials to those students.

2         Q.    Just a couple or three years

3    ago, did you have a directorship, or were you

4    director of any program at Mass General

5    during the time period 2017 to 2018?

6         A.    Yes.  So the Department of

7    Neurology at that time developed their own

8    consultative service for their investigators.

9    They have a very, very large research

10   enterprise within the department.  And given

11   my long involvement with investigators in

12   neurology, I was asked to lead that service.

13        Q.    So we're going to turn away now

14   from your professional experience and go into

15   your -- just some of your professional

16   activities.  And I'm just going to ask you

17   about the ones that are more recent, then

18   we'll go back to what you do now, okay,

19   Doctor?

20        A.    Sure.

21             MR. MARTIN:  I would ask that

22        Mr. Lopez, Jimmy, turn to page 2, and

23        we'll go through the professional

24        activities.  There you go.

Do Not Disclose - Subject to Further Confidentiality Review

1    Q.    And just a few minutes to let

2  the jury know what your -- some of your

3  activities were.

4        Did you list the important

5  professional activities on your CV, your

6  resume?

7    A.    Yes.

8    Q.    And just a few years ago, let's

9  go only back to 2009 -- we could go back to

10  2002, etcetera, and you'd have a lot of

11  professional activities, would you not?

12    A.    Yes.

13    Q.    Let's just go to the recent

14  ones.

15        In 2009, it indicates that you

16  were a reviewer for the Institute of

17  Medicine, is that correct?

18    A.    That's correct.

19    Q.    First of all, what is the

20  Institute of Medicine, Dr. Betensky?

21    A.    So the Institute of Medicine

22  again is a federal institute.  It's part of

23  the National Academies of Medicine.  They may

24  -- it actually may not -- it may have been

Do Not Disclose - Subject to Further Confidentiality Review

1    subsumed into the National Academy of

2    Medicine.  But in any case, it's a premier

3    institution that is involved -- or one of the

4    activities that they do or did was to convene

5    experts and to do very deep reviews of areas

6    in medicine, and then the end -- and those

7    would be maybe a year and a half long reviews

8    that would involve in person meetings, and

9    outside speakers, and review of a huge amount

10   of literature.  And they would culminate in a

11   publication with the committee's findings.

12        Q.    Do you have an opinion as to

13   whether or not the Institute of Medicine is

14   an important research institution?

15        A.    Yes.

16              MR. NORTH:  Objection to the

17        form.

18   BY MR. MARTIN:

19        Q.    And what is that opinion?

20        A.    Yes.  It is very, very highly

21   regarded.  And yes, it is very important, and

22   their products are very highly regarded.

23              MR. MARTIN:  Jimmy, we're going

24        to go actually forward.

1          Q.     And I see that you were interim

2     statistical consultant at the New England

3     Journal of Medicine.

4                Dr. Betensky, what is The New

5     England Journal of Medicine?

6                MR. NORTH:   Objection.

7          Leading.

8     BY MR. MARTIN:

9          Q.     Dr. Betensky, what is The New

10     England Journal of Medicine?

11          A.     So The New England Journal of

12     Medicine is, you know, the premier

13     clinical -- or clinical journal for the field

14     of medicine.  It's published once a week.  It

15     has an extremely high impact factor, which

16     means many, many people read it, many people

17     cite the articles.  It's considered one of

18     the highest level journals, and most

19     important journals for reporting findings in

20     medicine.

21          Q.     Did you have any consulting

22     position, either permanent or interim, with

23     The New England Journal of Medicine?

24          A.     Yes, I did.  So they have a

1    group of about four or five statistical

2    editors, they call them statistical

3    consultants, who are part of the editorial

4    board, and that -- and so I served in that

5    role for about three months in 2009 to 2010

6    while one of their permanent consultants was

7    unable to participate.

8         Q.    Was that an important position

9    with The New England Journal of Medicine?

10             MR. NORTH:  Objection to the

11        form.

12        A.    Yes, that's a very important

13   position.  All of the papers that ultimately

14   get published in the journal, for which it's

15   appropriate, meaning they're not just

16   editorials, but for any paper that has any

17   data in it, they undergo a very rigorous

18   statistical review, and that's a very

19   important part of the review process for the

20   journal.

21             I would add -- I'll just add,

22   because you're giving me the opportunity, I

23   was actually invited to be permanent

24   statistical consultant a few years after

1    that, but I wasn't able to take on that

2    commitment at that time.

3    BY MR. MARTIN:

4         Q.    You're pretty busy --

5         A.    Right.

6         Q.    -- it sounds like to me.

7               I see that you served as a

8    permanent member with the NIH Cancer

9    Biomarkers Study section.  Is that right?

10              MR. NORTH:  Objection.

11    Leading.

12         A.    Yes.

13    BY MR. MARTIN:

14         Q.    Let me ask it this way, given

15    the objection, Dr. Betensky.

16              Have you ever held any -- have

17    you ever been a member of anything having to

18    do with the National Institutes of Health,

19    particularly in the area of cancer

20    biomarkers?

21         A.    Yes.  So I --

22         Q.    Could you describe what that

23    was?

24         A.    Yes.  So I was a member of

1    what's called a study section.  So I'll

2    explain what that means.  A study section is

3    simply a review group.

4              So as I mentioned, the National

5    Institutes of Health, NIH, funds a huge

6    amount of research, including cancer

7    research, across the United States.  And so

8    the way that that works is that investigators

9    submit grants, meaning applications for

10   projects, and these are highly competitive,

11   and those applications are requests for funds

12   to support their research.  And the way --

13   and so those applications are reviewed by

14   review groups, and NIH calls those review

15   groups study sections.

16             So I was a permanent member of

17   this particular study section or review group

18   that reviewed grants from investigators

19   across the United States who were studying

20   cancer biomarkers.

21        Q.    Can you tell the jury what the

22   NIH is and what it does?

23        A.    So the NIH, again, is the

24   National Institutes of Health.  It's a

1    federal agency with a very large budget.  And

2    one of its major activities is to support

3    research in medicine and public health across

4    the United States.

5              It also has a smaller, what

6    they call Intramural Research Program, which

7    means that they have their own investigators

8    who are employees of the NIH who also conduct

9    research.

10             But I think primarily they are

11   funders of all kinds of research in clinical

12   medicine, in all kinds of various

13   applications.

14        Q.    Did you ever develop -- well,

15   let me ask it this way.

16             I see that you were a member of

17   the Institute of Medicine Committee on

18   Cognitive Rehabilitation Therapy in Traumatic

19   Brain Injury.  What does that mean?

20        A.    So that was a committee, again

21   through the Institute of Medicine, and our

22   task was to review the role and potential

23   efficacy of what's called cognitive

24   rehabilitation therapy for the condition of

Do Not Disclose - Subject to Further Confidentiality Review

1    traumatic brain injury.

2              So it is -- traumatic brain

3    injury is a very -- it's a terrible event

4    that happens to people from accidents or in

5    combat or various other places, and it's very

6    hard to treat, and there haven't been proven

7    therapies for it.

8              And so the purpose of this

9    committee was to examine all of the studies

10   and all of the literature that had

11   investigated this particular type of therapy

12   called cognitive rehabilitation therapy for

13   this disease.

14        Q.    Was that -- just of interest,

15   was that a successful program?  Did it turn

16   out that the therapy worked?

17        A.    So I believe that, you know, it

18   was mixed, and which is actually why the

19   committee was convened.  I don't remember the

20   details of the findings, which probably means

21   that, you know, that some aspects of it were

22   successful, and probably we recommended

23   further study with better designed studies.

24              Part of the problem in

1    traumatic brain injury is that there's a lot

2    of heterogeneity in the patients; some of

3    them have had their injury for a long time,

4    some of them are new with their injury.  So

5    there's a lot of heterogeneity that needs to

6    be understood, and I think that that was

7    probably part of our recommendation.  Yeah,

8    that's what I remember at this point.

9         Q.     Has some of your statistical

10   research shown that a particular treatment

11   for a disease or condition actually did not

12   help the disease or condition, that it was

13   unsuccessful treatment, non-efficacious?

14        A.     Yes.  So I was -- early in my

15   career at Harvard I was affiliated with AIDS

16   research, so this was in the middle and late

17   1990s, and it was a time when there wasn't

18   much success in HIV AIDS research.

19               So I was involved in several

20   clinical trials that shut down early for

21   futility, meaning that the treatments were

22   not working, they didn't seem to be giving

23   the patients any benefit at all.

24               And actually, that led me to

1    publish several papers on what's called

2    futility analysis in clinical trials, which

3    means how can you design a clinical trial

4    such that you can stop it early if it appears

5    that there's no treatment benefit.  So even

6    if there isn't an adverse effect, if there's

7    no benefit it still isn't desirable to keep

8    anybody in a trial if they're not getting

9    anything from it.

10                   And so that became a

11   methodological area that I became interested

12   in as motivated by what was going on in

13   HIV/AIDS at the time, and I proposed designs

14   for futility analysis.

15        Q.     Have you ever been involved in

16   any matters regarding the health of veterans?

17        A.     Yes.  So I was involved in

18   another Institute of Medicine committee that

19   actually was charged by Congress, I believe,

20   to meet every few years, maybe it was every

21   three years, I don't remember exactly how

22   frequently, to -- at each, you know,

23   subsequent meeting to investigate the current

24   literature on the health effects of Agent

1    Orange on Vietnam veterans, and the idea

2    being that as time evolved, there would be

3    potentially some health effects that would

4    emerge that may not have been apparent

5    earlier in time.

6         Q.    All right.  I see in 2013 to

7    '14 you were a member of the Committee on

8    Diversity at the American Statistical

9    Association.

10             What is the American

11   Statistical Association, and what did that

12   committee membership involve?

13             MR. NORTH:  Objection.

14        Leading.

15   BY MR. MARTIN:

16        Q.    Let me ask it again in a

17   non-leading way.

18             Have you ever had any member --

19   excuse me.

20             Have you ever had any committee

21   memberships regarding anything having to do

22   with any statistical associations?

23        A.    Yes.  So I've been involved in

24   a few different committees or -- yeah,

 1    committees through different statistical

 2    associations.

 3              So the American Statistical

 4    Association is the -- probably the largest

 5    professional organization for statisticians

 6    based in the United States, and they sponsor

 7    conferences where statisticians are able to

 8    report on their research and have various

 9    training opportunities.

10              They're also very interested in

11    supporting diversity in the field of

12    statistics, which, of course, includes

13    biostatistics.  So I was a member of the

14    committee that they had on diversity, which

15    included planning an annual conference called

16    StatFest that they hold every fall in which

17    they invite undergraduates who are interested

18    in statistics or math or computer science or

19    data science from underrepresented

20    backgrounds to come together to present any

21    projects that they've been involved in, and

22    to learn about graduate school opportunities.

23              I've also been involved in

24    program committees for various statistical

1    associations, meaning I've been involved in

2    designing the programs for conferences.

3         Q.    Great.

4              MR. MARTIN:  Let's go ahead and

5         skip over to page 3, if you would,

6         Jimmy.

7         Q.    And I want to ask you,

8    Dr. Betensky, it looks like you spent some

9    time as co-chair for Scientific Registry of

10   Transplant Recipients.  What were you doing

11   back then in 2014 to 2016 regarding the

12   Scientific Registry of Transplant Recipients?

13              MR. NORTH:  Objection to the

14        form.  Leading.

15   BY MR. MARTIN:

16        Q.    I'll reask it.

17              Have you ever been involved in

18   any health issues or statistical analyses

19   regarding patients such as transplant

20   patients?

21        A.    Yes.  So I was co-chair of the

22   Scientific Registry of Transplant Recipients

23   technical advisory committee.  So again, this

24   is a federally funded organization that is

Do Not Disclose - Subject to Further Confidentiality Review

1    concerned with allocation of transplants, of

2    organ transplants for patients across the

3    United States.

4              The technical advisory

5    committee was comprised of several

6    statisticians and physicians involved in

7    transplant transplantation.

8              And my interest and my

9    involvement was -- had to do with -- I mean,

10   there are very important statistical issues

11   that are involved in the analysis of efficacy

12   of transplants and efficacy of different

13   strategies for allocation of transplants, and

14   so this intersected with my statistical

15   interests.

16             And so, as I mentioned, I

17   co-chaired this committee.  We met -- I think

18   we met twice a year, once was in person, and

19   we reviewed reports of transplants across the

20   United States and of different, again,

21   different strategies for allocation.

22        Q.    You mentioned efficacy.  What

23   is efficacy?

24        A.    So efficacy in the context of a

1    transplant would be, you know, good health

2    following the transplant.  So in a very

3    seriously ill patient, it might be their

4    survival time.  And so, obviously, the goal

5    would be to maximize survival in a patient

6    after receiving a transplant.

7         Q.     Are there ways that statistics

8    can be used to determine if a particular

9    treatment is efficacious?

10        A.     Yes, absolutely.  So there are

11   many ways -- many definitions of efficacy,

12   and they depend on the context.

13             So in a transplant setting or

14   perhaps some cancer settings, efficacy may be

15   survival.  But in other settings it may be a

16   score on a cognitive test, meaning, you know,

17   1, 2, 3, 4, or 1 through 40.  So depending on

18   the nature of the measurement, there are

19   different statistical techniques and methods

20   that are applicable and appropriate for

21   analyzing that efficacy.

22        Q.     All right.  Dr. Betensky, have

23   you ever received any awards -- well, I can't

24   remember specifically, but I may not have

1    asked you, but what is MIT?  My question to

2    you is, what is MIT?

3         A.    MIT is the Massachusetts

4    Institute of Technology, so a major

5    university located in Boston.

6         Q.    Does MIT sometimes collaborate

7    with Harvard University, it also being in the

8    Boston area?

9         A.    Yes.

10         Q.    And have you ever received any

11    awards regarding any matters that you had to

12    do with from MIT or Harvard?

13         A.    Yes.  So as I mentioned

14    earlier, I was involved in the joint venture

15    between MIT and Harvard in the HST, or

16    Health, Sciences and Technology program which

17    is the small track within Harvard Medical

18    School that is more technically oriented.

19    And I taught within that program.  I taught a

20    biostatistics course for several years.  And

21    I received an award for my teaching and my

22    general involvement in the curriculum

23    committee for that program.

24         Q.    On that same page, I'd like to

1    point your attention to the editorial

2    activities on page 3, and I won't go through

3    each one, but I'll ask you some questions

4    about that section of your resume.

5              My question is, have you

6    conducted editorial research and -- let me

7    start over.

8              Have you been an editor in any

9    research activities?

10       A.    Yes, I have.

11       Q.    And what does it mean to be an

12   editor of -- well, what journals have you

13   been an editor of in the past, including

14   associate editor or editor?

15       A.    Yes.  So I've been associate

16   editor for several of the leading statistics

17   journals, so those include Biometrics,

18   Statistics in Medicine, Biostatistics, among

19   many others.

20              I've also -- and as I mentioned

21   earlier, I was a statistical consultant,

22   which was really statistical editor, for The

23   New England Journal of Medicine for a short

24   period of time.

1          And then currently, and

2    actually for the past seven years, I have

3    been the statistical editor for the Annals of

4    Neurology, which is one of the top clinical

5    neurology journals.

6          Q.    Are your editorial activities

7    important in research in science and in

8    public health and in health to patients?

9          A.    Yes.

10          MR. NORTH:  Object to the form.

11          A.    Yes, I believe they are very

12    important.  So in, for example, in my role at

13    Annals of Neurology I meet with the other

14    editors once a week, every Tuesday morning we

15    meet, used to be in person, not anymore, and

16    we spend an hour and a half reviewing papers,

17    discussing papers.

18          And I have a very strong voice.

19    And in terms of the appropriateness of the

20    methods that were applied, I often review

21    papers.  So in the past seven years I've done

22    approximately 750 reviews of papers that have

23    gone into the journals.  Now, some of those

24    750 are repeat reviews, meaning the authors

 1    had to resubmit and I reviewed for a second

 2    time.

 3              And, you know, the editor takes

 4    my recommendation very seriously.  And if I

 5    say, as I sometimes do, "this is simply not

 6    valid and I can't believe the results," then

 7    they reject the paper.

 8              More often what happens is I

 9    will return a review to the author saying,

10    you know, "what about this," or "you really

11    need to account for this in your statistical

12    analysis," or "this isn't appropriate because

13    of this, please redo it."  And the authors

14    respond to my suggestions and will change the

15    paper and fix the analysis based on my

16    statistical review, of course along with the

17    medical review that they're also receiving.

18    BY MR. MARTIN:

19         Q.    You've talked about The New

20    England Journal of Medicine and its position

21    as a prestigious and important journal.  Are

22    there differences in the reliability of

23    certain journals as opposed to other

24    journals?

Do Not Disclose - Subject to Further Confidentiality Review

1              MR. NORTH:  Objection to the

2       form.

3       A.      Yes, there are.  So one quite

4   imperfect way of measuring that is through

5   what's called the impact factor, which is

6   calculated according to the number of

7   citations that articles from the journal

8   receive in subsequent papers, in other words

9   the number of times that authors of

10  subsequent papers refer to the original

11  paper.  But it's an imperfect measure for a

12  lot of reasons.  But it is a measure of the

13  quality and the -- yeah, I guess the quality

14  of the journal.

15              So some journals have an impact

16  factor of, you know, 20, some are 10, some

17  are 1, so it can give a rough idea.

18  Although, again, it's imperfect and has

19  different meanings in different fields.

20  BY MR. MARTIN:

21      Q.      I see in your resume you list

22  265 journal articles that you either authored

23  or co-authored.  Is that number correct?

24      A.      So actually it's correct as of,

1   I guess, the date of preparation here.  I

2   actually just had a paper accepted for

3   publication yesterday, so it's not quite

4   correct, but pretty much.

5          Q.     Is the listing of the 265, and

6   then we've got the other one that you've

7   mentioned recently, is that listing of the

8   265, and include the one you listed, 266, are

9   those peer-reviewed published articles?

10         A.     They are.

11         Q.     Could you explain to the jury

12  what a peer-reviewed article is?

13         A.     So a peer-reviewed article is

14  an article that undergoes critical review by

15  experts in relevant fields.

16                So, for example, as I

17  mentioned, if an article is submitted to the

18  Annals of Neurology, it's generally reviewed

19  by three reviewers who are research

20  neurologists, generally speaking, in the

21  fields that the article is about.

22                So if an article is submitted

23  that is relevant to Alzheimer's disease,

24  experts in Alzheimer's disease would review

Do Not Disclose - Subject to Further Confidentiality Review

1    the paper, and then along with a statistical

2    review, as I mentioned.

3              For a statistics journal, if I

4    submit a paper on a particular statistical

5    method, the reviewers would be experts in

6    those methods.  So they read the paper, they

7    give critical comments and suggestions to the

8    author, and they make recommendations to the

9    editor as to whether the paper is worthy of

10   publication in the journal or not.

11        Q.    Tell the jury, if -- the

12   publication and research regarding the

13   publication of peer-reviewed articles in

14   respected journals, is that important in

15   scientific research for purposes of public

16   health and patient safety?

17             MR. NORTH:  Objection to the

18        question.

19   BY MR. MARTIN:

20        Q.    You can answer.

21        A.    Yes.  So --

22        Q.    Could you describe that

23   importance?

24        A.    Yes.  So publication in a

Do Not Disclose - Subject to Further Confidentiality Review

1    peer-reviewed journal gives an article a

2    certain weight of truth to it.  So if

3    there's -- if I read an article that's

4    published in a good journal, I give it a lot

5    more weight than if I read, you know, some

6    manuscript that is just published online, for

7    example, that hasn't undergone a rigorous

8    peer review process.

9              So publication really gives --

10   is a way of -- it's imperfect, of course, but

11   it gives assurance that the article is worthy

12   and reliable to some extent.

13        Q.    Are there any of your

14   publications on that list that come to mind

15   as being particularly important to public

16   health and safety of patients?

17        A.    So I would say -- I guess I can

18   answer that in a couple of different ways.

19              There are papers that I've

20   published that have been directly related to

21   safety, and I can point those out.

22              And then the second answer

23   would be that many of the statistical methods

24   that I've developed are general and include,

1    you know, applications to safety and,

2    therefore, are important to safety.

3         Q.    Dr. Betensky, could you name a

4    couple of those articles, if there are such

5    articles, that you have written that are

6    directly related to the public health?

7         A.    Yes.  So one article, I was

8    involved in a clinical trial in ALS, a

9    neurological disease, that was investigating

10   a treatment called coenzyme Q10, and it was a

11   study of tolerability and safety in ALS

12   patients.  And so I think it was published

13   around 2007 or thereabouts.

14              And so that was a study -- it

15   was a small study of about 30 ALS patients,

16   and we compared them to placebo patients from

17   an earlier trial, and we determined using

18   important ALS measures that the treatment

19   appeared to be safe.

20        Q.    Was it important to you to have

21   a comparator group in addition to the group

22   that received the proposed treatment?

23        A.    Yes.  Absolutely.

24        Q.    Why is that?

1       A.      So one reason is that there is

2  a natural course of the disease, and so it's

3  important to control for that natural course.

4              So, for example, if we're

5  following ALS patients over a certain amount

6  of time and looking at some measure, the

7  concern would be, well, maybe that measure is

8  just naturally changing in ALS patients

9  regardless of treatment.  And so for that

10 reason, it's important to compare to a

11 similar comparable group who is -- that is

12 not being treated.

13             There's also an issue of a

14 placebo effect, and so there is concern that

15 possibly patients show some kind of outcome

16 because they know that they're on an active

17 treatment and, you know, that can influence

18 their outcomes as well.

19             MR. MARTIN:  Jimmy, could you

20         please put the neurology article on

21         the screen, if you have that?  I

22         believe I sent it to you earlier this

23         morning.  There are two articles, and

24         that would be one of them.  The other

1    one, if you can.

2            MR. NORTH:  Mr. Martin, before

3        you continue, I'd like to enter a --

4        I'm sorry.  Mr. Martin, before you

5        proceed I'd like to object to the

6        display of a scholarly article as

7        inadmissible hearsay.

8            (Whereupon, Plaintiffs' Exhibit

9        Number 2 was marked for

10        identification.)

11   BY MR. MARTIN:

12       Q.    So shown on the screen is an

13   article, "Tolerance of high-dose (3,000

14   milligrams a day) coenzyme Q10 in ALS."

15            Is that the article you

16   co-authored that you've spoken of as having

17   importance and directly related to public

18   health?

19       A.    Yes, this is related to patient

20   safety.

21       Q.    And I'd like to ask, is there

22   another example of something that you have

23   written in the peer-reviewed literature that

24   is directly related to public health, just

Do Not Disclose - Subject to Further Confidentiality Review

1    another example?

2         A.     So there's another article that

3    I was involved in, another research project

4    that was investigating the use of telehealth,

5    which, of course, we're all using these days

6    but was pretty innovative several years ago.

7               So it was introduced in the

8    context of stroke treatment.  And the idea

9    was that many patients live far from what's

10   called a regional stroke center, which is a

11   specialized -- or a hospital that has the

12   capability of treating a stroke.  And that's

13   a problem because stroke needs to be treated

14   optimally within three hours if a treatment

15   called TPA is to be given.

16              So this study was investigating

17   the use of telehealth, telemedicine, or they

18   call it telestroke, so that a radiologist and

19   a neurologist could evaluate a patient

20   remotely and make a decision about treatment

21   with TPA, and then get them to the regional

22   stroke center.  So the idea being that they

23   would have the benefit of being treated

24   within that three-hour window.

1            And so the study that I was

2    involved in was comparing the outcomes of

3    patients who were treated remotely via

4    telehealth to those that were treated

5    directly at the regional stroke center.

6        Q.    Great.

7            Just out of curiosity, what

8    were the findings?

9        A.    So the findings were that it

10   appeared to be a safe approach.

11       Q.    Telehealth, or the

12   telemedicine?

13       A.    That's right.  So we looked at

14   various outcome measures that are standard in

15   stroke, so they look at functioning and

16   quality of life after a stroke, and we didn't

17   see any difference between the patients who

18   received the TPA remotely versus those who

19   received it at the stroke center.

20       Q.    Dr. Betensky, have you ever

21   written any book chapters, and I'd ask --

22   actually let me ask that again.

23            MR. MARTIN:  Jimmy, turn to

24       page 28.

1      Q.     And I'll ask you, Doctor.

2  Dr. Betensky, have you ever found the time to

3  write any book chapters?

4      A.     Yes, I have.

5      Q.     And are those shown on page 28

6  of your resume?

7      A.     Yes.  So actually there's one

8  book chapter that I co-authored, so it was --

9      Q.     Which one is that?

10     A.     So that's --

11     Q.     Go ahead.

12     A.     That's the first one that's

13  listed under "Book Chapters and Reviews."

14     Q.     And what's the name of the book

15  chapter and review that you have written?

16     A.     The name is "Statistical

17  principles and methods for the analysis of

18  clinical studies."

19     Q.     All right.  Just generally what

20  types of things are included in that book

21  chapter, the subject matter?

22     A.     So it's really an introduction

23  to, as the title says, statistical principles

24  and methods.  So we start out by talking

1    about how would you describe data, how would

2    you compare groups, and how would you do more

3    complex kinds of analyses that make

4    adjustments.

5             We consider different kinds of

6    outcome measures.  That could be, as I

7    mentioned earlier, survival time, or some

8    measure, some numerical measure, or some

9    perhaps binary measure, meaning a yes/no

10   outcome.  So we consider different kinds of

11   outcomes, and went through different kinds of

12   methods for those outcomes.

13        Q.     And, Dr. Betensky, have you had

14   teaching positions through the years?

15        A.     Yes, I have.  That's always

16   been a part of my job.

17        Q.     And what is a postdoctoral

18   advisor?

19        A.     So a postdoctoral advisor is a

20   faculty member who advises a postdoctoral

21   fellow.

22             MR. MARTIN:  All right.  And

23        page 29, if you would Jimmy.

24        Q.     Do you list the teaching

Do Not Disclose - Subject to Further Confidentiality Review

1    positions you've had through the years both

2    as postdoctoral advisor and other teaching

3    positions?

4         A.    Yes.  This isn't entirely

5    current, but for the most part these are

6    listed, yes.

7         Q.    All right.  Do you enjoy

8    teaching?

9         A.    I do.

10         Q.    What do you enjoy about

11    teaching?

12         A.    I enjoy -- well, I should say

13    teaching for me is really two different kinds

14    of activity, so there's traditional teaching

15    in a classroom, and then there's teaching

16    Ph.D students and postdoctoral fellows.

17              So in the classroom I enjoy the

18    challenge of explaining new statistical

19    concepts to students.  And it's, of course,

20    gratifying when they actually learn and they

21    progress in their capabilities and their

22    knowledge.

23              And then I also very much enjoy

24    working one-on-one with Ph.D students and

```
 1    fellows and helping them transition into

 2    becoming independent researchers.

 3                MR. MARTIN:  Page 32, Jimmy.

 4         Q.     Have you ever been fortunate

 5    enough to participate in research grant

 6    funding?

 7         A.     Yes, I have over the years.

 8         Q.     Explain that to the jury.

 9         A.     Sure.  So as I explained

10    earlier, the National Institutes of Health

11    provides funding for research in all areas of

12    biomedicine, including statistical research.

13                When I was at Harvard, Harvard

14    is a tough place, and I was required to

15    actually support or come up with 80 percent

16    of my salary with grants, grant funding.  So

17    Harvard paid 20 percent of my salary, and

18    that was for my teaching activities, and the

19    rest of my salary I had to come up with by

20    myself through grants.

21                And so over the years I've

22    applied for many grants, meaning that I write

23    up a description of a project that I want to

24    undertake, I justify the project, I explain
```

 1   why it's significant to medicine and to

 2   health, I explain why it's innovative and

 3   worth the money, and I explain what I'm going

 4   to do so that nobody is worried that I'm

 5   going to waste the money.

 6            And so I've had many of those

 7   grants over many years.  Some are research

 8   grants.  I've also -- as I mentioned, I've

 9   also had grants to support training programs

10   in neurostatistics and neuroepidemiology, and

11   also training programs to promote diversity.

12      Q.     Dr. Betensky, in our questions

13   and answers today you've talked about public

14   health and patient safety, and I may have

15   asked you about public safety.  What does it

16   mean to -- what does public health mean?

17            MR. NORTH:  Objection to the

18       form.

19      A.     So public health is the health

20   of the public.  So it's really about

21   population-level health.  I would contrast

22   that with medicine, which is more about

23   individual health.  Now, of course, there's

24   overlap.  But public health is -- we don't

Do Not Disclose - Subject to Further Confidentiality Review

1    have patients in public health, we have

2    populations, whereas in medicine we have

3    patients, of course they're part of

4    populations.

5    BY MR. MARTIN:

6         Q.    And what is the relationship,

7    if any, between public health, as you've

8    discussed, and patient safety, individual

9    patients?

10        A.    Well, it's certainly related,

11   because patients are the components of the

12   public, and so to protect patient safety is

13   protecting public health.  So they're

14   intricately related.

15        Q.    Do you have particular interest

16   in areas of patient safety in your role as a

17   biostatistician?

18        A.    Of course.  So I'm very much

19   interested in the health of patients, and,

20   you know, that includes safety and protection

21   from harm due to various treatments or

22   therapies.  And I'm also interested in

23   patient health with respect to effective

24   treatments.

1          Q.     Doctor, I know we've been

2     working through this and -- but it's

3     important, I think, for our purposes that we

4     go through these.  But I am getting toward

5     the end of your resume, and I want to ask

6     you, my next question is, have you ever had

7     the opportunity and honor to be a part of any

8     invited lecture where you've actually given

9     lectures to important institutions or members

10    of those institutions?

11               MR. NORTH:  Objection to the

12          form.

13          A.     Yes, I have.

14    BY MR. MARTIN:

15          Q.     Let me reask it.

16               Doctor, what is an invited

17    lecture?

18          A.     So an invited lecture is what

19    it says it is, so it's a lecture that a

20    researcher or other people would give at the

21    invitation of some organization.

22          Q.     Have you given invited lecture

23    presentations?

24          A.     Yes, I have.

1          Q.     Could you tell the jury some of

2     the institutions that have invited you and

3     that you gave presentation to?

4          A.     Sure.  So over the years I've

5     given several of these.  Several have been at

6     universities.  I've gone to Yale many times,

7     Johns Hopkins.  I gave a -- I was invited to

8     give a talk at Johns Hopkins in 2001.  I also

9     actually gave a talk at Johns Hopkins just

10    about a year ago in 2019.  And, you know, a

11    whole variety of different universities.

12              I've also been invited to give

13    talks at conferences, and those have included

14    the American Statistical Association

15    conference, there's another conference called

16    the Eastern North American Region of the

17    International Biometric Society.  I've given

18    talks internationally at meetings of the

19    International Biometric Society.  Let's see.

20              So I gave a talk in Florence,

21    Italy, in Dublin, in Geneva, in Prague.  So

22    I've had the great opportunity to travel to

23    many great places to give invited talks.

24              MR. MARTIN:  Jimmy, if you'll

1        turn to page 35, and particularly I'm

2        going to look at the last few entries

3        there.

4            Q.      Doctor, have you participated

5    with companies that manufacturer

6    pharmaceuticals?  Have you participated in

7    presentations to companies like that?

8            A.      Yes.

9            Q.      Could you tell us about those

10   presentations and what companies and, to the

11   extent you can disclose it, what the

12   presentations were about?

13           A.      Sure.  So I was asked -- so I

14   published a paper several years ago on the

15   effect of heterogeneity among patients on the

16   power of a clinical trial.  So let me explain

17   what that means.

18                   A clinical trial is designed to

19   have a good chance of having a successful

20   outcome under certain assumptions.  If the

21   patients in that trial are very

22   heterogeneous, that can dilute the chance of

23   success.

24                   So I wrote a paper about this

1    in the context of brain tumors.  And the

2    company, Bayer, was actually very interested

3    in that paper, and so they invited me to a

4    meeting that they held in New Haven,

5    Connecticut where they were in the process of

6    designing trials, and they wanted to learn

7    from me about this problem of heterogeneity

8    and how to possibly account for that so that

9    they wouldn't be wasting their money on a

10   trial that was potentially too small to

11   detect a real treatment effect.

12        Q.    Do you believe that is

13   important for that knowledge to be asked for

14   and also received by experts such as yourself

15   in the manufacturer of pharmaceuticals and

16   like devices?

17             MR. NORTH:  Objection to the

18        form.

19        A.    Yes.  Certainly, you know,

20   anybody, whether it's a company or an

21   academic group, anybody that's, you know,

22   planning a study, you know, of course should,

23   you know, bring the very best methods to the

24   table in whatever way that can happen.

```
 1    BY MR. MARTIN:

 2        Q.     Have you ever been on any study

 3    safety boards?

 4        A.     Yes.

 5        Q.     What are those called?  I used

 6    the wrong term.

 7        A.     Okay.  So they're called --

 8    they go usually by one of two names.

 9    Sometimes they're called data safety

10    monitoring boards, and abbreviated as DSMBs,

11    the initials, and sometimes they're called

12    data monitoring committees, data -- so DMCs.

13             So I've been on several DSMBs.

14    I'm currently on maybe a handful, or maybe

15    fewer than that, maybe three or so, yes.

16        Q.     And is it -- with respect to

17    your background, training, and experience, is

18    your work on the data safety monitoring

19    boards, is that of import in understanding

20    your background?

21             MR. NORTH:  Objection to the

22        form.

23        A.     Yes, I think so.  I think it

24    shows that I am viewed externally as an
```

 1    expert statistician who is capable of

 2    evaluating safety of an ongoing clinical

 3    trial, and participating in a recommendation

 4    that's made to a company or a sponsor for

 5    whether the trial is safe and should be

 6    continued.

 7    BY MR. MARTIN:

 8        Q.     What is a data safety

 9    monitoring board exactly?

10        A.     So a DSMB, data safety

11    monitoring board, is generally a small

12    committee of maybe four or five experts

13    coming from different fields, but all of whom

14    have expertise that is relevant to a

15    particular clinical trial.

16            So on any -- for any clinical

17    trial, the DSMB may include -- or will

18    include physicians from the area -- the

19    disease area that's being studied.  It may

20    include a patient representative, in other

21    words someone who has that condition or

22    disease.  And it also includes a statistician

23    who understands clinical trials and analysis

24    of data from clinical trials.

1           MR. MARTIN:  Let's go to

2       page 39, Jimmy, please.

3       Q.     And that's the last page of

4   your resume/curriculum vitae.

5              I want to ask you, Doctor, what

6   are your major research interests at this

7   time?

8       A.     So I would say my -- this is

9   actually a little bit outdated, but not

10  entirely.  So my major research interest is

11  survival analysis.

12      Q.     What does that mean?

13      A.     What that means, so that is the

14  analysis of data that are incomplete in

15  certain ways.  And so the technical term is

16  that it may -- the data may involve censoring

17  or truncation.  So those are two technical

18  terms, but basically what they mean is we

19  don't fully observe the outcome on everybody.

20             So, for example, in a cancer

21  clinical trial that is looking at time to

22  death, of course not everybody dies during

23  the course of the clinical trial, and so for

24  those individuals we have what's called

1    censored observations, meaning we know that

2    they lived at least a certain amount of time,

3    but we don't know how long they lived.  So

4    I'm involved in all kinds of methodological

5    research for how to best analyze data that

6    have those kinds of missingness.

7              And in addition to these other

8    topics that I've worked on throughout the

9    years, I'm also very interested, and related

10   to survival analysis, in biased sampling, so

11   samples that involve some kind of non-random

12   selection.

13             And currently I'm very

14   interested in COVID-19 related research, and

15   have been involved in and have even published

16   a few papers on COVID-19 related projects.

17        Q.    Okay.  And could you describe

18   what those projects have been, and your work

19   in the area of COVID-19 pandemic?

20        A.    Yes.  So early on in the

21   epidemic, so back in March and April of 2020,

22   I was very concerned about all of the data

23   that was being published by newspapers and in

24   the public view regarding the percentage of

1    positive COVID-19 tests.  And my concern was

2    very much related to my research interests,

3    and that is the biased sampling.

4              So what I mean by that is those

5    estimates were entirely reflective -- or at

6    least I should say partly reflective of who

7    was being tested.  So in other words, the

8    whole population was not being tested for

9    COVID-19, but only select groups of people,

10   for various reasons, were being tested.

11             And so I wrote a paper on how

12   that incomplete testing for COVID-19 could be

13   leading to biased estimates related to the

14   epidemic.

15        Q.    And did you -- did that

16   research conclude anything about whether or

17   not a particular treatment, for instance, was

18   efficacious or not?  Did it concern those

19   types of things?

20        A.    No, treatment was not involved

21   in that at all.

22        Q.    All right.  By the way, Doctor,

23   are you being paid for your time at the

24   deposition today, and for your research and

1    participation in the matters that you'll be

2    testifying about today regarding Bard?

3         A.    Yes, I am.

4         Q.    Okay.  And what is the hourly

5    fee or rate that you're charging?

6         A.    So I charge 850 an hour for my

7    testimony, and 750 an hour for my consulting

8    work.

9         Q.    And all of the consulting work

10   you've done for this particular deposition,

11   culminating in this particular deposition,

12   what is the estimated number of hours that

13   you have spent up to today?

14        A.    I actually don't know.  I

15   haven't prepared an invoice, and I haven't

16   added it up.

17        Q.    You'll prepare something so

18   that we can take a look at that?

19        A.    Yes.

20        Q.    And do you believe that those

21   are reasonable charges for your services in

22   the case?

23        A.    Yes, I do.

24        Q.    And is the charge that you will

1  make and have made, are those charges per

2  hour for your time?

3        A.     Yes.

4        Q.     All right.  Doctor, what is

5  your current position?

6        A.     So I am currently professor of

7  biostatistics and chair of the Department of

8  Biostatistics at the NYU School of Global

9  Public Health.

10       Q.     And what do you do on a

11 day-to-day basis in that position?

12       A.     So I'm engaged in really, I

13 guess -- I guess it's maybe three different

14 kinds of activities.

15              So I'm involved in research, as

16 I've described, so that is collaborative

17 research with other clinical investigators.

18 It's also my own methodological research.

19              I am involved in teaching, so I

20 teach -- generally teach one course per

21 semester.  I just finished teaching this week

22 a course on statistical inference.

23              I also advise students.  I

24 advise a Ph.D student and master students who

1    have to write theses.

2              And then I'm also involved in

3    administration of the department.

4        Q.    Are you currently professor and

5    chair of biostatistics at NYU School of

6    Global Public Health?

7        A.    Yes, I am.

8        Q.    Is the NYU School of global

9    health -- Global Public Health actually in

10   New York City?

11       A.    It is.

12       Q.    Do you believe it to be an

13   important institution regarding public

14   health?

15             MR. NORTH:  Objection to form.

16       A.    Yes.  Yes, I do.  So it's

17   relatively new, it's maybe six or seven years

18   old, and it was just accredited by the

19   American Public Health Association, or

20   Schools of Public Health Association about a

21   year and a half ago, which is a big

22   distinction.

23   BY MR. MARTIN:

24       Q.    I believe you've mentioned this

1    earlier, but are you still and remain a

2    professor, an adjunct professor specifically,

3    in the Department of Biostatistics at

4    Harvard?

5         A.    Yes, I am.

6         Q.    All right.  And in that role,

7    what do you do as an adjunct professor at

8    Harvard?

9         A.    So one continuing activity is

10   my involvement with the diversity program.

11   So, for example, this past summer I met with

12   the students who were participating in that

13   program.  And then I continue to communicate

14   with colleagues regarding that program, for

15   example.

16        Q.    Give me one second, Doctor.

17             Doctor, we've gone through your

18   resume, which is marked as an exhibit, and I

19   want to ask you some questions about it and

20   about your testimony today.

21             Doctor, have we gone through

22   most, if not all, at least subject matter of

23   your resume, your curriculum vitae that's

24   been noted as -- marked as an exhibit?

1      A.      Yes.

2      Q.      And the areas on -- excuse me.

3              The areas listed on the

4    curriculum vitae include personal data,

5    education and training, professional

6    experience, professional activities,

7    editorial activities, honors and awards,

8    publications, teaching roles, book chapters

9    and review, research grant participation,

10   academic service, presentations, and some

11   additional information regarding your major

12   research interests.

13             Now, have I outlined what is in

14   this curriculum vitae?

15             MR. NORTH:  Objection to the

16        form.

17      A.      Yes, you have.

18   BY MR. MARTIN:

19      Q.      Particularly with respect to

20   the subject matter, are those the subject

21   matter contained in your curriculum vitae?

22      A.      Yes.

23      Q.      And does a curriculum vitae

24   list in more detail the data within those

 1    particular groups of areas of interest that

 2    are on the resume/curriculum vitae?

 3                 MR. NORTH:  Objection to the

 4        form.

 5        A.    Yes.

 6    BY MR. MARTIN:

 7        Q.    If I were to ask you to go into

 8    detail about each of the areas in your resume

 9    or curriculum vitae, would the resume be a

10    summary of that testimony?

11                 MR. NORTH:  Objection to form.

12        A.    Yes.

13    BY MR. MARTIN:

14        Q.    If we were to go through that

15    testimony, or if we were to go through each

16    section of it and go into detail, would it

17    take a lot of time?

18        A.    Yes, it would.

19        Q.    So if we were to look at this

20    summary of your -- would this curriculum

21    vitae be considered a summary of the data

22    that we've gone through?

23        A.    Yes.  Although I actually would

24    point out that we talked about my involvement

1    on data safety monitoring boards, and I

2    actually don't list that on this CV.  That's

3    just -- I haven't included those things on

4    this CV, but that is part of what we

5    discussed.

6         Q.    Is it still an important part

7    of what we discussed?

8         A.    Absolutely.

9         Q.    All right.  Doctor, you're

10   going to be asked to give your opinions

11   today, and I would ask you, can you agree

12   that when you give an opinion in your

13   testimony today that you will make certain

14   that you give those opinions in terms of

15   reasonable medical -- excuse me.  Let me

16   start over.

17             You're going to be asked to

18   give opinions today, and you understand that?

19        A.    Yes.

20        Q.    And when you give an opinion,

21   can we be assured that your opinion is based

22   upon reasonable scientific certainty?

23             MR. NORTH:  Objection to the

24        form.

Do Not Disclose - Subject to Further Confidentiality Review

1          A.      Yes.

2    BY MR. MARTIN:

3          Q.      Can we also be assured that

4    your testimony today will be given within

5    terms of reasonable scientific probability?

6                  MR. NORTH:   Objection to the

7          form.

8          A.      Yes.

9    BY MR. MARTIN:

10         Q.      All right.  Are you prepared,

11   then, today to assure us that when you do

12   give opinions today, you will have given them

13   with the backup of reasonable medical

14   certainty and -- let me start over.

15                 Can we be assured, then, that

16   when you give an opinion today it will be

17   based upon reasonable statistical certainty?

18                 MR. NORTH:   Objection to form.

19         A.      Yes.  And my understanding is

20   that those are all synonymous.

21   BY MR. MARTIN:

22         Q.      Yes.

23                 And one more question just for

24   the record.

```
 1                    When you give an opinion today,
 2       can you please also give it within terms of
 3       reasonable statistical probability?
 4                    MR. NORTH:  Objection to the
 5            form.
 6            A.      Yes.
 7       BY MR. MARTIN:
 8            Q.      Okay.  Doctor, have you
 9       formulated certain opinions regarding the
10       subject matter about which you are prepared
11       to testify today?
12            A.      Yes.
13            Q.      Just in a shorthand summary,
14       what are those opinions?
15            A.      So the shorthand summary, again
16       based on three different avenues of
17       investigation, is that there does appear to
18       be an increased risk of certain adverse
19       events to patients who received newer vena
20       cava filters as compared to the SNF older
21       filter.
22            Q.      All right.  Any other opinions
23       today, just in a shorthand analysis?
24            A.      I guess that's the summary.  I
```

1   mean, there are details within it, but...

2        Q.    All right.  One or two other

3   questions, then I'll pass to Mr. Mankoff.

4             Are you qualified today to give

5   the opinions that you are prepared to give

6   and that you will give in this deposition?

7             MR. NORTH:  Objection to the

8        form.

9        A.    Yes, I am.

10  BY MR. MARTIN:

11       Q.    Dr. Betensky, do you believe

12  that you're qualified to give the opinions

13  that you're prepared to give today?

14             MR. NORTH:  Objection to form.

15       A.    Yes, I do.

16  BY MR. MARTIN:

17       Q.    And what qualifies you to

18  formulate and provide opinions regarding the

19  matters today?

20       A.    So I am an expert in statistics

21  and biostatistics, and have considerable

22  experience in applying the methods of

23  statistics and biostatistics to all kinds of

24  data, including patient safety data.

```
 1        Q.     Okay.  Thank you, Dr. Betensky,
 2   for your time this morning, and I'm going to
 3   pass to Josh.  Thank you.  Josh Mankoff.
 4            MR. MANKOFF:  Thank you,
 5        Mr. Martin.
 6            We've been going for nearly two
 7        hours now.  I'm happy to jump right
 8        in, but do people want to take a quick
 9        break?
10            MR. NORTH:  I think we need a
11        break.
12            THE VIDEOGRAPHER:  With the
13        approval of counsel, going off the
14        record.  The time is approximately
15        10:49 a.m.
16            (Whereupon, a recess was
17        taken.)
18            THE VIDEOGRAPHER:  With the
19        approval of counsel, back on the
20        record.  The time is approximately
21        11:03 a.m.  This marks the beginning
22        of recording media number 2.
23            MR. MARTIN:  Can you guys hear
24        me?
```

1              MR. LOPEZ:  Yes.

2              MR. MARTIN:  It looks like I'm

3         having bandwidth problems.

4              So just real quickly before it

5         cuts me off, and if it does go ahead

6         and go forward, Josh.  But so for the

7         record for this deposition Exhibit

8         Number 1 will be the CV, Exhibit

9         Number 2 will be the first transcript

10        that we discussed at a little bit of

11        length, and Exhibit Number 3 will be

12        the second transcript that we

13        discussed and was shown on the screen.

14             So for purposes of the

15        deposition, those would be Exhibits

16        Number 1, Number 2, and Number 3,

17        understanding that the exact number

18        numbers for trial exhibit purposes may

19        change.

20             And I believe that's agreeable

21        to Richard.  Is that right, Mr. North?

22             MR. NORTH:  Yes, that's

23        correct.

24             ///

```
 1              (Whereupon, Plaintiffs' Exhibit
 2         Number 3 was marked for
 3         identification.)
 4              MR. MARTIN:  If I cut out,
 5         Josh, please continue on.
 6                   EXAMINATION
 7  BY MR. MANKOFF:
 8         Q.     Dr. Betensky, as we dive into
 9  the opinions that you're offering in this
10  case, I'd like to just start broadly and
11  generally so we can give the jury a bit of a
12  roadmap before we go into the details.
13              So first of all, did you
14  analyze data from the company Bard?
15         A.     Yes, I did.
16         Q.     Okay.  And would it be accurate
17  to say that you looked at -- broadly looked
18  at three different types of data?
19         A.     Yes.
20         Q.     Okay.  And can you describe,
21  again broadly, what those -- those three
22  areas, then, that you looked at?
23         A.     Yes.  So one is what's called
24  the design and failure mode effect analysis,
```

1    so this was an analysis undertaken by Bard

2    and their engineers and others in which they

3    assessed the likelihood of various adverse

4    outcomes related to the filters.  So that is

5    the first area, or set of data that I

6    examined and compared those likelihood

7    assessments between filters.

8                    The second area is I looked at

9    data provided by Bard on adverse events,

10   various adverse events from filters and

11   associated sales data for those filters, and

12   using those inputs I calculated reported risk

13   ratios, which I'm sure I will explain later,

14   but generally speaking, or broadly speaking,

15   measures of comparison of risk between newer

16   filters and the old filter.

17                   And then the third area, the

18   third type of data that I examined is an

19   experiment conducted by Bard scientists, a

20   bench test experiment, in which they did a

21   direct comparison at two temperatures of the

22   Recovery filter and the SNF filter with

23   respect to migration resistance related to

24   one of the adverse events.

1    Q.    Okay.  Thank you for that.

2          So regarding that first area

3    that you looked at, Bard's predictions about

4    failure events, did you come to a conclusion

5    regarding that opinion?

6    A.    Yes.  So there are several

7    comparisons that I made, in other words,

8    comparing several --

9    Q.    And so yes, can you just --

10   sorry to interrupt.

11         Can you tell me what your

12   conclusion was with regard to that analysis?

13   A.    Yes.  So there are several

14   comparisons, and across all of those

15   comparisons, in all cases the assessment made

16   by Bard of the likelihood of the adverse

17   event was greater than or equal to -- sorry,

18   the assessment of the likelihood of the

19   adverse event for the newer filters was

20   always greater than or equal to their

21   assessment for the likelihood of that event

22   for the SNF filter.

23   Q.    Similarly with respect to your

24   second opinion about the adverse event report

Do Not Disclose - Subject to Further Confidentiality Review

1    data, the failure reports that Bard received,

2    did you come to a conclusion when analyzing

3    that data?

4           A.     Yes.  So --

5           Q.     And what was your conclusion

6    there?

7           A.     So the conclusion there, again

8    after several analyses, several time points,

9    some sensitivity analyses, my conclusion

10   there is that there did appear to be an

11   increased risk of various adverse events for

12   the newer Bard filters as compared to the SNF

13   filter in most cases.

14          Q.     And finally, with respect to

15   your analysis of the migration bench test

16   data that you described, did you come to a

17   conclusion there?

18          A.     Yes.  So based on that lab

19   experiment, which again compared the Recovery

20   filter versus the SNF filter, the Recovery

21   filter was significantly associated with

22   lower migration resistance as compared to the

23   SNF.

24          Q.     Okay.  So with that background

1    then, I would like to jump into your -- go

2    into the details about your analysis of the

3    design failure mode and effects document.

4              Do you recall approximately how

5    many of those documents you reviewed?

6         A.    I don't know the number, but

7    there were several of them.

8         Q.    Okay.  Let's look at one

9    briefly just to look at the kind of

10   information that you evaluated.

11             Is this one of the documents

12   that you reviewed on the screen?

13        A.    Yes.

14             MR. MANKOFF:  For the record,

15        this is exhibit -- Trial Exhibit

16        Number 1763.

17        Q.    Let me just zoom in a little

18   bit so it can be read.

19             Which filter does this document

20   pertain to?

21        A.    This pertains to the Simon

22   nitinol filter, the SNF filter.

23             MR. MANKOFF:  And, Mr. North,

24        just for the record, do you have any

1    objection to the admission of this

2    document as an exhibit?

3              MR. NORTH:  No.

4              MR. MANKOFF:  Thank you.

5              (Whereupon, Plaintiffs' Exhibit

6    Number 4 was marked for

7    identification.)

8    BY MR. MANKOFF:

9         Q.    What, if you look at the

10   "Comments" section, what time period is Bard

11   using to make predictions for this document?

12        A.    So this is based on complaint

13   history from 2004 through 2006.

14        Q.    Okay.  Let's just jump down to

15   the end of the document to look at the kinds

16   of predictions that they're making.

17             So if we zoom in on section 5

18   here, what -- let me pull up the header so we

19   can see those as well.  What potential

20   failure modes are they evaluating or making

21   predictions about here?

22        A.    So potential failure mode is

23   unable -- or failure to deploy the filter.

24        Q.    And then just jumping down a

1    few more pages for another example on

2    page 16, what is Bard evaluating on this

3    page?

4         A.     So this is related to

5    packaging, so failures in the packaging.

6         Q.     Okay.  And just two more

7    examples.

8                On page 18, what potential

9    failure mode is being evaluated here?

10        A.     This is fracture, so type 2.

11   So, for example, leg and/or hook separated

12   from the filter.

13        Q.     What is the potential cause of

14   failure that Bard evaluates?

15        A.     So there are several that are

16   listed here, so would you like me to list all

17   of them?

18        Q.     So, for example, what is 3.2.2

19   evaluating?

20        A.     So this is material fatigue due

21   to movement as a cause of failure, potential

22   cause of failure.

23        Q.     Okay.  Now, let's switch over

24   to another Bard document.  This is

1     Exhibit 628.  And what document is this?

2          A.     So this is the design failure

3     modes and effect analysis for the Recovery

4     filter.

5          Q.     And for what date is this --

6     what's the date of this document?

7          A.     October 16th, 2003.

8               MR. MANKOFF:  Mr. North, for

9          the record, do you have any objection

10         to admitting this exhibit into

11         evidence?

12              MR. NORTH:  No, I do not.

13              MR. MANKOFF:  Thank you.

14              (Whereupon, Plaintiffs' Exhibit

15         Number 5 was marked for

16         identification.)

17    BY MR. MANKOFF:

18         Q.     Again, by way of example, let's

19    just confirm whether Bard is analyzing

20    similar parameters with respect to the

21    Recovery filter.  So here on page --

22              MR. MARTIN:  Josh, before you

23         go on, just since this is a trial

24         deposition, in addition to asking

1          Mr. North if he has any objections,

2          maybe just make a formal, you know,

3          offer to admit into evidence, then the

4          judge can rule on that offer.  It's a

5          technical thing, but you never know, a

6          judge may require you to make that

7          formal offer into evidence.

8                MR. MANKOFF:  Okay.  So I would

9          offer Exhibit 1763 in evidence, and

10          also Exhibit 628 into evidence, and

11          propose that both the pages that are

12          being shown here are published to the

13          jury.

14                MR. NORTH:  For the record, I'm

15          not certain that I'm required to

16          determine whether I'm going to object

17          or not in a deposition like this, but

18          I'm not going to object to those two

19          documents.

20     BY MR. MANKOFF:

21          Q.    So in this document, on page 5,

22     what is Bard identifying as a potential

23     failure mode for the Recovery filter?

24          A.    Unable to deploy the filter.

1          Q.     Let's jump to page 13.  I'll

2     zoom in so we can see it.  What is the

3     potential failure mode that Bard is

4     evaluating here?

5          A.     This is about migration.

6          Q.     And what are the potential

7     effects that they evaluate for migration for

8     the Recovery filter?

9          A.     So there's filter propagates,

10     filter embolization, and patient death.

11          Q.     Okay.  And then one more

12     example.  I guess that's the last example.

13               So I'm going to move to

14     Exhibit 641.  Can you describe generally what

15     we're looking at here?

16          A.     Yes.  So this is a summary

17     table that I constructed just to make it

18     easier to compare comparable entries from the

19     DFMEA documents from different filters.  So

20     here we have listed three different filters,

21     and with regard to failure mode of migration.

22          Q.     Will this document help to

23     explain your opinions to the jury?

24          A.     Yes, it will.

```
 1              MR. MANKOFF:  Mr. North, do you
 2       have any objection to admitting this
 3       for demonstrative purposes and
 4       displaying to the jury?
 5              MR. NORTH:  Yes, I do.  My
 6       recollection is that this has not been
 7       disclosed before.  I could be
 8       incorrect, but I don't recall prior
 9       disclosure.
10              MR. MANKOFF:  For the record,
11       let me zoom in on the top here.
12              This is Exhibit B to
13       Dr. Betensky's report, so it was
14       disclosed.
15              MR. NORTH:  Okay.  Proceed.
16              MR. MANKOFF:  So I mean,
17       assuming that it has been disclosed
18       and produced with her report, do you
19       have any objections to admitting it
20       for demonstrative purposes and
21       displaying it to the jury?
22              MR. NORTH:  For demonstrative
23       only.
24              MR. MANKOFF:  Okay.  So I would
```

 1          move to admit Exhibit 641 for

 2          demonstrative purposes, and display it

 3          to the jury.

 4                  (Whereupon, Plaintiffs' Exhibit

 5          Number 6 was marked for

 6          identification.)

 7     BY MR. MANKOFF:

 8          Q.      So, Dr. Betensky, I'm going to

 9     focus on the SNF and Recovery filters.  Let

10     me try and zoom in on those two sections of

11     the document so you can see it better.

12                  Can you explain what you're

13     doing, what information you're providing or

14     what your opinions are here with respect to

15     the SNF filter?

16          A.      Yes.  So again, this is

17     extracted from the original DFMEA document

18     for the SNF filter, and this is, in

19     particular, for the failure mode of

20     migration.

21                  And what's -- and then in the

22     potential effects of failure are different

23     levels of outcomes from this -- from the

24     failure of migration.  So beginning with

1    "Filter detaches from IVC wall," and then

2    next is "Filter embolization to or towards

3    the heart or lungs," and then lastly is the

4    "Critical health hazard," which is filter

5    embolization to the heart or lungs, and is

6    life-threatening.

7                And then the next column over,

8    "Potential Causes of Failure," lists

9    potential causes of the failures, and there

10   are seven of them that we see here listed.

11               And then moving to the right is

12   what's called the "Occurrence Rating."  And

13   so the occurrence rating for this DFMEA

14   document from SNF was provided on a 10 point

15   scale, 1 to 10, and each rating is associated

16   with a probability or a probability range of

17   the likelihood of the worst health -- the

18   worst possible health outcome associated with

19   the corresponding cause of failure.

20               And so the column to the right

21   of Occurrence Rating just simply translates

22   the number, so in this case we see 2's, so it

23   translates the 2 into the probability range

24   according to the document that explains how

1    to read the DFMEA document.

2            And so here you see that an

3    occurrence rating of 2 translates into a

4    probability of 1/150,000 all the way up to

5    1/20,000, meaning that's the range that the

6    Bard scientists predicted as the likelihood

7    of a critical health hazard associated with

8    twisted legs of the filter.

9        Q.     And what's the purpose of

10   having the SNF and the Recovery

11   information -- the Recovery information next

12   to the SNF information?

13       A.     Yes.  So the Recovery table

14   organized in the same way is providing Bard's

15   assessment of the risk, and in particular

16   their assessment of patient death associated

17   with different causes of failure for the

18   Recovery filter at or near the time of the

19   launch of the Recovery filter.

20            And the comparison here is

21   simply to illustrate their own internal

22   assessments of elevated chance, higher chance

23   of a critical outcome such as death for the

24   Recovery when they launched it as compared to

1    the older filter, the SNF in many cases.

2          Q.     Okay.  So let's -- so I want to

3    look at a few examples.

4                  So what is Bard predicting in

5    2.1.5 for the SNF filter?

6          A.     So what that shows is that

7    they're predicting that the likelihood of a

8    wire fracture and detachment, or detachment

9    occurring and leading to a critical health

10   hazard has a likelihood of 1/150,000 to

11   1/20,000.

12         Q.     And did Bard make a similar

13   prediction for the Recovery filter?

14         A.     So for the Recovery filter,

15   they predicted a probability of 1/20,000 to

16   1/2,000 as the probability of a wire fracture

17   that leads to patient death.  So in other

18   words, actually one component of critical

19   health hazard.

20         Q.     And did they also -- did Bard

21   also make a prediction regarding wire

22   detachment in the Recovery filter?

23         A.     Yes.  Right.  So 2.1.5 for --

24   on the Recovery side is wire detachment, and

1    they predicted likelihood of wire detachment

2    leading to patient death of 1/20,000 to

3    1/2,000.

4         Q.     Okay.  Let's just look at one

5    more comparison.

6              On the SNF side, what did Bard

7    predict for 2.1.7?

8         A.     So they predicted a probability

9    of a critical health hazard following -- so

10   sorry, a probability of inadequate radial

11   strength that would lead to a critical health

12   hazard would have a probability of 1/150,000

13   to 1/20,000.

14        Q.     And for Recovery, did Bard make

15   a similar prediction?

16        A.     Yes.  So that is in 2.1.8 on

17   the Recovery side.  And their prediction

18   there is a higher probability of

19   inadequate -- so a probability of 1/20,000 to

20   1/2,000 for inadequate radial strength

21   leading to patient death.

22        Q.     And so overall, is Bard

23   predicting that the Recovery filter is going

24   to migrate and cause a critical health hazard

 1    more often than the SNF filter?

 2                MR. NORTH:   Objection to the

 3         form.

 4         A.      Yes.

 5    BY MR. MANKOFF:

 6         Q.      Let me rephrase that.

 7                So overall, what is the

 8    difference in prediction between the SNF and

 9    the Recovery filter with respect to

10    migration?

11         A.      Yes.  So according to these

12    DFMEA sheets, Bard is predicting higher

13    probabilities of failure and subsequent

14    critical health outcome, such as death, for

15    the Recovery as compared to the SNF.

16         Q.      Okay.  I'd like to jump over to

17    some of the documents that you relied on in

18    forming your opinions.  So now I'm showing

19    you Exhibit 616.  Is this a document that you

20    discuss in your report?

21         A.      Yes.

22         Q.      And what is this document?

23    What's the title of the document?

24         A.      "Recovery Filter Adverse Events

```
 1    (Migrations/Fractures)."
 2         Q.    And what's the time period, or
 3    what year is this document related to?
 4         A.    So this is through
 5    September 26th, 2005.
 6              MR. NORTH:  I'm going to for
 7         the record object to the display of
 8         this document.  I don't believe it's
 9         admissible.  I believe it is
10         excludable as not relevant, and also
11         under Rule 403.
12              MR. MANKOFF:  Well, I would
13         move for admission of Exhibit 616, and
14         to display, to publish it to the jury.
15         Mr. North, your objection is noted.
16              (Whereupon, Plaintiffs' Exhibit
17         Number 7 was marked for
18         identification.)
19    BY MR. MANKOFF:
20         Q.    Dr. Betensky, what did Bard --
21    what was the rate of reports of migration
22    that Bard received for the Recovery filter in
23    2005?
24              MR. NORTH:  Objection.
```

1      A.     So they are reporting here a

2   rate of 0.156 percent, and as they note,

3   based on the units sold.

4   BY MR. MANKOFF:

5      Q.     And is that generally -- the

6   report of migrations indicated in this

7   document, is that generally in line with the

8   predictions we were looking at a minute ago

9   in your Exhibit B?

10      A.     Yes, it is.  So this is about,

11   you know, 1.5/1,000, and so -- actually so

12   this would be slightly larger than what they

13   were predicting.

14      Q.     Okay.  Let's look the one other

15   example, Exhibit 1940.  Is this a document

16   that you reviewed and relied on in forming

17   your opinions?

18      A.     Yes.

19           MR. MANKOFF:  And I would move

20        for admission of Exhibit 1940, and to

21        publish it to the jury.

22           MR. NORTH:  I object.

23           MR. MANKOFF:  What's the basis

24        of your objection, Mr. North?

1          MR. NORTH:  I don't believe the

2     document is admissible.  I think it

3     violates several rulings of the court

4     in limine that should apply to any

5     future case.

6          (Whereupon, Plaintiffs' Exhibit

7     Number 8 was marked for

8     identification.)

9  BY MR. MANKOFF:

10     Q.     Okay.  I'm going to expand the

11  bottom portion of this document.  Can you

12  describe generally what's being shown here?

13     A.     Yes.  So what's being shown

14  here, each row is listing a different filter,

15  and the columns have different adverse events

16  in them.  And then the content of the cells

17  are the rates, so meaning the number of those

18  particular events divided by the sales of the

19  filter in those years.

20     Q.     Okay.  And I just want to focus

21  on Recovery reports of migration since that's

22  what we were talking about a minute ago.

23               So what was the rate of

24  migration reports for the Recovery filter in

1    this document?

2         A.    Right.  So here it's showing it

3    to be 0.238 percent.

4         Q.    And again, is that roughly in

5    line with Bard's predictions for Recovery

6    filter migrations?

7         A.    Yes.

8         Q.    Just for reference, I'm going

9    to pull up the notes here.

10             In what year is this data

11   related to?

12        A.    This is through 2010.

13        Q.    Thank you.

14             Okay.  So to switch back to the

15   design failure mode and effects analysis

16   documents, I want to show you Exhibit 5644.

17   And I've jumped to page 12, but let me pull

18   up the heading here so you can tell us what

19   this document is.

20        A.    Yes, so this is the standard

21   operating procedure for the failure mode and

22   effects analysis.  So this explains the

23   content in the tables that are produced.

24        Q.    Okay.  And you mentioned this

1    briefly, but I want to go into a little bit

2    more detail.

3                The predictions, the occurrence

4    ratings that you described in your Exhibit B,

5    does that -- for the migration of the

6    Recovery and the SNF filter, does that

7    describe how often a migration would occur?

8        A.     No.  So the occurrence as is

9    explained in item E-1 on the screen in this

10   SOP, standard operating procedure, combines

11   three different events.  So the occurrence is

12   the product of three probabilities.

13               So the first probability is the

14   probability of the failure, the component or

15   process failure.  The second is that a

16   hazardous situation arises from the failure.

17   And then the third is that the worst case

18   effect, such as critical health hazard or

19   death, arises from the hazardous situation.

20               And so occurrence combines

21   everything.  So it's not just the failure,

22   it's the failure, and then downstream of the

23   failure the hazardous situation, and then

24   downstream of the hazardous situation the

1    worst possible outcome.

2              MR. MANKOFF:  I move for

3         admission of Exhibit 5644 and to

4         display it to the jury.

5              MR. NORTH:  No objection.

6              (Whereupon, Plaintiffs' Exhibit

7         Number 9 was marked for

8         identification.)

9    BY MR. MANKOFF:

10        Q.    Let's look at another

11   comparison that you made between the SNF and

12   Recovery filter.  So this is Exhibit 641,

13   page 3.  And again, I'll just pull up the

14   Recovery and SNF data.

15             What is being compared here in

16   2.3 for the SNF filter?

17        A.    So this is perforation of the

18   caval wall.

19        Q.    And what did Bard predict about

20   perforation for the SNF in 2.3.1?

21        A.    So the prediction is that

22   there's a probability ranging between

23   1/150,000 to 1/20,000 that the hooks are too

24   sharp, and ultimately lead to the critical

Do Not Disclose - Subject to Further Confidentiality Review

1    health hazard.

2          Q.     And in this case, what is the

3    critical health hazard?

4          A.     So this is penetration of

5    adjacent anatomical structure.

6          Q.     And did Bard make a similar

7    prediction with respect to the Recovery

8    filter?

9          A.     So with Recovery filter, they

10   also have the item 2.3.1 which they describe

11   as the barbs being too sharp, and for -- in

12   place of that critical health hazard for the

13   SNF they are using patient death as the

14   critical health hazard, which would be one

15   component of the SNF critical health hazard.

16                And the prediction is that

17   there's a probability of 1/2,000 to 1/200

18   that the barbs are too sharp and lead to

19   patient death.

20         Q.     And what did Bard predict with

21   respect to the SNF filter in 2.3.2?

22         A.     So there is -- so the cause of

23   failure is described as general design of

24   attachment points.  And again, their

1    prediction is 1 in -- oh, probability of

2    1/150,000 to 1/20,000 that there would be --

3    that the design would be failed in some way

4    and lead to the critical health hazard.

5         Q.    And what is the prediction for

6    the similar potential cause for the Recovery

7    filter?

8         A.    So for the Recovery, the

9    probability prediction is 1/2,000 to 1/200.

10         Q.    Okay.  One more example on this

11    page.  What did Bard predict for the SNF for

12    2.3.3?

13         A.    So they predicted a probability

14    of 1/150,000 to 1/20,000 for the failure of

15    excessive radial force leading to the

16    critical health hazard.

17         Q.    And what was the related

18    prediction for the Recovery filter?

19         A.    So for Recovery it's -- it's

20    described, 2.3.3 again, as excessive

21    expansion.  And they assigned it a

22    probability of 1/2,000 to 1/200 that

23    excessive expansion would occur and lead to

24    patient death.

1    Q.    So overall with these examples

2    that we've looked at, what is the comparison

3    of Bard's predictions of perforation with the

4    Recovery and the SNF filter?

5    A.    So they are predicting higher,

6    much -- or 10-fold higher at least

7    probabilities of the failures and leading

8    to -- of these failures occurring and leading

9    to patient death for Recovery versus SNF.

10    Q.    Okay.  Let's, just to check on

11    those predictions, let's go back to

12    Exhibit 1940, and I'll pull up the Recovery

13    information for perforation.

14         What were the reports of

15    Recovery perforation that Bard received,

16    according to this document?

17    A.    So this lists it as

18    0.143 percent, so about 1.4 per 1,000, which

19    is right in the middle of the range that they

20    predicted.

21    Q.    Okay.  Let's look at SNF

22    predictions with respect to fractures.  And I

23    want to focus on 3.2.  What is the potential

24    effect of a fracture that Bard evaluates here

1    with respect to the SNF filter?

2         A.    So there are three that are

3    listed here, including the critical health

4    hazard of -- which is life-threatening.

5         Q.    And in 3.3.2, what does Bard

6    predict with respect to the SNF filter?

7         A.    So there they are predicting a

8    probability of 1/20,000 to 1/10,000 that the

9    failure of material fatigue due to movement

10   occurs and leads to a critical health hazard.

11        Q.    Okay.  And there's no

12   comparison here in Exhibit B.  Do you recall

13   why that is?

14        A.    I believe -- actually, I don't

15   recall.  I don't recall.

16        Q.    Do you recall if Bard made a

17   specific prediction about filter fracture for

18   the Recovery filter?

19        A.    I don't -- I actually don't

20   remember.  Perhaps they combined filter

21   fracture with another outcome, although I

22   don't remember.

23        Q.    Well, let me ask this.

24             If there had been a direct

1    comparison, would you have put that -- would

2    you have lined it up in this document here?

3         A.    Yes.  Absolutely.

4         Q.    That was the purpose of this

5    document, right?

6              MR. NORTH:  Objection to the

7         form.

8         A.    That was exactly the purpose,

9    was to make it easy to do a side-by-side

10   comparison.

11   BY MR. MANKOFF:

12        Q.    Okay.  Since there is no

13   side-by-side comparison, I want to jump back

14   to Exhibit 628, and again remind the jury

15   what this document is.

16        A.    So this is the design failure

17   mode and effects analysis for the Recovery

18   filter, looking at a particular outcome of

19   filtration, or process of filtration.

20        Q.    Is this the source data

21   generally for the information we've been

22   looking at in Exhibit B?

23        A.    Yes, it is.

24        Q.    Okay.  Let me just zoom in a

1    little bit so we can see it better.

2              Does Bard make predictions

3    about a potential cause of -- so what's the

4    failure mode that Bard is predicting in this?

5         A.    So the failure mode is

6    compromised filtration efficiency.

7         Q.    And does Bard predict that

8    fracture would be a potential cause of

9    compromised filtration efficiency?

10        A.    Yes.  They have wire fracture

11   listed as one of the potential causes of

12   failure.

13        Q.    And how do they describe how

14   often that is going to occur in this

15   document?

16        A.    So in the occurrence column,

17   which is labeled O, they assign wire fracture

18   a 2.  And I forget what probability that

19   translates into, but that translates into

20   some probability for wire fracture occurring

21   and leading to patient death.

22        Q.    And you have an occurrence

23   rating of 2 here for the Recovery filter?

24        A.    Yes.

1        Q.      And so what does -- for

2   example, wire detachment is also listed here.

3   What probability does occurrence rating 2

4   translate into?

5        A.      So that's a probability of

6   1/20,000 to 1/2,000.

7        Q.      Okay.  So I want to, again,

8   look at the actual failure reports that Bard

9   received.  In Exhibit 616, what was the rate

10  of failure, filter fracture reports that Bard

11  was receiving?

12       A.      0.215 percent.

13       Q.      And is that in line with the

14  prediction that we looked at?

15       A.      Yes.

16       Q.      And if we go forward in time to

17  Exhibit 1940 and look at the Recovery

18  fracture reports that Bard has in this

19  document, what is the rate of fracture

20  reports that Bard has here for the Recovery

21  filter?

22       A.      So, let's see.  So their total,

23  the total fracture rate, they're reporting

24  0.546 percent.

1    Q.    And is that more than 1/200?

2    A.    Is that more than -- that is

3 slightly more than 1/200, yes.

4    Q.    Okay.  So before we move on to

5 your next area of analysis, when you boil it

6 all down, how did Bard predict the Recovery

7 would perform compared to the SNF filter?

8    A.    So they were predicting that --

9 they were predicting higher or -- higher or

10 equal probabilities of critical health

11 outcomes for Recovery as compared to SNF.

12    Q.    And were the actual failure

13 reports that Bard received in line with those

14 predictions?

15    A.    So they were more or less in

16 line.  They actually may have been higher in

17 some cases, but that's to be expected,

18 because the DFMEA probabilities included the

19 end -- the worst possible end result of the

20 critical health outcome or death, whereas

21 what is in -- the numbers that Bard reported

22 in their sheets didn't only include cases

23 that had the critical health hazard outcome,

24 so there would be more of them.

1    Q.    And when we talk about the

2  failure reports to Bard, do you have an

3  understanding of whether those reports

4  capture all of the filter failures that are

5  occurring in the real world?

6    A.    Almost certainly they do not.

7  So there's -- they are reported voluntarily,

8  and certainly they're not complete.

9    Q.    So does that mean that there

10  are more failures occurring than are reported

11  to Bard?

12    A.    In all likelihood, yes.

13    Q.    Okay.  So let's now move on to

14  your analysis of adverse event reports with

15  respect to the Recovery filter.

16        Generally, what data did you

17  analyze to look at the adverse event reports?

18    A.    So I used data that were

19  provided by Bard that included beginning

20  approximately in the year 2000, which is what

21  they provided, data on adverse events, and

22  accompanying that, their sales data.

23    Q.    And did you prepare an exhibit

24  to help explain your opinions in this area?

```
 1           A.      Yes, I did.

 2           Q.      So I'm showing on the screen

 3    Exhibit 665.  Is this the exhibit that you

 4    prepared?

 5           A.      This is one page of several

 6    pages, yes.

 7           Q.      This is an Excel spreadsheet,

 8    right?

 9           A.      Yes.

10           Q.      And will the pages of this

11    Excel spreadsheet help to explain your

12    opinions to the jury?

13           A.      I'm not -- I don't think

14    they're necessary.

15           Q.      But will they assist in

16    providing the opinions that you're going to

17    give?

18           A.      Sure.  They show the inputs to

19    these numbers, so in that sense, yes.

20           Q.      And this page, generally what

21    does this page that we're looking at show?

22           A.      So this is really a summary

23    page, and all the subsequent pages are, as I

24    said, sort of the raw data that go into this
```

1    page.  So this is, again, a summary of the

2    data provided by Bard consisting of the

3    adverse events and the sales.  And the

4    summary is a comparison, a measure of

5    comparison that I calculated between the

6    Recovery and the SNF filters.

7        Q.    And does the Excel spreadsheet

8    accurately reflect the calculations that you

9    made?

10       A.    So the spreadsheets contain the

11   raw data.  I don't know if I have -- I don't

12   believe I did all of the calculations within

13   the spreadsheet.  I may have used separate

14   statistical software for some of the actual

15   calculations.

16       Q.    Okay.  Let me try it this way.

17             Do some of the pages of the

18   spreadsheet show the results, accurately

19   reflect the results of the calculations you

20   made?

21       A.    There may be -- I believe there

22   may be a few places where I caught errors,

23   and I may not have updated every single cell

24   on every single spreadsheet, but for the most

```
 1    part they do.

 2              MR. MANKOFF:  Okay.  So I move

 3         to admit Exhibit 665 for demonstrative

 4         purposes and to publish it to the

 5         jury.

 6              MR. NORTH:  I'm going to object

 7         only to the extent that it may

 8         reference doubt.  But otherwise, no

 9         objection.

10              (Whereupon, Plaintiffs' Exhibit

11         Number 10 was marked for

12         identification.)

13    BY MR. MANKOFF:

14         Q.    There's a lot of numbers on

15    this page, so for this part of your opinion

16    I'd like to focus on the comparisons you made

17    between the Recovery filter and the SNF

18    filter, so that will help narrow us down a

19    little bit.

20              Let's just start with the

21    earliest time period and try and move forward

22    in time.  So let me start with a general

23    question.

24              What time periods did you
```

1    analyze with respect to the Recovery compared

2    to the SNF filter?

3         A.     So I have several different

4    time periods, and they're cumulative, meaning

5    through the dates, the designated dates.

6              So for example, I did one

7    analysis through the second quarter of 2003.

8    I did a second one through the third quarter

9    of 2004, then through the third quarter of

10   2005, through November 2007, through

11   November 2009, through July 2010, and there

12   may be actually additional dates as well.  So

13   I was guided by -- again, by the data that

14   were provided by Bard.

15        Q.     Okay.  So let's start with that

16   earliest time period that you mentioned in

17   2003.  So let me pull that row up, and let me

18   try and line up the header so we can see what

19   is being reported here.

20              Let's start with migration.

21   What are you -- what is your opinion about

22   Recovery versus SNF for migration?

23        A.     So let me begin by just

24   explaining what is -- the number that is

1    contained here.

2                   So this is what's called a

3    reporting risk ratio, and it's a calculation

4    where I calculated the risk of migration for

5    the Recovery filter, and divided that by the

6    risk of migration for the SNF filter.

7                   And those risks are calculated

8    as the number of migration events that were

9    reported, that's why it's called the

10   reporting risk ratio, divided by the number

11   of Recovery filters that were implanted as

12   measured by sales data, or approximated by

13   sales data.  So that's the calculation of the

14   risk.

15                  And what is contained in this

16   table is the ratio, again the risk of

17   migration for Recovery divided by the risk of

18   migration for SNF.

19                  And here you see the number is

20   183.31.  So the data lead us to a ratio of

21   183, approximately, meaning that the risk of

22   migration for the Recovery filter as reported

23   is 183 times that for the SNF filter.

24        Q.     Does that mean that there were

1    more reports for Recovery compared to SNF

2    when you adjust for sales?

3         A.     That's another way of saying

4    it.

5         Q.    Okay.  Now, you have some other

6    columns on here.

7               What does it mean for 0/0 for

8    filter embolization deaths?

9         A.     So I use the notation 0 divided

10   by 0 when there were 0 events reported for

11   Recovery and there were 0 events reported for

12   SNF.  So that's what that means here.

13        Q.     And then for caval perforation

14   and filter fracture you have 0.  What does

15   that mean?

16        A.     So 0 is an actual 0, which

17   means that there were 0 events reported for

18   Recovery, for the Recovery filter, and some

19   non-0 number of events reported for SNF.

20        Q.     Okay.  Let's look at the next

21   time period, which I believe is April 23rd,

22   2004.  Let me pull that out.

23               Are these also reporting risk

24   ratios?

1          A.     Yes, that row, that first row

2     is, yes.

3          Q.     What is the reporting risk

4     ratio for this time period for filter

5     migration?

6          A.     So for this time period through

7     April 23rd, 2004, that reporting risk ratio

8     is 38, approximately.

9          Q.     And then on the next row you

10    have -- the next two rows you have reference

11    to a P.  Can you describe what that is?

12         A.     Yes, P is shorthand for the

13    statistical term p-value, and on these two

14    rows I have two different ways of calculating

15    the p-value.  So there's technical issues in

16    calculating it when there are 0 counts in

17    some cases.

18              But in any case, the p-value is

19    a way for us to indicate how strong the

20    evidence is that the quantity that we're

21    estimating, which in this case is this

22    reporting risk ratio, is different from the

23    value 1.

24              So just to parse out that, the

1    risk ratio we would expect to be 1 if there

2    is no difference in risk between the Recovery

3    and SNF.  We have data and we estimate a risk

4    ratio, reporting risk ratio, of 38, which is

5    quite a bit larger than a risk ratio of 1,

6    but we don't know if that is meaningful, if

7    it's meaningfully different from 1.  So

8    that's where statistics come in.

9              Obviously 38 is different from

10   1, but maybe that's just due to chance, and

11   maybe, you know, that could have just

12   happened by chance.

13             So the p-value is a measure of

14   how likely is that to have happened by chance

15   alone versus the alternative, which is maybe

16   we got a 38 because really there is an

17   elevated risk of migration for Recovery

18   versus SNF.

19             So the smaller the p-value, the

20   less likely it is that that 38 arose by

21   chance alone, meaning the more likely it is

22   that it truly is different from 1 and not

23   equal to 1.

24             So in this particular case,

1    these p-values are quite small.  We consider

2    anything really less than 0.05 to be pretty

3    small, and these are much smaller than that,

4    which provides strong evidence that what

5    we're seeing as this reporting risk ratio is

6    not just random and by chance different from

7    1, but truly is different from 1.

8          Q.    So if I understand you

9    correctly, the statistical calculations you

10   performed, what do they indicate about

11   whether the 38 value that you have there is

12   due to chance?

13         A.    So they indicate a very small

14   likelihood that it would be due to chance.

15   So in particular, you know, so the p-value is

16   the probability that by chance alone we could

17   have gotten something as large as 38, or

18   larger.  And so the probability of this

19   happening by chance alone is, you know, quite

20   small, 0.0009.

21         Q.    And is another way of saying

22   all of that that the result is statistically

23   significant?

24         A.    Yes.  So we would say that it's

Do Not Disclose - Subject to Further Confidentiality Review

1    statistically significant at -- we would have

2    to specify what our threshold is in order to

3    conclude significance.  But if we use the

4    typical .05, we would say it's highly

5    statistically significant because the

6    p-values are much smaller than that threshold

7    of .05.

8         Q.    Okay.  Let's look at what your

9    calculations were with respect to death

10   compared to the Recovery versus SNF.

11        A.    Okay.

12        Q.    What is your result there?

13        A.    Right.  So here I put the

14   symbol for infinity in this cell.  And the

15   reason for that is that it involves dividing

16   by 0.

17             So what that means is that

18   there were 0 deaths reported for the SNF

19   filter, while there were more than 0 for the

20   Recovery filter.

21        Q.    And is the difference between

22   the Recovery and the SNF with respect to

23   death statistically significant?

24             MR. NORTH:  Objection.

```
1            A.     Yes.  So again, this is a

2    technical point that I won't elaborate on too

3    much on, except to say that this is -- I

4    could evaluate this using what's called this

5    exact p-value calculation.

6                  And what I obtain is that the

7    probability of obtaining this infinite

8    reporting risk ratio, if there were truly no

9    difference in the risk of death, is 0.0016.

10   BY MR. MANKOFF:

11           Q.     So when you compared the

12   reports of death for Recovery versus SNF, did

13   you conclude whether or not the difference

14   was likely to be due to chance?

15                  MR. NORTH:  Objection.

16           A.     So this calculation suggests

17   that this reporting risk ratio is truly

18   different from 1, and not simply due to

19   chance alone.

20   BY MR. MANKOFF:

21           Q.     And what did you calculate for

22   filter embolization deaths for Recovery

23   versus SNF?

24                  MR. NORTH:  Objection.
```

1          A.     So the same, infinite outcome,

2    meaning, again, there were no SNF filter

3    embolization deaths, and there were at least

4    one Recovery filter embolization death.

5    BY MR. MANKOFF:

6          Q.     And did you conclude whether or

7    not this difference was due to chance?

8               MR. NORTH:  Objection.

9          A.     So again, so this p-value is

10   0.0135, meaning the probability that we could

11   have gotten this infinite reporting risk

12   ratio by chance alone is 0.01, meaning it's

13   significantly different from 1.  It's not by

14   chance alone that it's different from 1.

15   BY MR. MANKOFF:

16         Q.     And what was your calculation

17   of the Recovery versus SNF reports for tilted

18   filter?

19         A.     So really the same numbers.  So

20   the infinity for the reporting risk ratio,

21   meaning 0 tilted filters for the SNF, more

22   than 1 or greater for the Recovery.  And also

23   this is statistically significantly different

24   from one, so this is not -- unlikely to be by

1    chance alone.

2         Q.    Okay.  Let's move forward to

3    the next time period that you looked at.

4              I'll pull out the third quarter

5    of 2004.  Let me again pull out the header so

6    we can see what these numbers refer to.

7              What was your calculation with

8    respect to filter embolization deaths for

9    this time period?

10             MR. NORTH:  Objection.

11        A.    So this is infinite reporting

12   risk ratio.

13   BY MR. MANKOFF:

14        Q.    And does that mean that there

15   are more reports than expected for the

16   Recovery compared to the SNF?

17        A.    So again, it means that there

18   were 0 for the SNF, and 1 or greater for

19   Recovery.

20        Q.    Okay.  And what was the

21   calculation for migration for the time

22   period?

23        A.    So the reporting risk ratio for

24   migration is 24.95.

1      Q.      Okay.  And what about for caval

2    perforation?

3      A.      4.85.

4      Q.      And what was the reporting risk

5    ratio for filter fracture?

6      A.      12.47.

7      Q.      And then you have -- what is

8    the significance of "migration plus"?

9      A.      So the sheet -- the data sheets

10   from Bard changed over time, and at some

11   point they included filter embolization with

12   migration, and called that migration, and so

13   I included this category which I designated

14   as migration plus to mean that I, as they did

15   in their data sheets, added the migration

16   events with the filter embolization events.

17     Q.      And what was the reporting risk

18   ratio for that category?

19     A.      33.26.

20     Q.      Okay.  Did you conduct tests of

21   statistical significance for these values?

22     A.      Yes, I did.

23     Q.      Okay.  And where are they on

24   your chart here?

1          A.     So if you move over to the

2    right, yes, so there I have what I've called

3    the approximate p-values associated with each

4    one of those reporting risk ratios.  And I've

5    highlighted the ones, just to make it

6    visually easier, I've highlighted the ones

7    that are less than 0.05.

8          Q.     I don't have these lined up

9    perfectly, but let me go back out to look at

10   the full page.

11              Are these the approximate

12   p-values over on the right-hand side?

13         A.     Yes, they are.

14         Q.     Okay.  And explain again, what

15   does the highlighting mean for those values?

16         A.     Simply that the numbers are

17   less than that sort of important threshold of

18   0.05.

19         Q.     So do the highlighted values

20   then designate reporting risk ratios that are

21   statistically significant?

22         A.     They are statistically

23   significant relative to .05, yes.

24         Q.     Let's look at the next time

1    period.  I believe we're at the third quarter

2    of 2005, is that right?

3         A.       Yes.

4         Q.       What was the reporting risk

5    ratio for filter embolization deaths for this

6    time period?

7         A.       So this is also infinity,

8    indicating 0 filter embolization deaths for

9    the SNF, and something greater than 0 for

10   Recovery.

11        Q.       And what was the calculation

12   for migration?

13        A.       Reporting risk ratio for

14   migration is 63.78.

15        Q.       And for caval perforation?

16        A.       4.39.

17        Q.       And for filter fracture?

18        A.       53.15.

19        Q.       And let me see if I can go and

20   pull up the earlier time period next to this

21   one.

22             Are these numbers generally

23   increasing as Bard obtains more data?

24        A.       So they are increasing, except

1   for caval perforation where it's actually

2   slightly decreasing, but more or less appears

3   stable.

4        Q.     Let's look at November of 2007.

5   What was your calculation for filter

6   embolization then?

7             MR. NORTH:  Objection.

8        A.     So that is infinity for the

9   reporting risk ratio, again meaning 0 filter

10  embolization deaths for SNF, and 1 or more

11  for Recovery.

12  BY MR. MANKOFF:

13       Q.     And what was your calculation

14  for migration?

15       A.     114.91.

16       Q.     And for caval perforation?

17       A.     9.76.

18       Q.     And for filter fracture?

19       A.     81.78.

20       Q.     So for filter fracture, does

21  that mean that there's 81 times more reports

22  of fracture for the Recovery than the SNF

23  when you correct for sales?

24       A.     I mean, that -- I would prefer

1   to say it a little bit more precisely.  But

2   yes, colloquially speaking, that's correct.

3        Q.    Okay.  Let's look at

4   November 2009.  We have two more time periods

5   on this spreadsheet to look at.

6            For November 2009, what's your

7   calculation for filter embolization deaths?

8        A.    So again, a risk ratio -- a

9   reporting risk ratio of infinity.  0 filter

10  embolization deaths for SNF, and 1 or more

11  for Recovery.

12       Q.    And what was the calculation

13  for migration?

14       A.    So the reporting risk ratio for

15  migration was 135.49.

16       Q.    And for caval perforation?

17       A.    12.03.

18       Q.    And what about filter fracture?

19       A.    There is nothing in this cell,

20  meaning that there was no data for me to be

21  able to calculate this.

22       Q.    Okay.  And I believe we'll look

23  at some different fracture data in a minute.

24            What was the calculation for

1    tilted filter?

2         A.    So infinity, again meaning 0

3    tilted filters for SNF, and 1 or more for

4    Recovery.

5         Q.    Okay.  Then let's look at the

6    last time period on this spreadsheet, and

7    that's July 2010.  What was the calculation

8    for filter embolization deaths?

9              MR. NORTH:  Objection.

10        A.    So that reporting risk ratio is

11   infinity.

12   BY MR. MANKOFF:

13        Q.    And for migration?

14        A.    288.39.

15        Q.    And for caval perforation?

16        A.    21.72.

17        Q.    Okay.  So did you do any

18   additional calculations to confirm the

19   accuracy of these estimates?

20        A.    Yes, I did.  So I believe in

21   some cases I calculated confidence intervals.

22        Q.    And did you do any sensitivity

23   analyses?

24        A.    Yes.  And I also conducted

1   various sensitivity analyses to test certain

2   assumptions that I was required to make.

3        Q.    Okay.  Let's take a look at --

4   you know what, before we get into that, I

5   wanted to look at -- let me ask this

6   question.

7              Did you describe in your report

8   any -- let me put it this way.

9              Did Bard make calculations or

10  do analyses similar to what we've been

11  reviewing here?

12      A.    Yes, they did.  They used the

13  same data or very similar data, and they

14  actually calculated rates or probabilities,

15  or maybe I should say risks, that's the word

16  that I've been using, so they calculated

17  risks of these events separately by filter,

18  in fact, we looked at some of those a while

19  ago.

20              And they actually also

21  calculated reporting risk ratios.  And they

22  even did statistical analysis on those

23  reporting risk ratios.

24      Q.    Were Bard's conclusions

1    generally in line with your conclusions?

2         A.    Yes, I believe they were.

3         Q.    Okay.  And did you discover any

4    errors that Bard had made with respect to

5    tabulating or calculating data?

6         A.    Yes.  There were several

7    errors, and I detailed those in my reports.

8    So there were some discrepancies, there were

9    some undercounts and -- yes.

10        Q.    Okay.  I'd just like to look at

11   one of those by way of example.  So I've

12   switched tabs on your spreadsheet.  Can you

13   describe what we're looking at here?

14        A.    Yes.  Although I don't see --

15   is there -- I don't know the name -- I don't

16   know what years this is looking at.

17        Q.    I'll represent that this is the

18   third quarter of 2005.  It's cut off from the

19   screen.

20        A.    Okay.  So then this represents

21   what I've called the raw data, so this is the

22   input data to those reporting risk ratios

23   that we just looked at on the front page,

24   which is the summary page.  So here, for

1    that, this period of time, I have listed the

2    sales numbers provided by Bard for the

3    different filters, so the Recovery and the

4    SNF on the first two lines, and then I've

5    also listed the counts of the various adverse

6    events as provided by Bard within this time

7    frame.

8           Q.     Okay.  What count did you use

9    for the filter fracture migration?

10          A.     So the number here is 46.

11          Q.     I should say, for the Recovery

12   filter?

13          A.     For the Recovery.

14          Q.     And what number did you use for

15   filter fracture for the Recovery?

16          A.     45.

17          Q.     Okay.  So is this the

18   spreadsheet from which you got -- is this a

19   Bard spreadsheet that we're looking at?  This

20   is Exhibit 4306.

21          A.     Yes, it is.

22          Q.     And just to zoom in on the time

23   period here, is this the spreadsheet from

24   which you analyzed the third quarter of 2005

1    information?

2         A.    Yes.

3         Q.    Okay.  And so just to confirm

4    for the Recovery filter, what did they have

5    for counts of migration and filter fracture?

6         A.    So they have 46 for migration,

7    and 45 for filter fracture.

8              MR. MANKOFF:  And I move for

9         admission of Exhibit 4306 and to

10        publish it to the jury.

11             MR. NORTH:  I object.

12             (Whereupon, Plaintiffs' Exhibit

13        Number 11 was marked for

14        identification.)

15   BY MR. MANKOFF:

16        Q.    So going back to Exhibit 616,

17   again just to orient us, what is the time

18   period of analysis for migration, reports of

19   migration on this document?

20             MR. NORTH:  Objection to the

21        form.

22        A.    So this is approximately the

23   same, so through the third quarter of 2005.

24             ///

BY MR. MANKOFF:

Q.    And how many migrations have been reported to Bard for this time period?

A.    So in this document they are reporting 55 migrations.

Q.    And further down they report on fractures.  How many reports of fractures did Bard have for this time period?

A.    So here in this document they were reporting 76 filter fractures.

Q.    Can you explain why you used 45 or 46 for migration and fracture rather than these higher numbers?

A.    Yes.  So I wanted to take a conservative approach.  And in the case of discrepancies, of which I found several, as I mentioned, between company documents, I selected the smaller number for the Recovery filter.

Q.    And would that tend to make the calculations that you made smaller or larger?

A.    Choosing the smaller number would make them smaller, so it would translate into a lower risk of the event for

1    Recovery, and therefore a lower reporting

2    risk ratio for Recovery versus SNF.

3         Q.    Okay.  And did you analyze

4    additional fracture data when you were

5    looking at the adverse event reports?

6         A.    Yes, I did.

7         Q.    Okay.  I'd like to go through

8    those as well, again focusing on the Recovery

9    filter.

10             So let's look at December of

11   2009.  What is RRR here?

12        A.    So that's just an abbreviation

13   for the reporting risk ratio.

14        Q.    And what did you calculate for

15   the reporting risk ratio for fracture for

16   this time period?

17        A.    So here I estimated 28.5.

18        Q.    And so is that the same

19   calculation as we were looking at on the

20   other spreadsheet?

21        A.    It's the same calculation,

22   though I did not have -- I believe I did

23   not -- actually, I think through -- can you

24   move that top?  Yes, I just want to see what

1    is written on this document with regard to

2    the SNF comparison.

3              Okay.  Yes.  So I believe this

4    particular comparison is the same kind of

5    calculation that I had on the front page,

6    yes.

7         Q.    Okay.  So I started to ask you,

8    now I want to go into more detail about any

9    calculations you did to verify the accuracy

10   of your results and your opinions and your

11   conclusions here.

12             So did you calculate confidence

13   intervals?

14        A.    I did on this table, for

15   example.

16        Q.    Okay.  And what is a confidence

17   interval?

18        A.    So a confidence interval is an

19   interval, so you can see that in the column

20   labeled 95 percent CI, "CI" for confidence

21   interval.  And so essentially it's an

22   interval that contains the estimate, in this

23   case the reporting risk ratio, so you can see

24   28.5 lies between 18.2 and 46.7.  And this

1    interval is an interval that we can be

2    95 percent confident contains the true

3    reporting risk ratio.

4                So we acknowledge that if

5    somehow we could do this, quote unquote,

6    experiment many times over we might not get a

7    reporting risk ratio of 28.5 every time, but

8    the confidence interval tells us that if we

9    were to repeat the experiment -- if we were

10   to repeat this, of course this is completely

11   hypothetical because we can't repeat it, but

12   then 95 percent of the times that we would

13   repeat it, the confidence interval would

14   contain the truth.

15               So that's just long-winded,

16   maybe unnecessary, explanation for why we

17   believe this confidence interval, because we

18   can be assured that with 95 percent

19   confidence that it contains the true

20   reporting risk ratio.

21       Q.     And what are you reporting here

22   under Fisher's exact p-value?

23       A.     So this is just simply that

24   exact p-value that we saw on the summary

1    page.  So here it is, and it's tiny, so less

2    than 2.2 times 10 to the minus 16th.  Again,

3    testing whether the reporting risk ratio of

4    28.5 could have arisen by chance alone, or

5    not.  And so here we see that there's

6    infinitesimal probability that it arose by

7    chance alone.

8         Q.    Okay.  And then you mentioned a

9    sensitivity analysis.  What is a sensitivity

10   analysis?

11        A.    So a sensitivity analysis is

12   where we take -- often depends, it means we

13   take the actual data and change it in a few

14   different ways just to test the sensitivity

15   of the findings to potential different -- or

16   changes in the data.

17            So what I mean by that in this

18   particular example is understanding that the

19   SNF filter came on the market I believe in

20   1990 or the early '90s, whereas the data that

21   Bard provided and that I have in my analysis

22   and that they actually used in their analyses

23   starts in 2000, I wanted to account for

24   possible events that might have occurred

1    prior to 2000.

2           Based on other documents that I

3    saw, there were very few of those, so I, in a

4    so-called sensitivity analysis, I added five

5    events to the SNF counts of events, and did

6    the analysis supposing that there were

7    actually five more than we actually know

8    about.

9         Q.      And what was the result of that

10   analysis?

11        A.      So the result is very, very

12   similar to the analysis based on the original

13   data.  It didn't change any of the findings,

14   I don't believe.

15        Q.      Well, was the result still

16   increased for the Recovery with respect to

17   the SNF?

18        A.      So, yes.  So let me explain it.

19           The effect of adding the five

20   events will decrease the actual reporting

21   risk ratio just by definition, because it

22   amounts to increasing the denominator of that

23   ratio.

24           So here in this particular

1    example, through the end of 2009, the effect

2    of doing that was to change the reporting

3    risk ratio from 28.5 to 23.2.  But it still

4    remains highly statistically significant,

5    meaning very, very small chance that a

6    reporting risk ratio of 23.2 could have

7    arisen by chance when -- if the truth were

8    really 1.

9         Q.     And do the confidence intervals

10   under the sensitivity analysis suggest that

11   the reporting risk ratio is greater than 1?

12        A.     Yes.  So you can see that the

13   interval -- the endpoints of the interval

14   decreased, so at a lower -- the lower

15   endpoint is 15.4, and the upper endpoint also

16   decreased to 36.3, but that interval, of

17   course, is still far away from 1.

18             So 1, meaning no difference in

19   risk, reporting risk, is nowhere near this

20   interval, so there remains, again, strong

21   evidence that this didn't arise by chance

22   alone.

23        Q.     Okay.  Let's look at the data

24   for the Recovery filter through

1    December 2010.  What was the reporting risk

2    ratio for that time period?

3         A.     So here -- so first I want to

4    just explain that for this time period, I

5    compared Recovery in this time period to SNF

6    through 2009.  And the reason for that is

7    that there was some data missing or not

8    available for SNF in 2010, and again I wanted

9    to take the most conservative approach, and

10   so this value for SNF through 2009 is the

11   largest event rate for SNF fracture, so I

12   used that as the comparator here, and that

13   gave me a reporting risk ratio of 29.8.

14        Q.     And were these results

15   statistically significant, that result, and

16   also under the sensitivity analysis?

17        A.     Yes, in both cases they're

18   highly significantly different from 1.

19        Q.     Okay.  And let's look one year

20   later in December 2011.  What was the

21   reporting risk ratio for that time period?

22        A.     So in that -- through 2011, the

23   reporting risk ratio is 31.5.

24        Q.     And let's look at the next

1   year, in December 2012, what was the

2   reporting risk ratio for fracture for the

3   Recovery filter?

4        A.    So through 2012, the reporting

5   risk ratio was 33.3.

6        Q.    And were the results

7   statistically significant for those latter

8   time periods under the sensitivity analysis?

9        A.    Yes, they were.

10       Q.    Okay.  I want to look at -- I'm

11  going to skip this.

12            So before we move on to your

13  third analysis, can you just sum up then,

14  when you look at the adverse event reports

15  for the Recovery versus the SNF, what's your

16  overall conclusion?

17       A.    So my overall conclusion is

18  that over the course of time, so from

19  approximately 2003 and through 2010, and then

20  in some cases going to 2012, there is

21  consistently a higher reporting risk ratio

22  for various adverse events for the Recovery

23  filter as compared to the SNF filter, and

24  those elevated risks for -- reporting risks

1    for Recovery versus SNF are -- do not appear

2    that they could have arisen by chance alone,

3    so they are truly significantly different

4    from 1, the risk ratio, reporting risk ratios

5    are.

6         Q.    Okay.  I'd like to move on to

7    your analysis of Bard's bench test data.

8              Can you describe the data that

9    you looked at?

10        A.    Yes.  So this was a bench test

11   conducted by Bard scientists to compare

12   migration resistance as measured by pressure

13   between the Recovery filter and the SNF

14   filter.

15             And so the aspects of the

16   experiment were filter type.  So there

17   were -- I forget the exact numbers, but

18   possibly, I don't know how many, maybe ten of

19   each type.

20        Q.    So let's take a look at the

21   Exhibit 2063.

22        A.    Okay.

23        Q.    Is this the data that you

24   analyzed?

```
 1        A.      Yes, this is the Recovery data
 2    from that experiment.
 3        Q.      And is this the -- this is
 4    Bard's data?
 5        A.      Yes.
 6        Q.      Okay.  I move for admission of
 7    2063, and to display it to the jury.
 8                MR. NORTH:  No objection.
 9                (Whereupon, Plaintiffs' Exhibit
10        Number 13 was marked for
11        identification.)
12    BY MR. MANKOFF:
13        Q.      Okay.  So let me just pull up
14    the top half so it can be seen better.
15                Can you explain what's the
16    data?
17        A.      Yes.  So here are ten samples
18    with the Recovery filter, so those are
19    labeled on the left-hand side RF1 to RF10,
20    and each of them was tested three different
21    times, so that's in the run number column.
22    And what we see on the screen here is that
23    these first ten samples were evaluated at a
24    temperature of approximately 37 degrees
```

1    Celsius, or normal body temperature.

2          Q.     Okay.   And so just going back

3    to your analysis then, what did you do with

4    these data?

5          A.     So in addition to these data,

6    there are approximately ten more samples of

7    Recovery that were evaluated at a higher

8    temperature of 40 degrees Celsius, and then

9    additionally there were 20 additional samples

10   of the SNF filter that also were evaluated

11   at, half -- about half at 37 degrees and

12   about half at 40 degrees.   So I put all that

13   data together and I fit a statistical

14   regression model.   And the outcome of the

15   model is the pressure measurement.

16              And the model allowed me to

17   test for the effect of temperature and the

18   effect of filter type on the outcome of

19   pressure or migration resistance.

20         Q.     So did you compare the Recovery

21   and the SNF filter, how they performed on

22   this test?

23         A.     Yes, I did.

24         Q.     And Exhibit 4498, is this the

1    summary of your analysis and opinions on the

2    dataset?

3         A.     Yes.

4              MR. MANKOFF:  So I would move

5         for admission of Exhibit 4498 for

6         demonstrative purposes.

7              MR. NORTH:  It's hearsay.  I

8         object.

9              (Whereupon, Plaintiffs' Exhibit

10        Number 12 was marked for

11        identification.)

12             MR. MANKOFF:  Sorry, I couldn't

13        hear you.

14             MR. NORTH:  It's hearsay.  I

15        object.

16   BY MR. MANKOFF:

17        Q.     So what was the result of your

18   analysis when you compared the SNF and

19   Recovery data?

20        A.     So perhaps it's simpler to go

21   to the second page.  Is that possible?

22              Okay.  So the first page is a

23   slightly more complicated model, but I found

24   that I didn't need the more complex model, so

1    I ended up with this simpler model where I

2    adjusted for temperature and found that the

3    Recovery filter is -- has associated with it

4    on average a 34-unit lower pressure readout

5    than the SNF filter.  So Recovery has

6    34 units less pressure, meaning less

7    migration resistance, than the SNF, and

8    that's, again, highly statistically

9    significant, meaning that we believe that

10   that estimate of a 34 unit decrease for

11   Recovery versus SNF is significantly

12   different from a 0 unit decrease.

13        Q.    Is that the estimate that you

14   have here?

15        A.    Yes.  So that column with the

16   estimates list the impact of those factors on

17   the average pressure outcome.

18        Q.    And what does "RF" stand for

19   here on this table?

20        A.    That's a Recovery filter.

21        Q.    And what about "SF"?

22        A.    That's the SNF filter.

23        Q.    And why is it called an

24   estimate?

1      A.     Because they're based on the

2    sample in this case of 20 Recovery filters,

3    each one repeated three times, and about 20

4    SNF filters.

5           So the idea is that in

6    statistics we assume that there is a true

7    relationship between pressure and filter type

8    and temperature, but we only get to estimate

9    it with a sample.  So we don't believe that

10   34, or minus 34.3781 is the actual truth,

11   it's just an estimate of the truth based on

12   the data that we have.  The p-value tells us

13   how much we can rely on that estimate in our

14   interpretation.

15      Q.     And in this case does the

16   p-value tell you that you can rely on this

17   estimate?

18      A.     Yes.  The p-value tells us that

19   we can certainly believe that this estimate

20   is different from 0, which is what we would

21   get if there were no difference in the

22   pressure outcome by filter type.

23      Q.     Did you look at -- when you

24   analyzed these data, did you look at whether

1    temperature had an effect on the Recovery

2    filter?  That is, when -- you mentioned Bard

3    ran the experiment at two different

4    temperatures.  When Bard changed the

5    temperatures, did it change the results?

6         A.    Yes.  So what the results show

7    is that when the experiment was run at

8    37 degrees Celsius, normal body temperature,

9    that that pressure outcome decreased by about

10   nine units as opposed -- in comparison to

11   when it was run at a slightly higher

12   temperature of 40 degrees Celsius.

13        Q.    Was that a statistical

14   meaningful decrease?

15        A.    Yes.  And so again, you can see

16   that in the right-most column where it says

17   PR greater than absolute Z, that's just the

18   p-value.  So the p-value associated with that

19   estimate of negative 9.0552 is 0.004.  So

20   again, that's a very small p-value, so the

21   probability that that minus 9 should really

22   be a 0 is .0042.

23        Q.    Okay.  I want to go back to the

24   raw data that you analyzed.  Is that big

1    enough to read on the screen?

2         A.    Yes, I can see it, more or

3    less.

4         Q.    Okay.  What was the average

5    migration resistance for the Recovery filter

6    at normal body temperature?

7         A.    So that's on the right-hand

8    side, and so averages 45.2.

9         Q.    And what are the units that are

10   used here?

11        A.    Let's see.  I guess that's

12   millimeters of mercury.

13        Q.    And what was the average

14   migration resistance for the Recovery filter

15   at this increased temperature?

16        A.    So at the higher temperature,

17   it's 51.5.

18        Q.    And is that the difference that

19   you referred to earlier that was

20   statistically meaningful?

21        A.    So based on model, the

22   difference was about 9.  And here we're

23   seeing it's about 6, or slightly larger than

24   6.  And the reason for that is that the model

 1    is not only accounting for the difference in

 2    Recovery, but it's also using the SNF data.

 3    So it's pooling these averages from both

 4    Recovery and SNF to get that difference of 9.

 5         Q.    Okay.  So overall, what does

 6    this tell you about the difference between

 7    the Recovery and the SNF filter?

 8         A.    So this experiment tells us

 9    that the Recovery filter is -- decreases the

10    pressure of filter migration by about

11    34 units, millimeters of mercury, as compared

12    to the SNF.  And furthermore, normal body

13    temperature decreases it additionally by, on

14    average, 9 degrees, or we can say within

15    Recovery alone by about 6 degrees.

16         Q.    I think you might have

17    misspoken there at the end.

18              Are the units degrees when you

19    talk about the decrease?

20         A.    I'm sorry.  Yes, I did

21    misspeak.  Thank you.

22              So it's still millimeters

23    mercury, but I was talking about temperature.

24    Yes, thank you.

 1        Q.      Okay.   Just so we're on the

 2    same page, so can you just explain again what

 3    the effect of the Recovery and the

 4    temperature was?

 5        A.     So, yes.   So Recovery leads to

 6    a decrease of 34 units of pressure as

 7    measured by millimeters of mercury as

 8    compared to the SNF.   And within the Recovery

 9    filter, the normal body temperature versus

10    higher temperature of 40 degrees Celsius

11    leads to a decrease in pressure of filter

12    migration of about 6 millimeters of mercury.

13        Q.      Okay.   Now, we spent some time

14    now discussing various statistical

15    calculations that you made on these three

16    data sets.

17              So just as far as method, can

18    you explain whether the methods that you used

19    here, are they novel?

20        A.     No.   They're not novel at all.

21    They're very standard.

22        Q.      And are they newly developed

23    techniques?

24        A.     No.   These have been around for

1    a long time.

2         Q.    Are they techniques that are

3    taught, say, in college statistics courses?

4         A.    Yes, they are.

5         Q.    Are they techniques that could

6    have been used in 2003 or 2004 or 2005?

7         A.    Yes, absolutely.

8         Q.    Okay.  I believe that's all of

9    your opinions with respect to the Recovery

10   filter.

11              Can you explain the bottom line

12   when you look at all three of these analyses

13   what your conclusions are with respect to the

14   Recovery filter?

15              MR. NORTH:  Objection to the

16       form.

17         A.    Yes.  So these are very

18   different analyses, these three different

19   sort of streams of data or analyses, but they

20   all point in the same direction, which is

21   that there does appear to be an elevated risk

22   of various adverse events for the Recovery

23   filter as compared to the SNF filter.

24              MR. MANKOFF:  Can we go off the

Do Not Disclose - Subject to Further Confidentiality Review

1    record for a minute?

2            MR. NORTH:  Yes.

3            THE VIDEOGRAPHER:  Off the

4    record.  The time is approximately

5    12:46 p.m.

6            (Whereupon, a luncheon recess

7    was taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                AFTERNOON SESSION

2

3                THE VIDEOGRAPHER:  With the

4        approval of counsel, back on the

5        record.  The time is approximately

6        1:33 p.m.  This marks the beginning of

7        recording media number 3.

8   BY MR. MANKOFF:

9        Q.    Okay.  Dr. Betensky, let's turn

10   now to your analysis of Bard's predictions

11   with respect to the G2 filter.

12                And I'm showing you

13   Exhibit 5408.  Can you describe what this one

14   is?

15        A.    So this is the design failure

16   mode and effects analysis for the Recovery

17   filter.

18        Q.    And for the product family,

19   they indicate the Recovery filter G1A,

20   femoral system, correct?

21        A.    Yes.

22        Q.    Okay.  And what is the time

23   period relevant to this document, do you

24   recall?  I don't think it's on the front page

1    of the document.  Do you recall?

2           A.    No, I don't.

3           Q.    Okay.  Let's look at -- okay.

4    There's some revision numbers here, so let me

5    pull those up.

6                 What are the revision dates for

7    this document?

8           A.    So they're in February 2005.

9           Q.    And did you analyze this

10   document in forming your opinions?

11          A.    Yes, I believe I did.

12                MR. MANKOFF:  I move to admit

13          Exhibit 5408, and to display to the

14          jury.

15                (Whereupon, Plaintiffs' Exhibit

16          Number 14 was marked for

17          identification.)

18   BY MR. MANKOFF:

19          Q.    Let's look at a couple of

20   examples on this document.  On page 4, what

21   is Bard analyzing in item 3?

22          A.    Deployment.

23          Q.    Okay.  And if we jump to

24   page 13, what do they analyze in 2 and 2.1?

1          A.      Anchoring or antimigration,

2    with migration as the failure mode.

3          Q.      Okay.  And then one more

4    example, on page 19, what is being analyzed

5    in 3.1?

6          A.      So the potential failure mode

7    of fracture.

8          Q.      Okay.  So let's go back to your

9    Exhibit B, and take a look at how Bard's

10   predictions compared -- for the G2 compared

11   to the SNF.  So I'm pulling up SNF and G2.

12             And I'm going to have to ask

13   some questions that may be repeated because I

14   know that in some cases the Recovery filter

15   testimony may not be included, so forgive me

16   if some of it seems repetitive.

17             But can you explain why you put

18   these two filters side-by-side?

19          A.      Yes.  So I went to the original

20   DFMEA documents for the different filters,

21   and I extracted the relevant columns or

22   categories of interest, and lined them up so

23   that ultimately I could compare the predicted

24   probabilities for the effects of failure that

1    were made by Bard scientists for the

2    different filters.

3        Q.    Okay.  So let's take a look at

4    what Bard provided for migration for the SNF.

5    And I just want to focus in on a few of

6    these.

7              So what was Bard's prediction

8    with respect to 2.1.5?

9        A.    So the prediction that they

10   made is a probability of between 1/150,000 to

11   1/20,000 for the likelihood of wire fracture

12   or detachment that subsequently would lead to

13   a critical health hazard.

14       Q.    Did Bard make a similar

15   prediction for the G2 filter?

16       A.    Yes.  So for G2 it's separated

17   into two parts, so 2.4.4 is wire fracture,

18   2.4.5 is wire detachment.  For each of them

19   they predicted a likelihood of that

20   particular event followed by a

21   life-threatening effect of 1/20,000 to

22   1/2,000.  So they predicted that for wire

23   fracture followed by life-threatening event,

24   and then separately for wire detachment

1    followed by life-threatening event.

2          Q.     So is Bard predicting that a

3    fracture or wire detachment will result in a

4    life-threatening event for the G2 up to

5    1/2,000 times, or more often than that?

6                MR. NORTH:  Objection to the

7          form.

8          A.     So the way -- I'm sorry, can

9    you ask the question again?  I lost the first

10   part of the question.

11   BY MR. MANKOFF:

12         Q.     Right.  So the question is the

13   1/20,000 to 1/2,000, the upward bound of

14   that, the 1/2,000, is the prediction that

15   that will occur up to 1/2,000 times, or it

16   more than that?

17         A.     Sorry, that what will occur?

18         Q.     A wire fracture or detachment

19   resulting in a life-threatening event with a

20   G2 filter.

21         A.     Right.  So we know, like I

22   present here, is that separately the

23   probability is up to 1/2,000 for wire

24   fracture leading to a life-threatening event,

1    and separately for wire detachment leading to

2    a life-threatening event.

3                    Now, if these were mutually

4    exclusive, meaning that they couldn't both

5    happen, we would add them together to get

6    something comparable to what we have for the

7    SNF 2.1.5 which combines them.

8                    But if they can happen together

9    in the same patient, then it's something

10   in-between 1/20,000 to 1/2,000, and two times

11   that.

12       Q.     Okay.  Did Bard predict that

13   the SNF would migrate because of inadequate

14   radial strength?

15       A.     Yes.  So they have a prediction

16   in 2.1.7 of probability of 1/150,000 to

17   1/20,000 for the failure mode of inadequate

18   radial strength with the subsequent critical

19   health hazard event.

20       Q.     And did Bard make a similar

21   prediction for the G2 filter?

22       A.     Yes, they did.  So that is

23   2.4.8, and for the G2 they predicted

24   probability of 1/20,000 to 1/2,000 for

1    inadequate radial strength occurring and

2    leading to a life-threatening event.

3         Q.    Okay.  And one more.  What was

4    Bard's prediction for inadequate design for

5    the SNF filter and migration?

6         A.    So for the SNF they predicted a

7    probability of 1/150,000 to 1/20,000 for the

8    failure mode of inadequate hook design

9    leading to a critical health hazard.

10        Q.    What about for the G2 filter?

11        A.    For the G2, they predicted

12   probability of 1/20,000 to 1/2,000 for the

13   failure mode of inadequate hook design

14   leading to a life-threatening event.

15        Q.    Okay.  I'd like to pull up an

16   exhibit we talked about before, Exhibit 1940,

17   to look at the failure reports that Bard

18   received for the G2 filter now.

19             And focusing on migration, what

20   was the rate of migration reports for the G2

21   filter?

22        A.    So it is 0.121 percent.

23        Q.    All right.  Was that the number

24   here that I'm highlighting?

1      A.      Yes.

2      Q.      Is that in line with Bard's

3  predictions?

4      A.      Yes, it is, especially

5  considering that what's on this page is just

6  about migration, which includes the critical

7  health hazard as the -- as a final outcome,

8  but also includes other final outcomes.  So

9  this might be larger than -- slightly larger

10  than what they predicted, but close.

11      Q.      Okay.  Let's look at your

12  analysis of predictions for perforation.

13          What did Bard predict for SNF

14  for hooks causing perforation in 3.3.1?

15      A.      So they predicted a probability

16  range of 1/150,000 to 1/20,000 for the

17  failure of being hooks too sharp, and leading

18  to a critical health hazard.

19      Q.      And did Bard make a similar

20  prediction for the G2?

21      A.      For G2 they called it barbs too

22  sharp in 6.2.1, and their prediction range is

23  a probability of 1/2,000 to 1/200 for barbs

24  being too sharp and leading to a

1    life-threatening event.

2         Q.      What about the general design

3    of attachment points resulting in

4    perforation, what were Bard's predictions for

5    that category?

6         A.      So for that category they

7    predicted a probability of 1/150,000 to

8    1/20,000 for a failure of the general design

9    of attachment points leading to subsequent

10   critical health hazard.

11        Q.      And for the G2 filter?

12        A.      For the G2, again for the same

13   cause of failure being general design of

14   attachment points, they predicted a

15   probability of 1/2,000 to 1/200 for that

16   event, and then leading to a life-threatening

17   end result.

18        Q.      And is the comparison similar

19   for excessive radial force causing a

20   perforation?

21        A.      Yes.  Their predictions are

22   consistent across all of these events,

23   actually.

24                So for the SNF, they're

1   predicting 1/150,000 to 1/20,000 for each

2   cause of failure leading to a critical health

3   hazard.  And for the G2, they're predicting

4   1/2,000 to 1/200 for each potential cause of

5   failure leading to a life-threatening event.

6        Q.     Okay.  And then let's look at

7   whether the actual reports were in line with

8   those predictions for the G2 filter.

9              What was the perforation rate

10  for the G2 filter in Exhibit 1940?

11       A.     So it's 0.132 percent.

12       Q.     And is that generally in line

13  with Bard's predictions?

14       A.     Yes, it is.

15       Q.     Okay.  Let's take a look at

16  Bard's predictions for G2 fractures.

17             What did Bard predict in 3.1.2

18  for the SNF filter?

19       A.     Okay.  So they predicted a

20  probability of 1/20,000 to 1/10,000 for the

21  event of material fatigue due to movement

22  leading to, I guess, major dissatisfaction.

23       Q.     Did Bard make a similar

24  prediction for the G2 filter?

```
 1              A.      Yes, they did.

 2                      Also 3.1.2, they predicted a

 3      probability of 1/2,000 to 1/200 for material

 4      fatigue due to movement leading to patient or

 5      user annoyance.

 6              Q.      And on the bottom, what is the

 7      potential effect indicated on bottom half of

 8      this chart here?

 9              A.      So the worst effect is

10      life-threatening, a life-threatening outcome.

11              Q.      And so what was Bard's

12      prediction for the G2 filter with respect to

13      that outcome?

14              A.      So for each of the potential

15      causes of failure related to fracture they

16      predicted a probability of 0 to 1/20,000 for

17      such a failure that would be

18      life-threatening.

19              Q.      So what is your understanding

20      of -- what does 0 mean in this context?

21              A.      It means a 0 chance of the

22      failure being life-threatening.  That's what

23      a 0 -- it doesn't mean a 0 chance of the

24      failure, it's a 0 chance for the
```

1    life-threatening outcome as the end result of

2    the failure.

3         Q.    Okay.  Let's take a look at the

4    actual fracture reports that Bard received

5    for the G2 filter in Exhibit 1940.

6              What was the total fracture,

7    reported fracture rate for the G2 filter?

8         A.    0.117 percent.

9         Q.    And is that in line with the

10   prediction, at least on the top half of the

11   chart we just looked at of your exhibit?

12        A.    I believe so.

13             The top half of the chart.  Can

14   I see that again?

15        Q.    Sure.

16        A.    Yes, yes.  So it is.  It's

17   within that 1/2,000 to 1/200 range.  Although

18   again, this -- what's reported in the

19   spreadsheet is the failure, and not

20   associated with the end effect.

21        Q.    Okay.  Let's look at some G2

22   Express comparisons.

23             I'll represent that the G2

24   Express is similar to the G2, so I can try

1    and speed this up a little bit.

2              But let's look at what Bard

3    predicted for the SNF for hooks, sharp hooks

4    causing a perforation.  What was Bard's

5    prediction there?

6         A.    So the prediction for SNF is a

7    probability of between 1/150,000 to 1/20,000

8    for the failure of the hooks being too sharp

9    and leading to a moderate health hazard.

10        Q.    And what about for the G2X --

11   the G2 Express?  Excuse me.

12        A.    For the G2 Express they

13   predicted a probability of 1/2,000 to 1/1,000

14   for the same failure of hooks being too sharp

15   and leading to a moderate health hazard.

16        Q.    And generally, how did the

17   predictions for penetration compare with the

18   G2 Express and the SNF?

19        A.    So in one category they are the

20   same, and that is the failure of user error

21   leading to moderate health hazard.  So in

22   that particular case, they're both predicted

23   to occur with a probability of 1/150,000 to

24   1/20,000.

1          For the other potential causes

2    of failure listed here, the G2 Express is

3    predicted to have the failure leading to the

4    moderate health hazard of -- with a

5    probability of 1/2,000 to 1/1,000 versus the

6    same comparable causes of failure leading to

7    moderate health hazard for the SNF having

8    probability between 1/150,000 to 1/20,000.

9         Q.    Looking at Exhibit 40, were the

10   failure reports for penetration that Bard

11   received for the G2X in line with those

12   predictions?

13        A.    Yes.

14        Q.    Okay.  Let's take a look at

15   your comparison of fracture with the G2

16   Express.

17             What did Bard predict for the

18   SNF for material -- for factor caused by

19   material fatigue due to movement?

20        A.    So for SNF they predicted a

21   probability of 1/20,000 to 1/10,000 for the

22   failure of material fatigue due to movement

23   leading to a critical health hazard.

24        Q.    And for the G2 Express?

 1          A.     So there they predicted a

 2    probability of 1/10,000 to 1/5,000 for that

 3    same failure, material fatigue due to

 4    movement leading to a critical health hazard.

 5          Q.     Did Bard -- in discussing the

 6    potential effects of failure for the G2

 7    Express, did Bard predict that a strut might

 8    migrate to the heart or lung for the G2

 9    Express?

10          A.     So that is listed in the second

11    potential effect.  So it was described as

12    filter or portion of filter embolization to

13    heart or lungs.

14          Q.     Okay.  Let's look at the

15    fracture reports that Bard received for the

16    G2 Express.  Were they in line with Bard's

17    predictions?

18          A.     Yes.  So for total fracture

19    rate it's .079 percent, which is consistent

20    with their probability predictions given,

21    again, that this is just about the event, and

22    doesn't include exclusively the critical

23    health hazard outcome.

24          Q.     When you boil it all down, did

1    Bard -- how did Bard predict the G2 and G2

2    Express would perform compared to the SNF

3    filter?

4         A.    So for each of the potential

5    failure modes they predicted higher or equal

6    probabilities of those events occurring and

7    leading to a critical health hazard for the

8    G2X as compared to the SNF, and in most cases

9    they predicted higher probabilities.  In a

10   few, they were equal.

11        Q.    Let's turn to your analysis of

12   the adverse event reports and focus --

13   there's a lot of numbers on this table, let's

14   focus on the data for the G2 and the G2X.

15              So let me pull -- let me see if

16   I pull up this whole section if it's big

17   enough for you to see the numbers on.

18              Okay.  So what was your

19   reporting risk ratio calculation for -- let's

20   start with the earliest time period and go

21   forward in time.

22              So what was the earliest time

23   period you analyzed for the G2 filter?

24        A.    So I had data going back to the

```
 1    third quarter of 2005.

 2         Q.     And for the G2, those are all

 3    0's, right?

 4         A.     Those are all 0's, yes.

 5         Q.     Okay.  So let's start with

 6    November 2007.  What was your calculation for

 7    migration for the G2 filter?

 8         A.     So the reporting risk ratio for

 9    migration for G2 versus SNF is 97.15.

10         Q.     And for caval perforation?

11         A.     5.65.

12         Q.     And for filter fracture?

13         A.     2.74.

14         Q.     And what about tilted filter?

15         A.     So that is listed as infinite,

16    meaning that there were 0 tilted filters

17    reported for SNF, and something greater than

18    0 for G2.

19         Q.     Okay.  And so in November 2007,

20    what does that lead you to conclude about the

21    G2 compared to the SNF?

22         A.     So through that calendar date,

23    for -- so there is an elevated reported risk

24    for the G2 filter as compared to the SNF
```

1    filter for migration, for caval perforation,

2    and for filter fracture.

3        Q.      And is -- does the 97 signify a

4    97 times higher risk of a migration report

5    for the G2 compared to the SNF?

6        A.      So the 97 means that the

7    reported risk for migration among people --

8    among patients with G2 filters is 97 times

9    the reported risk for migration among

10   patients with an SNF filter.

11       Q.      And similarly for fracture,

12   that's more than twice as many times the risk

13   of fracture report for the G2?

14       A.      Yes.

15       Q.      Okay.  Let's look at

16   November 2009.  What were your

17   calculations -- you have calculations for the

18   G2, the G2X, and the two combined, correct?

19       A.      Yes.

20       Q.      Okay.  Why did you combine the

21   two?

22       A.      I combined the two because it

23   was my understanding that they were very

24   similar to each other, and it, therefore,

1    made sense to consider them jointly as well

2    as separately, and from a statistical point

3    of view that would provide a more stable or

4    reliable result given that there would be

5    higher numbers, higher numbers of sales when

6    combined, and higher numbers of event reports

7    when combined.

8          Q.    So other than -- you have two

9    0's in this section of the chart.  Other than

10   the two 0's, what were you results?  Do your

11   results indicate that the G2 and the G2X

12   performed worse than the SNF?

13               MR. NORTH:  Objection to the

14          form.

15   BY MR. MANKOFF:

16         Q.    Let me rephrase that.

17               Other than the two 0's that you

18   have here, can you describe generally what

19   your results were for the G2 and G2X compared

20   to the SNF for the failure events listed

21   across the top?

22         A.    Yes.  So all of these estimates

23   of reporting risk ratio, with the exception

24   of filter fracture for which there isn't any

1    data, and the exception of those two 0's,

2    show an elevated risk for G2 or G2X, or the

3    combination, as compared to the reporting

4    risk for SNF.

5         Q.    Okay.  And then the last -- the

6    most recent time period on this sheet at

7    least is July 2010.  What were your results

8    for the G2 and G2X for that time period?

9         A.    So for that time period as

10   well, there is a highly elevated reporting

11   risk for G2 or G2X versus SNF for migration

12   around, let's say, 100 or thereabouts.

13            For caval perforation, it's

14   approximately 20, or 15 to 20 for the

15   reporting risk ratio.

16            And then for migration, it's in

17   the neighborhood of 30 or so, 35.

18        Q.    And so we looked at three time

19   periods here, November 2007, 2009, and 2010.

20   And just for reference, did you calculate

21   p-values for all of those calculations as

22   well?

23        A.    I did where I could, yes.

24        Q.    Okay.  And were those -- did

1  those calculations generally indicate that

2  the results that you had were statistically

3  significant?

4      A.    Yes.  So I've highlighted in

5  yellow the approximate p-values that are

6  small, meaning less than 0.05, indicating

7  that, you know, there's strong evidence that

8  these reporting risk ratios are actually

9  larger than 1, and it's not just random

10 chance that made them larger than 1.

11      Q.    And I realized as we were

12 talking that you did analyze an earlier time

13 period for the G2 compared to SNF.  Let me

14 pull that one up.

15          What time period is indicated

16 here?

17      A.    So this is through

18 February 9th, 2006.

19      Q.    And what was your result for

20 migration?

21      A.    So the reporting risk ratio for

22 migration through that time is 135,

23 approximately.

24      Q.    And was that statistically

1    significant?

2         A.    Yes.  So the p-values are very,

3    very small, indicating that there's an

4    extremely small chance that this reporting

5    risk ratio of 135.07 could have arisen by

6    chance.

7         Q.    After the Recovery filter we

8    have -- you made some additional calculations

9    based on additional fracture data, so let's

10   take a look at that for the G2 filter.  So I

11   guess the earliest time period here is

12   December 2009.  Let me pull that up.

13             What was the reporting risk

14   ratio for fracture for the G2 for this time

15   period?

16        A.    So it's 6.5.

17        Q.    And did you do calculations to

18   evaluate the strength of these results?

19        A.    Yes.  So I calculated the

20   95 percent confidence interval to accompany

21   that estimate of 6.5, and that -- there we

22   see that we can be 95 percent confident that

23   the reporting risk ratio is somewhere

24   in-between 4.1 and 10.6, so that gives us

1    some indication of the variability associated

2    with that 6.5 estimate.

3              And in addition, I conducted a

4    sensitivity analysis with regard to the SNF

5    numbers just in case I was missing a few

6    fractures that weren't reported by Bard

7    because they may have occurred prior to 2000,

8    so I added 5 to the SNF numbers from 2009,

9    and that comparison yielded a similar

10   reporting risk ratio of 5.3, and also a

11   similar 95 percent confidence interval.

12        Q.    Okay.  Let's look at May 2011.

13   What were your results?  Again, you have

14   three different results for the G2 and G2X.

15   Perhaps you can explain what your conclusions

16   were there.

17        A.    Yes.  So all three results are

18   very similar, so they yielded a reporting

19   risk ratio between 10 and 12, approximately,

20   which is highly statistically significant,

21   and the 95 percent confidence intervals give

22   us a high level of confidence that that

23   reporting risk ratio is no less than

24   approximately 5.

1      Q.      Okay.  The next time period is
2  December 2011.  What were your results for
3  the G2 and G2X for that time period?
4      A.      So for that time period the
5  reporting risk ratio ranged from 4.5 to 7.7,
6  depending on if they were combined or not
7  combined, and those were all highly
8  statistically significant, meaning almost
9  certainly different from 1.
10      Q.      I can't fit more on the page,
11  so let's pull up December 2013.
12              What were the results of your
13  calculations for the G2 and the G2X?
14      A.      So through December 2013, the
15  reporting risk ratios ranged from 6.4 to 9.5,
16  and are highly statistically significant, so
17  certainly different from 1.
18      Q.      And for December 2014, what
19  were your results for the G2 and G2X?
20      A.      So through 2014, the reporting
21  risk ratios are in a similar range, so in
22  this case between 6.8 and 10.5, and are
23  highly statistically significant.
24      Q.      So what is your overall

1    conclusion based on this adverse event data

2    we've been reviewing for the G2 and G2X?

3         A.    So my conclusion is that the

4    data are showing us that there is a definite

5    elevation in the reporting risk ratio for G2

6    versus SNF, for G2X versus SNF, and when

7    they're combined as well, G2 or G2X versus

8    SNF.  And that holds for fracture, for

9    migration, and for other events as well.

10        Q.    And is that in line with the

11   predictions comparisons that you made in your

12   other analysis for the G2 and G2X?

13        A.    Yes.  So that is definitely in

14   line with the Bard predictions of higher

15   likelihood of failure followed by critical

16   health hazard for comparisons of G2 and G2X

17   versus SNF.

18        Q.    Okay.  Let's move over to your

19   analysis of Bard's predictions for the

20   Eclipse filter.

21              Is this the design document

22   that you evaluated for the Eclipse?

23        A.    Yes.

24        Q.    And what time period is

```
1    referenced here?
2         A.    So this is 2000 -- well, let's
3    see, June 2005 through March 2009, although
4    I'm confused at the moment because it says G2
5    and G2X.
6         Q.    Okay.  This is the design
7    document for the Eclipse, right?
8         A.    Right.
9              MR. MANKOFF:  Okay.  And I move
10        to admit Exhibit 635, and publish it
11        to the jury.
12             MR. NORTH:  No objection.
13             (Whereupon, Plaintiffs' Exhibit
14        Number 15 was marked for
15        identification.)
16   BY MR. MANKOFF:
17        Q.    Okay.  Let's look at a few
18   examples for the Eclipse filter.  What is
19   Bard analyzing in 3 point -- or in section 3
20   here?
21        A.    Deployment.
22        Q.    Okay.  And if we jump forward,
23   what did they analyze in section 2 and 2.1
24   here?
```

1        A.      Anchoring, antimigration, and
2   in particular cephalad migration.
3        Q.      Do you know what cephalad
4   means?
5        A.      I believe that means downward
6   migration of the filter.
7        Q.      Let's look at one more example
8   here.
9                What is Bard analyzing in
10  section 3.4?
11       A.      Fracture of type 4.
12       Q.      Let's go back to your Exhibit B
13  and look at your comparisons of the SNF and
14  the Eclipse filter starting with migration.
15               Again, why did you line up
16  these two filters?
17       A.      So again, I wanted to be able
18  to compare Bard's predictions for failure
19  leading to the end -- or the worst possible
20  effect of the failure for their new filter,
21  Eclipse, as they were launching it on the
22  market relative to their predictions for the
23  older filter, the SNF.
24       Q.      Okay.  Let's focus in on 2.1.5.

1              What is the potential failure

2      mode that Bard is analyzing for the SNF

3      filter here?

4          A.     So they're looking at wire

5      fracture or detachment.

6          Q.     And that's under potential

7      causes of failure, right?

8          A.     Sorry.  Right.

9          Q.     Okay.  What's the failure mode

10     that's being analyzed?

11         A.     Right.  Migration.

12         Q.     Okay.  And how often did Bard

13     predict that migration would occur due to

14     wire fracture/detachment?

15         A.     So they predicted a probability

16     of 1/150,000 to 1/20,000 for the event of a

17     wire fracture or detachment, I guess causing

18     a migration leading to a critical health

19     hazard.

20         Q.     Okay.  And just generally on

21     this page, the different causes, are all

22     assigned similar probabilities for the SNF,

23     right?

24         A.     That's right.

1          Q.     Okay.  And then for the

2    Eclipse, what is the -- are the probability

3    ranges the same here compared to the SNF?

4          A.     Yes, the probability ranges are

5    the same.

6          Q.     Okay.  And what is the

7    potential failure mode that Bard has

8    indicated in 2.4 for the Eclipse?

9          A.     This is cephalad migration.

10         Q.     Okay.  Now, did Bard predict

11   cephalad migration for the SNF?

12         A.     I believe they didn't -- they

13   didn't separate out types of migration.

14         Q.     Okay.  And did Bard -- let me

15   go to the next page of your Exhibit B.

16                Did Bard predict additional

17   migration for the Eclipse filter?

18         A.     Yes.  So they also predicted

19   caudal migration.

20         Q.     Okay.  And what was their

21   prediction for caudal migration compared to

22   cephalad migration?

23         A.     So I believe they are the same

24   for the probability ranges for each of the

1    causes of failure.

2         Q.     So what is your conclusion

3    about Bard's prediction about the likelihood

4    of migration for the Eclipse compared to the

5    SNF?

6         A.     Yes, so it is higher.  It is --

7    they're predicting a higher likelihood of

8    overall migration.  And we see that because

9    they're predicting similar likelihoods for

10   each type of migration separately.  And so to

11   make it comparable to SNF, if we were to

12   combine, it's not necessarily additive, we

13   can't necessarily add for technical reasons,

14   but it's -- it definitely would be higher.

15        Q.     Okay.  Let's take a look at SNF

16   versus Eclipse perforation or penetration.

17   What's Bard's prediction for the perforation

18   causing a moderate health hazard for the SNF?

19        A.     So the prediction through any

20   of the five potential causes of failure is

21   1/150,000 to 1/20,000.

22        Q.     And what about for the Eclipse,

23   these similar potential causes?

24        A.     So for the Eclipse, their

1    prediction is 1/2,000 to 1/1,000.

2         Q.    With one exception, right?

3         A.    Oh, sorry.  Actually, yes,

4    that's right.  With the exception of user

5    error, which they predict to be the same as

6    for the SNF, 1/150,000 to 1/20,000.

7         Q.    Okay.  And let's take a look at

8    your comparison of fracture predictions for

9    SNF and for Eclipse.

10        So for SNF, what did Bard --

11   how often did Bard predict that fracture

12   would occur due to material fatigue?

13        A.    So they predicted a probability

14   of 1/20,000 to 1/10,000 for material fatigue

15   due to movement leading to major

16   dissatisfaction -- leading to fracture and

17   then major dissatisfaction.

18        Q.    And did Bard make a similar

19   prediction for the Eclipse?

20        A.    So for the Eclipse, they

21   predicted a -- they assigned twice that

22   probability, so probability of 1/10,000 to

23   1/5,000 for material fatigue due to movement

24   leading to major dissatisfaction.

1      Q.      And did Bard also predict that

the Eclipse filter would fracture due to

biomechanical forces?

4      A.      Yes.

5      Q.      And did Bard predict that would

occur for the SNF filter?

7      A.      No, it appears that they did

not.

9      Q.      And what about snared hip weld

joint bundle fractures, did Bard predict that

would occur for the Eclipse filter?

12     A.      No.

13             I'm sorry, yes, for the

Eclipse.

15     Q.      And what about for SNF?

16     A.      No, it's not part of the

prediction for SNF.

18     Q.      Okay.  When you boil it all

down, how did Bard's predictions for the

Eclipse compare to the SNF?

21     A.      So they are making higher

predictions of the various causes of failure

for the Eclipse leading to major

dissatisfaction than they did for the SNF.

1    And in addition, they're predicting more

2    causes of failure.

3         Q.     Okay.  Let's flip over to your

4    adverse event analysis for the Eclipse

5    filter, and let me pull out what you have for

6    Eclipse here.

7               What time period did you

8    analyze for the Eclipse filter?

9         A.     So this was through 2010.

10        Q.     And what were your reporting

11   risk ratios for the various failures that you

12   evaluated?

13        A.     So sorry, just to go back, I

14   should have said July 2010, and, of course,

15   beginning at or near the time of launch when

16   the data would have been available.

17              So the reporting risk ratios,

18   so for migration it is 20.72 for Eclipse

19   versus SNF, and 5.18 for caval perforation.

20        Q.     And those were results

21   statistically significant?

22        A.     They are statistically

23   significant, yes.

24        Q.     I have to work to line that up.

1                    What does that mean with

2       respect to -- well, you know what, I'll ask

3       that question after we look at the other

4       fracture data.

5                    So on this page, again focusing

6       in on the Eclipse, I believe the earliest

7       time period you evaluated data for the

8       Eclipse was December of 2010, right?

9            A.     Yes.

10           Q.     Okay.  And what was the

11      reporting risk ratio in 2010?

12           A.     So it's 1.1 in 2010.

13           Q.     Okay.  And what about in

14      December 2011?

15           A.     2.9.

16           Q.     And is the 2.9 statistically

17      significant?

18           A.     Yes.  So the p-value is very

19      small, and the 95 percent confidence interval

20      lies above 1, which means we can be

21      95 percent confident that the true reporting

22      risk ratio is larger than 1.

23           Q.     And what about after there's a

24      year or more of data in December 2012?

 1          A.     At this time the reporting risk

 2   ratio is 4.5.

 3          Q.     So what's the general trend as

 4   Bard receives more adverse event reports

 5   regarding the Eclipse?

 6          A.     So the numbers are increasing,

 7   the reporting risk ratios are increasing, and

 8   are significantly different from 1.

 9          Q.     So what is your overall

10   conclusion, then, about the Eclipse compared

11   to the SNF with respect to the adverse event

12   data?

13          A.     So there appears to be a higher

14   reporting risk ratio for Eclipse versus SNF

15   for migration and for fracture after a few

16   years of its being on the market.

17          Q.     And is that in line with the

18   design documents that you evaluated, in your

19   design documents?

20          A.     Yes, that is --

21                 MR. NORTH:  Objection to the

22          form.

23          A.     That is consistent with those

24   documents which, again, predicted higher

1    probability of fracture leading to certain

2    health effects, and also it seems that it was

3    predicting more types of fracture.

4    BY MR. MANKOFF:

5         Q.    Okay.  Let's look at your

6    analysis of the design documents regarding

7    the Meridian filter.

8              Is this one of the documents

9    that you analyzed?

10        A.    Yes.

11        Q.    Specifically, is this the

12   Meridian design document that you looked at?

13        A.    Yes, I believe it is.

14             MR. MANKOFF:  Okay.  So I move

15        to admit Exhibit 637 into evidence,

16        and publish it for the jury.

17             MR. NORTH:  No objection.

18             (Whereupon, Plaintiffs' Exhibit

19        Number 16 was marked for

20        identification.)

21   BY MR. MANKOFF:

22        Q.    So just again to look at a

23   couple of examples, what did Bard evaluate in

24   section 4?

1          A.      Deployment.

2          Q.      Okay.  And then in section 2

3    and 2.1, what is Bard evaluating?

4          A.      They're evaluating anchoring or

5    antimigration with the potential failure mode

6    of cephalad migration.

7          Q.      And then finally, section 3.1,

8    what is being evaluated?

9          A.      So that is fracture.

10          Q.      Okay.  And then let's jump over

11    to your Exhibit B on the comparisons you made

12    with the SNF filter.

13                What was Bard's prediction for

14    the SNF for migration caused by wire

15    fracture/detachment?

16          A.      So they predicted a probability

17    of 1/150,000 to 1/20,000 for wire fracture or

18    detachment causing migration leading to a

19    critical health hazard.

20          Q.      And their probability ranges

21    for any of these potential causes on this

22    page are the same, correct?

23          A.      That's right.

24          Q.      Okay.  And then on the Meridian

1   side, what was Bard's prediction for wire

2   fracture or detachment?

3       A.    So here they've separated it.

4   It appears that they've separated wire

5   fracture and detachment into three categories

6   perhaps.  2.4.4 is fracture, 2.4.5 is

7   detachment, 2.4.6 is component detachment.

8             And for the first, for the

9   fracture, they are predicting a probability

10  of 1/20,000 to 1/10,000 causing -- for -- as

11  the probability for the appendage fracture

12  leading to cephalad migration and ultimately

13  a critical health hazard.

14            For the other, for the

15  detachment, they are predicting probabilities

16  of 1/150,000 to 1/20,000 for each of the two

17  detachment categories, leading again to

18  cephalad migration and to the critical health

19  hazard.

20      Q.    So how does that prediction for

21  the Meridian compare to the prediction for

22  the SNF, that -- those potential causes of

23  failure?

24      A.    So they're not -- first of all,

1    they're not comparable, because the SNF is

2    addressing migration as a total event, versus

3    the Meridian DFMEA is addressing such

4    cephalad migration.

5              So what that says firstly is

6    that even though some of the probability

7    ranges are the same between this Meridian

8    document and the SNF, we can't really compare

9    them as is because, again, the SNF is

10   including all migration, and so, therefore,

11   that would suggest that the Meridian

12   probability predictions are higher than the

13   SNF probability predictions.

14             And then, furthermore, for

15   Meridian they've separated fracture and

16   detachment into three categories which just

17   compounds the probabilities, it makes them

18   even larger.

19        Q.    Did Bard make predictions for

20   caudal migration for Meridian as well?

21        A.    Yes, they did.

22        Q.    And you lined up the same -- is

23   this the same category lined up for the SNF

24   as on the previous page?

1    A.    Yes, it is.

2    Q.    Okay.  And are the comparisons

3    or the predictions the same as on the

4    previous page?

5    A.    Yes.  Yes, the numbers in the

6    categories are the same, but the Meridian,

7    the Meridian -- the two versions of the

8    Meridian migration have to be viewed together

9    in comparison to the one for SNF.

10   Q.    Okay.  Let's look at your

11   comparison of SNF and Meridian for

12   perforation and penetration.

13         What was Bard's prediction for

14   hooks too sharp for the SNF?

15   A.    So they predicted a probability

16   of 1/150,000 to 1/20,000 for hooks being too

17   sharp, leading to perforation, leading to a

18   moderate health hazard.

19   Q.    And for the Meridian filter?

20   A.    So for the same, they predicted

21   probability of 1/2,000 to 1/1,000.

22   Q.    And what about for the general

23   design of the attachment points, what's the

24   comparison between the SNF and the Meridian?

1          A.     So it's the same comparison, so

2     probably of 1/150,000 to 1/20,000 for SNF

3     versus 1/2,000 to 1/1,000 for Meridian.

4          Q.     And is that similar predictions

5     for penetration caused by excessive radial

6     force?

7          A.     Yes.

8          Q.     Okay.  Let's look at your

9     comparisons regarding fracture.

10               What did Bard predict for

11    fracture for the SNF due to material fatigue?

12         A.     So they predicted a probability

13    of 1/20,000 to 1/10,000 for the event of

14    material fatigue due to movement causing

15    fracture and ultimately causing a critical

16    health hazard.

17         Q.     And what about for the Meridian

18    filter?

19         A.     So for that they predicted a

20    probability of 1/10,000 to 1/5,000.

21         Q.     And then did Bard also predict

22    that biomechanical forces would cause a

23    fracture for the Meridian?

24         A.     Yes.

1      Q.    And did they have a similar

2   prediction for the SNF?

3      A.    No, it is not present in the

4   SNF DFMEA.

5      Q.    Okay.  So when you boiled this

6   analysis down for the Meridian filter, how

7   did Bard's predictions for the Meridian

8   compare to the SNF?

9      A.    So they are predicting with

10  higher probability comparable events leading

11  to the same end results of critical health

12  hazards, and they're including additional

13  potential causes of failure that are not

14  included in the SNF document.

15     Q.    Okay.  Let's now move over to

16  your second analysis of the adverse event

17  reports focusing on the Meridian filter.  Let

18  me pull up the three time periods here.  Let

19  me see if I can get the headers to line up.

20  I think that lines up through the columns.

21  We'll pop it back here.

22          So for December 2012, what was

23  your calculation for the Meridian filter?

24     A.    So the calculation is a

1    reported risk ratio of 6 for Meridian versus

2    SNF with regard to fracture risk.

3          Q.      Okay.  And one year later in

4    December 2013?

5          A.      Through 2013, the reporting

6    risk ratio is 10.6.

7          Q.      Then finally when you go

8    through December 2014?

9          A.      Through 2014, the reporting

10   risk ratio is 11.5.

11         Q.      So how would you describe the

12   trend as you go forward in time for the

13   Meridian filter?

14         A.      So it is increasing, but, you

15   know, there aren't a lot of time points here,

16   obviously, but it is, you know, perhaps

17   leveling off at least between 2013 and '14.

18         Q.      And were these results for the

19   Meridian filters statistically significant?

20         A.      Yes, they were all highly

21   statistically significant.

22         Q.      And did you conduct sensitivity

23   analyses for these calculations as well?

24         A.      Yes, I did the same sensitivity

1   around the SNF numbers.  And in those

2   analyses the reporting risk ratios are 4.8,

3   8.6, and 9.4 for those three years, 2012

4   through 2014.

5        Q.    And what is your conclusion

6   then, what does the sensitivity analysis tell

7   you?

8        A.    So the sensitivity analysis

9   tells us that even if we are missing a

10  handful of SNF fractures, there still is an

11  elevated reporting risk for Meridian versus

12  SNF.

13       Q.    And the reporting risk ratio of

14  6, 10, and 11, is that saying that there's

15  six times -- there's a six times risk or a

16  ten times risk of a Meridian fracture report

17  compared to SNF?

18       A.    That's correct.

19       Q.    And so what's your overall

20  conclusion based on the adverse event

21  analysis for the Meridian filter?

22       A.    So based on the data that is

23  available here, there does appear to be an

24  elevated reporting risk for fracture for the

1    Meridian filter as compared to the SNF

2    filter.

3         Q.    And is that in line with your

4    analysis of the engineering documents?

5         A.    Yes, that is what the Bard

6    engineers were predicting.

7         Q.    Okay.  We're going to go over

8    the last filter, and then I think we can take

9    a break.  This should be the shortest one.

10              Let's move on to your analysis

11   of the design documents for the Denali

12   filter.  Is this the design document that you

13   reviewed?

14        A.    Yes.

15              MR. MANKOFF:  I move to admit

16        Exhibit 636, and publish it for the

17        jury.

18              MR. NORTH:  No objection.

19              (Whereupon, Plaintiffs' Exhibit

20        Number 17 was marked for

21        identification.)

22   BY MR. MANKOFF:

23        Q.    Again, we'll just look at some

24   of the examples in the document.

1              What does Bard analyze in

2     section 3 here?

3          A.    Deployment.

4          Q.    And in section 2 and 2.1, what

5     does Bard analyze?

6          A.    So this is about

7     anchoring/antimigration with a potential

8     failure mode of cephalad migration.

9          Q.    And in section 3.1, what is

10    being analyzed?

11         A.    Fracture.

12         Q.    Let's look at your comparisons

13    in Exhibit B of the SNF and the Denali

14    filter.

15              What was Bard's prediction for

16    migration caused by wire fracture for the

17    SNF?

18         A.    So for the SNF, the prediction

19    is a probability of 1/150,000 to 1/20,000 for

20    wire fracture or detachment occurring,

21    causing migration leading to critical health

22    hazard.

23         Q.    Okay.  And generally, on this

24    page are the probabilities of various

1    potential causes of failure the same for the

2    SNF?

3          A.    Yes, all of the ranges are the

4    same.

5          Q.    Okay.  And then if we look at

6    the Denali filter, where are Bard's

7    predictions about a fracture or detachment

8    causing a migration for the Denali filter?

9          A.    So for Denali they have broken

10   it down into three categories, so fracture,

11   and then detachment, and then component

12   detachment.  For each one of them, they are

13   predicting a probability of 1/20,000 to

14   1/10,000 causing the event, such as fracture,

15   leading to cephalad migration, and then

16   ultimately a critical health hazard.

17         Q.    And did Bard make any

18   predictions about cephalad migration

19   specifically for the SNF?

20         A.    No, they did not.

21         Q.    Okay.  And what comparison --

22   what kind of migration is being evaluated in

23   the comparison here on the next page for the

24   Denali filter?

1          A.     So this is caudal migration.

2          Q.     Okay.  And for SNF, is this the

3      same page -- the same migration predictions

4      as on the previous page?

5          A.     Yes, it is.

6          Q.     Okay.  So what is your

7      conclusion about migration when you compare

8      the Denali and the SNF filters?

9          A.     So the predictions for ultimate

10     critical health hazards are higher for Denali

11     than for SNF, and so they're actually higher

12     at the level of the cause of failure, but

13     then there are more causes, so those are

14     broken down for Denali versus SNF, so there's

15     higher likelihood within, let's say, caudal

16     migration leading to health hazard, but then

17     we have to increase that further to account

18     for cephalad migration as well.

19              So overall, there's -- they are

20     predicting definitely higher probabilities

21     for -- of fracture and related events leading

22     to migration and critical health hazards for

23     Denali as compared to SNF.

24         Q.     Okay.  Let's look at your

1   comparisons for Denali for perforation and

2   penetration.

3              What did SNF -- what did Bard

4   predict for SNF for the top three categories

5   for perforation?

6        A.    So for each one of the

7   categories, they predict a probability of

8   1/150,000 to 1/20,000.

9              For each one of those potential

10  causes of failure leading to perforation, and

11  ultimately leading to a moderate health

12  hazard, I don't remember if I said the

13  probability, so the probability is 1/150,000

14  to 1/20,000.

15       Q.    And for the Denali, for those

16  similar categories?

17       A.    So for the similar potential

18  causes of failure, they are predicting

19  probabilities of 1/2,000 to 1/1,000.

20       Q.    And then finally, let's take a

21  look at your comparisons with respect to

22  fracture predictions.

23              How often did Bard predict that

24  the SNF would fracture due to material

1    fatigue?

2         A.     So they predicted a probability

3    of 1/20,000 to 1/10,000 that there would be

4    material fatigue due to movement that would

5    lead to fracture, and ultimately a critical

6    health hazard.

7         Q.     And what about for the Denali?

8         A.     For Denali they are predicting

9    twice that probability, so 1/10,000 to

10   1/5,000 for the event of material fatigue due

11   to movement leading to fracture, and

12   ultimately to critical health hazard.

13        Q.     And did Bard also predict that

14   biomechanical forces would cause fracture in

15   the Denali?

16        A.     Yes, they did.

17        Q.     And did they make a prediction

18   about that for the SNF filter?

19        A.     No, they did not.

20        Q.     Okay.  So just, again, to sum

21   up your analysis of the Denali design

22   document compared to the SNF, what's your

23   overall conclusion?

24        A.     So my overall conclusion is

1    that the Bard engineers were predicting

2    higher likelihoods of failure for various

3    failure modes for Denali as compared to SNF.

4         Q.    Okay.  Let's move on to your

5    second analysis for the Denali filter.  And

6    let's just focus in on December of 2014.

7              What was your -- what was the

8    reporting risk ratio you calculated for the

9    Denali filter for December 2014?

10        A.    So I calculated a reporting

11   risk ratio of 2.1 for comparing Denali to SNF

12   for fracture.

13        Q.    And does that mean that there's

14   twice as many reports for Denali compared to

15   SNF when controlling for sales?

16        A.    Yes.

17        Q.    And is that result

18   statistically significant?

19        A.    Yes, with respect to a

20   threshold of 0.05, so the p-value is 0.025.

21        Q.    Okay.  And is this result here,

22   how does -- does that agree with your

23   analysis of Bard's design documents?

24        A.    Yes.  So again, the design

 1    documents suggested, you know, a clear belief

 2    by Bard that Denali would have a higher

 3    likelihood of fractures leading to health

 4    hazards.  And this is reflecting a higher

 5    risk of upstream failures that are related to

 6    fracture for Denali versus SNF.

 7         Q.    Okay.

 8              MR. NORTH:  I'm going to object

 9         to the answer the doctor just gave.  I

10         think that far exceeds her

11         qualifications and the scope of her

12         allowed testimony.

13    BY MR. MANKOFF:

14         Q.    Okay.  I'd like to talk a

15    little bit more about the adverse event data

16    that you relied on.

17              You mentioned a few times that

18    for the most part you looked at data from

19    2000 forward, is that correct?

20         A.    Yes.  That was what Bard

21    provided, and that's what internally their

22    studies examined.

23         Q.    Okay.  So why did you start in

24    the year 2000?

1       A.      So that's -- that is the data
2    that I was provided, that Bard provided.
3            And again, in the internal
4    company studies and reports, they also
5    started in 2000.
6       Q.      Did you generally try and align
7    your analysis with the analyses that you saw
8    in Bard's documents?
9       A.      So I did, because that's how
10   the data were provided.  So those particular
11   calendar dates of the different analyses are
12   simply reflecting when -- the data sheets
13   that were provided, so when the data were
14   gathered.
15      Q.      And then did you try and
16   account for or attempt to adjust for
17   possibility that there's information from the
18   1990s as relevant to your analysis?
19      A.      So that sensitivity analysis
20   for fracture -- well, I believe I did it
21   for -- I actually don't remember.
22            Well, the sensitivity analysis
23   that we've just examined was attempting to
24   crudely account for potentially, you know,

```
 1    missing events that might have occurred
 2    before 2000.
 3         Q.    Okay.  I wanted to look at
 4    Exhibit 614.
 5              Is this a document that you
 6    relied on in doing your adverse event
 7    analysis?
 8         A.    I believe so.
 9              MR. MANKOFF:  Okay.  I would
10         move to admit Exhibit 614, and publish
11         it to the jury.
12              MR. NORTH:  I'm going to
13         reserve objections on that.
14              (Whereupon, Plaintiffs' Exhibit
15         Number 18 was marked for
16         identification.)
17    BY MR. MANKOFF:
18         Q.    Okay.  Can you explain what
19    this -- I pulled up the top chart on this
20    page.  Can you explain what this chart is
21    showing generally?
22         A.    Yes.  So this chart is showing
23    data on fracture complaints and units sold
24    from the date of launch of the various
```

1    products through May 2007.

2         Q.    So did you rely on this

3    document to draw any conclusions about at

4    least the fracture data for the SNF from

5    launch?

6         A.    Yes.  So I interpreted this

7    document to be providing data that would

8    include data before 2000, because I know that

9    the SNF was launched in 1990 or thereabouts.

10   And so if this is data from launch through

11   May 2011, then it would necessarily include

12   data pre-2000.  And so that is what gave me

13   reassurance about the sensitivity analysis of

14   adding five fractures to the SNF total.

15              MR. NORTH:  I'm going to object

16         to that answer.  She has no foundation

17         for saying that, and this is also

18         violating the disclosure requirement.

19   BY MR. MANKOFF:

20         Q.    Is the number of fractures

21   reported for the SNF generally in line with

22   the other data you received about the SNF

23   filter fractures?

24         A.    Yes, it is.

```
 1         Q.      I'd like to look at one more
 2    document.  This is Exhibit 1605.
 3               Is this a document that you
 4    relied on in analyzing the adverse event
 5    data?
 6         A.      This -- I certainly reviewed
 7    this document.
 8         Q.      Okay.  I'm going to pull up the
 9    information on this page.
10               MR. MANKOFF:  I would move to
11         admit Exhibit 1605, and publish it to
12         the jury.
13               MR. NORTH:  I object.  No
14         foundation, no context, no disclosure.
15               (Whereupon, Plaintiffs' Exhibit
16         Number 19 was marked for
17         identification.)
18    BY MR. MANKOFF:
19         Q.      Dr. Betensky, what is being
20    reported on this page of this exhibit?
21         A.      So this is a list of patient
22    deaths prior to 2000.
23         Q.      And how many patient deaths
24    were reported for the Simon nitinol filter
```

1    for that period prior to 2000?

2                    MR. NORTH:  Objection.

3         A.      There is one in 1997.

4    BY MR. MANKOFF:

5         Q.      And what conclusion did you

6    draw from this document with respect to the

7    data before 2000?

8                    MR. NORTH:  Objection.  No

9         foundation.

10        A.      So this indicates that although

11   I used data beginning in 2000, I wasn't

12   missing very much with regard to Simon

13   nitinol filter before 2000.

14   BY MR. MANKOFF:

15        Q.      We've been discussing these

16   adverse event reports.  Did you consider, or

17   did you account for whether filter failures

18   would cause symptoms or not?

19        A.      I could not account for that

20   directly because I don't have any information

21   in the data that I have as to the breakdown

22   of symptomatic versus asymptomatic events.

23        Q.      If a failure was not causing

24   symptoms, would that result in a report not

1    being made?

2            MR. NORTH:  Objection.  No

3        foundation, no disclosure.

4        A.    So if there were no symptoms,

5    and if the patient was not otherwise being

6    monitored, then a report would not be made.

7            MR. NORTH:  Objection to this

8        entire line of testimony.

9            She is not a medical doctor,

10       she did not give a report as a medical

11       doctor, she is not qualified to give

12       medical opinions.  And we're going

13       right back to Judge Campbell with a

14       renewed Daubert motion if this

15       continues.

16   BY MR. MANKOFF:

17       Q.    Dr. Betensky, in your expert

18   report you had a section on potential

19   limitations.

20            Do you recall that?

21       A.    Yes, I do.

22       Q.    Why do you call them -- or what

23   is your discussion of potential limitations

24   generally?

1          A.      So as in any scientific

2    analysis that I would do in any aspect of my

3    work or professional activities, I always

4    want to identify any limitations or potential

5    limitations in any analysis that I conduct,

6    so I did the same thing within this report.

7    And so I considered a few potential

8    limitations.

9              MR. MANKOFF:  Is now a good

10        time for a break actually?

11              THE WITNESS:  Sure.

12              MR. MANKOFF:  Can we go off the

13        record?

14              THE VIDEOGRAPHER:  With the

15        approval of counsel, going off the

16        record.  The time is approximately

17        2:55 p.m.

18              (Whereupon, a recess was

19        taken.)

20              THE VIDEOGRAPHER:  With the

21        approval of counsel, back on the

22        record.  The time is approximately

23        3:14 p.m.  This marks the beginning of

24        recording media number 4.

BY MR. MANKOFF:

Q.     Okay.  Do you still have your
adverse event spreadsheet on the screen?

A.     Yes.

Q.     Okay.  Before we get into the
discussion I launched just before the break,
I realized that there was one column that we
forgot to look at here, so I just want to
look at that quickly for -- we can look at
all of the filters together here.

        What is the filter fracture
plus column that you provided?

A.     So actually, if you could move
that so I could just remind myself with the
footnote.

        So essentially what happened
was in the data sheets, at some point in time
filter fracture was not reported separately,
so it looks like it was after 2007, but
instead was reported together with detached
component.  And so you can see that after
2007, I don't have anything in the filter
fracture column, because I didn't have those
numbers separately from detached component,

1    but instead had the filter fracture plus,

2    which is the combination of filter fracture

3    or detached component.

4         Q.    So did you have fracture

5    reports from Bard in 2007, 2009, and 2010?

6         A.    So I believe I did not have

7    fracture separately.

8         Q.    So let me ask it this way.

9              Do you have reports of from

10   filter fracture plus from Bard in 2007, 2009,

11   and 2010?

12        A.    Yes.

13        Q.    Okay.  And were the reporting

14   fracture ratios generally greater than 1?

15        A.    Yes, they were.  The exception

16   is the Eclipse in 2010, and G2X in 2009, G2

17   in 2007.

18        Q.    Okay.  And if I need to pull up

19   the other half of your chart, do you know if

20   the results that are greater than 1, were

21   those statistically significant?

22        A.    I should check, so if you don't

23   mind.

24        Q.    Let me try and see if you can

1    read it if I do it this way.

2         A.    No, I can't.  It's actually cut

3    off.

4         Q.    Okay.  We'll leave that --

5         A.    Although, actually, I can see

6    that I have yellow highlighting, which as I

7    explained, I did in the cases where the

8    p-values were less than .05, so I can

9    actually see that those p-values are less

10   than .05 for the reporting risk ratios that

11   are greater than 1, and so they are

12   statistically significant.

13        Q.    So the numbers are cut off, but

14   you marked them.  Is that what you're saying?

15        A.    That's right.  I don't see the

16   actual numbers, but I see the yellow

17   highlighting.

18        Q.    Okay.  So I'd like to then move

19   on to our discussion of potential

20   limitations.  And I had asked you why you

21   call them potential limitations.

22        A.    Yes.  So they are potential

23   limitations because they are theoretical,

24   meaning that they might be limitations or

1    they might not be limitations, because -- and

2    the reason for my uncertainty is I just don't

3    know the extent to which they play a role in

4    the data, so that is why they're potential.

5         Q.     And is it customary to discuss

6    potential limitations when you do a

7    statistical analysis?

8         A.     Yes.  In fact, any scientific

9    paper, you know, certainly includes a

10   section, oftentimes it's in the discussion

11   section of the paper or the conclusion

12   section, in which potential limitations are

13   identified.  Any paper that didn't have that

14   would be called out, and it would be

15   requested, you know, by reviewers of any

16   peer-reviewed journal.

17        Q.     Okay.  So I'm displaying the

18   section of your report that discusses this

19   just to focus or discussion, and so you have

20   it available.  So let's just take the

21   potential limitations one-by-one.

22             What was the first potential

23   limitation that you discussed?

24        A.     So the first limitation or

1    potential limitation is that of

2    underreporting.  So reporting of adverse

3    events is voluntary, there's no way to ensure

4    that absolutely every adverse event is

5    reported.  And so what that means is that

6    there's likely underreporting of events.  Not

7    everybody who experiences an adverse event

8    files a report or not, you know, or a report

9    is not always filed for every adverse event.

10   And so that could be a problem, but only if

11   there is differential underreporting.

12            So because I'm looking at a

13   ratio of, let's say, Recovery risk divided by

14   SNF risk, there's no problem at all if there

15   is similar underreporting for both types of

16   filters because that washes out in the ratio.

17            The problem, potential problem,

18   could arise if there is different

19   underreporting between devices.  So if one

20   device had larger underreporting than another

21   device, then that could lead to, you know, an

22   inaccurate estimate of that reporting risk

23   ratio.

24            MR. NORTH:  I'd like to object

Do Not Disclose - Subject to Further Confidentiality Review

```
 1            for the record to the display of the
 2            report on the screen.  It's
 3            inadmissible hearsay.
 4       BY MR. MANKOFF:
 5            Q.    Does the magnitude -- or how
 6       does the magnitude of your calculations
 7       factor into your analysis of potential
 8       underreporting?
 9            A.    So doing the math, you know, so
10       I can go through -- so given any reporting
11       risk ratio, what we can do is a calculation
12       to say, well, if that reporting risk ratio
13       really is 1, meaning no difference in risk,
14       if we only had all of the adverse event data
15       in -- you know, that exists, so, in other
16       words, if there's no underreporting, if the
17       truth is 1, what does it mean that, you know,
18       we have a reporting risk ratio of 180 or 50
19       or something like that, that would have to
20       translate into a certain difference in
21       underreporting between filters.  And so in
22       many of these cases that would translate into
23       substantial -- a substantial difference in
24       underreporting between filters.
```

1    Q.    Did your -- how does your

2  sensitivity analysis address the potential

3  for underreporting?

4    A.    So I conducted a sensitivity

5  analysis with the SNF filter, and I added

6  just arbitrarily -- well, not arbitrarily, it

7  was based on what I had seen about potential

8  events prior to 2000, but I added five

9  adverse events in the SNF fracture analysis,

10  and did the analysis accordingly, so, in

11  other words, addressing the possibility that

12  perhaps SNF events were underreported, so I

13  added events to SNF.

14        And it does reduce, of course,

15  the reporting risk ratio, but in many of the

16  cases seen in my analysis it remains elevated

17  relative to 1 and statistically significant.

18    Q.    Okay.  Let's talk about the

19  next potential limitation that you discuss in

20  your report related to sales data.

21    A.    Yes.  So sales data is not

22  necessarily the true exposure, meaning it's

23  not necessarily the true number of filters

24  that was implanted.  So a hospital may buy a

1    certain number of filters, but ultimately not

2    use all of them.

3                     And so I -- what I did was I

4    discounted the sales numbers by 20 percent,

5    and redid my analysis, and I believe it may

6    have only been the 2010 analysis, I didn't

7    redo all of the analyses.

8                     Now, that's, again, not going

9    to affect at all the reporting risk ratios

10   because it's a ratio that discount in the

11   denominator cancels out, doesn't make a

12   difference, but it does have an impact on the

13   p-value or the statistical significance.  And

14   I found that it did not make much of a

15   difference at all.

16                    Now, the 20 percent is

17   justified by actually a document that we

18   looked at earlier, which I think it was the

19   Recovery filter where -- a Bard document

20   where they indicated that actually about

21   80 percent of those filters that were sold

22   were actually implanted.

23        Q.     And so do you expect that the

24   potential limitation would affect your

1    conclusions?

2         A.     No.  The p-values in most of

3    the cases are so highly significant, meaning

4    they're so small, that the increase in the

5    p-values, which certainly will occur by

6    decreasing the denominators, won't change

7    their significance relative to .05.

8         Q.     And similar question with

9    respect to underreporting, just to back up to

10   that one.

11              Do you expect that that issue

12   would affect your conclusions?

13        A.     So what we saw with the -- what

14   I saw with the SNF where -- so let me just --

15   let's see.

16              So first of all, adding events

17   actually increases the power, which is a

18   statistical term, which means makes it more

19   likely to get a significant p-value.  So what

20   drives statistical significance actually is

21   the number of events.

22              So if I had available more

23   events from both -- from both comparator

24   filters, that would give me smaller p-values.

 1              Now, if there's -- again, if

 2     there's differential underreporting, I have

 3     two forces working in opposition.  One is an

 4     increased number of events is reducing the

 5     p-value, but perhaps that increase in event

 6     reduces the reporting risk ratio.  So there

 7     are two opposing forces, which may mean that

 8     it doesn't have much of an effect.  It's hard

 9     to say in general, of course, but for the SNF

10     analysis it didn't make much difference.

11         Q.     So did you have any evidence

12     that differential underreporting affected

13     your overall conclusions, not the individual

14     numbers but the overall conclusions?

15         A.     So, no.  There is no evidence

16     of that.  And actually, I additionally have

17     evidence against that, I would say.  I did do

18     an analysis where I compared the reporting

19     risk ratios for a given time period across

20     adverse events, and the idea of my analysis

21     was that if there's really no difference in

22     risk between filters, then -- but the only

23     difference is driven by underreporting or

24     detection or something, then those reporting

1    risk ratios should be pretty similar across

2    adverse events.  I did a statistical test of

3    that, and it turns out that there actually --

4    they're not.  I mean, certainly they're not

5    by the numbers, we saw that, there were some

6    pretty large differences in those reporting

7    risk ratios within the calendar year across

8    adverse events.

9              But taking it one step further,

10   even doing a statistical test to make sure

11   that they're actually different, I found that

12   they are different.  So that's another reason

13   that makes me believe that underreporting

14   isn't what's driving the reporting risk

15   ratios here.

16        Q.    Okay.  The next potential

17   limitation you discuss is counting and data

18   errors.  Can you explain what that is?

19        A.    Yes.  So as I explained earlier

20   and indicated also in this report, there were

21   several errors that I found, and

22   inconsistencies and discrepancies across

23   various Bard data sheets, and also in the

24   actual spreadsheets when I went into the raw

1   data spreadsheets, and in all of the cases,

2   as I mentioned earlier, where I found

3   discrepancies, I found them with the newer

4   filters, and specifically I think many

5   examples with the Recovery filter, and I

6   always made the conservative selection of

7   numbers of events.

8            So, for example, with fracture

9   events where there was a choice between 46 in

10  one place and maybe it was -- I forget if it

11  was 55 or 76 in another place, I chose the

12  smaller number.  So that was how I dealt with

13  those discrepancies.  And I didn't find any

14  such discrepancies, actually, with the SNF

15  data.

16       Q.    And so does that potential --

17  as far as you can tell, did that potential

18  limitation influence your overall

19  conclusions, change your overall conclusions?

20       A.    No, that doesn't.

21       Q.    Okay.  The next potential

22  limitation you discuss is exposure time.  Can

23  you explain what that is?

24       A.    Yes.  So a completely different

1    measure of risk would take into account

2    exposure time to the filter, and the idea

3    being that that should be accounted for.  So

4    if you have a filter for one day, you have

5    less risk than you do if you have a filter

6    implanted for 30 days.  And so an alternative

7    analysis would take that into account.

8              Now, I could not take that into

9    account because I was not provided with any

10   person time exposure, that's what we call it,

11   or even estimates or rough estimates of

12   exposure time for these filters, so I

13   couldn't take that into account.

14             However, one conclusion that I

15   can come to is that given that I was

16   comparing the newer filters to the SNF

17   filter, and the SNF filter was intended to be

18   a permanent filter and the newer filters were

19   optionally retrievable, that would indicate

20   that exposure time to the SNF would maybe on

21   average be longer or no different, but

22   possibly, quite possibly longer than exposure

23   time to a retrievable filter.

24             And so what that would mean is

1    that actually this incidence rate ratio,

2    which is like my reported risk ratio, except

3    that it additionally adjusts for exposure

4    time, would actually be even larger than the

5    reported risk ratio if it is the case that

6    the permanent filter is associated with

7    longer exposure than the retrievable filter.

8         Q.    And how does the date of your

9    analysis interact with exposure time?  So if

10   you're looking at, say, the Recovery failure

11   report certainly after launch, what does that

12   tell you about exposure time?

13        A.    Yes.  So obviously there is

14   less exposure time possible the closer to the

15   launch of the product, and so that

16   additionally would give longer exposure times

17   potentially to the SNF which was on the

18   market longer than any of the newer

19   retrievable filters.

20        Q.    So does the potential

21   limitation of exposure time cause you to

22   question, or does it change your conclusions?

23        A.    No, it doesn't.  Because even

24   if I could estimate that quantity, it seems

1    that it would be similar to or larger than

2    the reporting risk ratios that I was able to

3    estimate based on the available data.

4         Q.    Okay.  The next potential

5    limitation you discuss, you called temporal

6    effects in reporting.  Can you explain what

7    that is?

8         A.    Yes.  So this is well-known in

9    adverse events analyses, and it sometimes

10   goes by the name of the Weber effect, and

11   this refers to increased reporting soon after

12   the launch of the product, perhaps when

13   everybody is paying attention to it, and then

14   some falloff or decrease over time.

15             And I considered that, but it

16   seems that that really wasn't apparent in the

17   data that I examined.  So the SNF, again, had

18   already been on the market for, you know, ten

19   plus years prior to any of these analyses, so

20   it would be long past its potential Weber

21   effect, so it should be pretty stable, that's

22   the denominator.

23             And the numerator, if there

24   were such a Weber effect, we would see

1    increasing reported risk ratios and then

2    decreases, decreases after an initial bump

3    up, and that isn't apparent in these data.

4         Q.    And we, a little while ago, we

5    discussed some of the data that you analyzed

6    for the SNF going back to its launch.  Did

7    you see any temporal effect when you looked

8    at that data?

9         A.    So I actually did not look at

10   the filters in isolation.  I just looked at

11   these reporting risk ratios, so...

12        Q.    I'm referring to the exhibit we

13   looked at that showed the fracture data from

14   launch through May 2011 for the various

15   filters.

16             Do you recall that document?

17        A.    Yes.

18        Q.    So that provided fracture

19   information for the SNF filter, right?

20             MR. NORTH:  Objection to form.

21        A.    Yes.

22   BY MR. MANKOFF:

23        Q.    Did that provide you any

24   information about whether there was a

1    temporal effect in the early part of the SNF

2    filter?

3          A.    So there did not seem to be.

4    So from 2000 through 2011, there were eight

5    such events, and some small number of them

6    were, I forget the actual number, were seen

7    after 2000.  So it's such a small number, it

8    would be hard to ascribe a Weber effect to

9    that.

10         Q.    Okay.  So overall, do you --

11   are you able to conclude whether the temporal

12   affects would change your conclusions?

13         A.    I conclude that there's no

14   evidence of temporal effects in reporting

15   based on the data that I have.

16         Q.    Okay.  And the next potential

17   limitation that you discuss is publicity.

18   Can you describe what that is?

19         A.    Yes.  So sometimes some events,

20   like an FDA warning, might lead to stimulated

21   reporting.  So if there's an FDA warning,

22   then people start paying more attention, and

23   that just leads to increased reporting.  But

24   I'm not aware of any event that occurred

1 prior -- certainly prior to 2014 that would

2 have led to this.  And again, there's no

3 indication in the data of such a, you know, a

4 blip.

5     Q.     And so did you find that

6 publicity would change your conclusions?

7     A.     I don't think -- so again, I

8 don't know of any event that would count as

9 such a publicity event.  And even if there

10 were, I don't believe that the data matched

11 that.

12     Q.     The final potential limitation

13 that you discuss is confounding or

14 channeling bias.  What is that?

15     A.     So that refers to patient

16 characteristics.  So the issue would be if

17 very different types of patients received the

18 SNF filter versus a retrievable filter, and

19 those -- the differences that defined those

20 groups of patients were also associated with

21 their adverse event risk, and then it might

22 be the case that, you know, one filter has

23 elevated risk versus the other, having

24 nothing to do with the filter but having to

1    do with the patients who are receiving the

2    filter.  So first of all, there's no data

3    again available to do this kind of analysis,

4    Bard did not do this analysis when they did

5    all of their similar kinds of analyses.

6              And the other way of looking at

7    it actually is that even if there are some

8    differences in patient groups, there might

9    very well be an overlap in patients, so there

10   might very well be patients who might have

11   received the SNF in the '90s, but in the

12   2000s received a retrievable filter, so

13   there's likely some overlap.

14             But also, risk is about the

15   experience of the filter, and includes the

16   patients receiving it.  So the interpretation

17   of the reporting risk ratio has to do with

18   the filter in the patients to whom the filter

19   is given as well.

20             I guess I would also add one

21   last thing, which is that oftentimes, even if

22   there is a patient-level fracture that

23   differentiates who receives the filter and is

24   related to risk, it often has a relatively

1    small impact on relative risk or risk ratio,

2    and not of the magnitude that we're seeing

3    for some of these here.

4          Q.      So overall, does that potential

5    limitation, do you believe that that would

6    change your conclusions?

7          A.      No.

8          Q.      Okay.  So I just wanted to take

9    a minute to talk about adverse event reports

10   generally.

11               Is there an inherent problem in

12   doing the analysis you did based on adverse

13   event reports?

14         A.      So, no, there isn't an inherent

15   problem.  So it certainly is not -- should

16   not be the final analysis, but it definitely

17   is a useful analysis.  It actually is

18   recommended by the FDA in some of their

19   documents that sponsors should be following

20   their products, and should do this kind of

21   analysis, even if it is limited potentially

22   by underreporting and various other issues,

23   it's still useful to be looking because

24   ultimately it's all about protecting patients

1    and patient safety.  And so -- and so it is,

2    I believe, and Bard believed also, a very

3    important activity to do while dealing with,

4    you know, risks of patients.

5         Q.    Did Bard do similar analyses

6    based on filter failure reports?

7         A.    Yes, they did.

8         Q.    Are your results that we've

9    discussed here today consistent with the

10   results that Bard generated?

11        A.    Yes.  They didn't do a lot of

12   reporting -- at least as far as what I saw,

13   maybe there are many other documents that I

14   did not see, I did not see a lot of reporting

15   risk ratios.  I did see some.  And they did

16   report significant p-values associated with

17   those.

18             Mainly they reported the rates

19   of the events separately by filters, but they

20   definitely did do the -- they did look at

21   reporting risk ratios, and they did do formal

22   statistical analysis of them.

23        Q.    Just tying it all together

24   then, overall these analyses that you've

1    done, what do they mean with respect to

2    patients getting filters, Bard filters?

3                     MR. NORTH:  Objection to the

4          form.  Beyond her qualifications.

5          A.      So I guess, so I -- in the same

6    way that I sit on data safety monitoring

7    boards and advise companies about safety in

8    randomized clinical trials, my view of these

9    data is that from at least three different

10   sources of data there is consistent

11   indication of elevated risk of the newer

12   filters as compared to the SNF filter.

13                   And the consistency is

14   important, that even with limitations, a

15   consistent direction of a finding carries

16   weight, and in some sense, you know,

17   doesn't -- maybe doesn't completely overcome

18   limitations, but counters some of those

19   limitations.  So consistency from many

20   different types of experiments and data is

21   very important in science.

22                   And so here also, three

23   different angles on this question are

24   pointing all in the same direction, and that

Do Not Disclose - Subject to Further Confidentiality Review

1    strengthens the findings, which themselves

2    are all pointing toward likely elevated risk

3    for the newer filters versus the SNF.

4    BY MR. MANKOFF:

5         Q.    A few more questions.

6               I realize we had discussed,

7    with the Denali and the Meridian filter there

8    was a discussion about cephalad migration and

9    caudal migration.  I know I asked you about

10   the one, I can't remember which one, just so

11   we have the terms defined, do you know what

12   caudal migration means?

13        A.    Yes.  So I may have reversed

14   it, because they're such similar words.

15              So I believe caudal is the

16   downward migration.

17        Q.    And what is cephalad migration?

18        A.    So cephalad would be the upward

19   migration.

20        Q.    Okay.  And are all the opinions

21   you've given here today to a reasonable

22   degree of scientific probability?

23        A.    Yes.

24              MR. MANKOFF:  No further

1          questions.  Well, I guess we'll

2          reserve redirect.

3                    MR. NORTH:  Can we go off the

4          record for a minute, please?

5                    MR. MANKOFF:  Yes.

6                    THE VIDEOGRAPHER:  Off the

7          record.  The time is approximately

8          3:46 p.m.

9                    (Whereupon, a recess was

10         taken.)

11                   THE VIDEOGRAPHER:  With the

12         approval of counsel, back on the

13         record.  The time is approximately

14         3:49 p.m.  This marks the beginning of

15         recording media number 5.

16                        EXAMINATION

17    BY MR. NORTH:

18         Q.    Good afternoon, Dr. Betensky.

19    How are you?

20         A.    Good afternoon.  Fine, thank

21    you.

22               You're muted.

23         Q.    Sorry about that.

24               You and I met several years ago

Do Not Disclose -- Subject to Further Confidentiality Review

1    when I took your deposition, didn't we?

2         A.    Yes.

3         Q.    And before we get into the

4    details, I just want to be sure the jury is

5    clear as to the scope of what your analysis

6    is.

7              Your opinions in this case are

8    limited to a comparison of the Simon nitinol

9    filter with other Bard filters, correct?

10        A.    Yes.  I guess I would -- I

11   mean, everything that I've done involves more

12   than just a strict comparison, but ultimately

13   I am making comparisons.

14        Q.    Well, you haven't attempted to

15   compare the performance of Bard filters with

16   competitive filters, have you?

17        A.    No.

18        Q.    You're not saying that any of

19   the Bard filters complication rates are

20   excessive, are you?

21        A.    I am not commenting on them in

22   isolation.  I'm comparing them to the SNF.

23        Q.    So you're only saying one is

24   higher than the other; you're not saying

1    they're necessarily excessive out in the

2    medical world, correct?

3                    MR. MANKOFF:  Object to the

4            form.

5            A.      That's correct.

6    BY MR. NORTH:

7            Q.      And you're not here to say that

8    any one of these devices poses an

9    unreasonable health risk to a patient,

10   correct?

11           A.      Well, I don't think I would

12   agree with that, because based on, for

13   example, the Bard DFMEA documents, Bard

14   identified several life-threatening and

15   critical health hazards and associated

16   probabilities of those occurring, so I can't

17   ignore that they recognize that those are

18   likely, or have likelihoods.

19           Q.      Well, that may be true, but

20   you're aware of the fact that all filters on

21   the marketplace have these sorts of risks,

22   correct, to some extent?

23                   MR. LOPEZ:  Objection.  Object,

24           lacks foundation.  It's also vague and

1          ambiguous when you say "these risks."

2                 MR. NORTH:  Objection to the

3          leading objection now.  We're going to

4          go to the judge if you keep doing

5          that, Mr. Lopez.

6    BY MR. NORTH:

7          Q.     Dr. Betensky, you are aware of

8    the fact that there are reports of

9    complications with all filters in the

10   literature, correct?

11         A.     No, I can't comment on that.

12   There are certainly filters that I know

13   nothing about.

14         Q.     Well, you do know something

15   about a number of other filters, correct?

16         A.     I know something about some

17   filters, but I don't -- I would be afraid to

18   say that I -- to say something about all the

19   entire universe of filters.  I don't know

20   that.

21         Q.     Now, you have been hired by

22   these attorneys to give opinions in this

23   litigation against Bard about our inferior

24   vena cava filter products, right?

1          A.       Yes.

2          Q.       And you've been hired by many

3      of the same attorneys to give opinions

4      against another company, Cook Medical, in

5      litigation involving their filters, correct?

6          A.       Yes.

7          Q.       And many of the attorneys

8      working with you in the lawsuit against Bard

9      are also working with you in the lawsuit

10     against Cook, right?

11              MR. MANKOFF:   Object to form.

12         A.       Actually, I'm not sure how many

13     attorneys are the same.

14              Cook was -- Cook, I haven't

15     worked on Cook for several years, and I

16     don't -- the primary attorneys were not the

17     same.

18     BY MR. NORTH:

19         Q.       But some of the same attorneys

20     were involved, correct?

21         A.       I actually don't remember.  I'm

22     sure that there's some overlap, but I don't

23     recall.

24         Q.       Well, with regard to the Cook

1    litigation, you made a similar analysis

2    comparing the complication rate of one Cook

3    filter against the complication rate of

4    another Cook filter, correct?

5         A.    I haven't looked at my Cook

6    analysis for a long time.  I don't believe I

7    used sales data in my Cook analysis.

8         Q.    I didn't ask about sales data,

9    Dr. Betensky.

10              I said, you compared

11   complications with one model filter of Cook

12   versus another.

13              MR. MARTIN:  Object to the

14        form.

15        A.    You actually said "rate," and I

16   took that to mean with the denominator.

17   That's my statistical interpretation.

18              So I did compare adverse

19   outcomes through a different kind of analysis

20   in that case, yes.

21   BY MR. NORTH:

22        Q.    And you've been involved not

23   only in the Bard litigation, and not only in

24   the Cook litigation, but you're also

1    testifying for the plaintiffs in litigation

2    against Cordis, another manufacturer of IVC

3    filters, correct?

4         A.    Yes.

5         Q.    And are some of the same

6    attorneys that have hired you in the Bard

7    litigation and the Cook litigation also

8    working with you in the Cordis litigation?

9         A.    So I'm working with Mr. Mankoff

10   in the Cordis litigation.  I don't know of

11   any overlap with Cook that I can think of.

12   So Josh Mankoff is involved in the Cordis

13   case.

14        Q.    Dr. Betensky, you know

15   Mr. Martin who questioned you this morning,

16   correct?

17        A.    Yes.

18        Q.    Did you know that he's the lead

19   counsel for the plaintiffs in the Cook

20   litigation?

21             MR. MARTIN:  Objection.  Form.

22        A.    I did not remember that.  I

23   don't believe I interacted with him at all or

24   much at all in my work on the Cook case.

BY MR. NORTH:

Q.    Just to be clear the jury understands, you have testified for the plaintiffs against Bard concerning Bard's IVC filters, you've testified for the plaintiffs against Cook regarding their IVC filters, and you've testified for the plaintiffs against Cordis involving their IVC filters, correct?

MR. LOPEZ:  Objection.  Form.

A.    Yes.

BY MR. NORTH:

Q.    And in each of those three litigations, you're paid at $850 an hour to give testimony, correct?

A.    Yes.

Q.    And you are paid $750 an hour to review documents, correct?

A.    Well, it's a lot more than reviewing documents.  But that is correct for all of the activities that I do in my litigation consulting.  It's much more than reviewing documents.

Q.    Can you estimate for me the total amount you've charged the plaintiffs in

1    these three litigations combined, Cook, Bard,

2    and Cordis?

3                   MR. LOPEZ:  Objection.  Form.

4          A.     No, I can't.

5    BY MR. NORTH:

6          Q.     I'm sorry, you can't?

7          A.     I can't.

8          Q.     Would it be in excess of

9    $100,000?

10         A.     Probably, yes.

11         Q.     Now, when we were talking about

12   health risks beforehand, you're not able to

13   say whether any of the relative risks that

14   you calculated are -- would be considered

15   high in the medical community, are you?

16         A.     I did not calculate risks.  I

17   calculated risk ratios.

18         Q.     Risk ratios.

19                You don't know if those would

20   be considered excessive in the medical

21   community, do you?

22         A.     I do know that.  I do know that

23   in general, you know, risk ratios, you know,

24   above 1.5 are typically taken seriously

1    across many contexts.

2           Q.     Let me ask it this way.

3                  You testified a few minutes ago

4    that you have not made any attempt to compare

5    Bard filter complications risk ratios with

6    other filters, correct?

7                  MR. LOPEZ:  Objection.  Form.

8           Also mischaracterizes her testimony.

9           A.     So I'd like to ask you to

10   please clarify that question.  It wasn't --

11   perhaps you could restate it, please.

12   BY MR. NORTH:

13          Q.     You have not made any attempt

14   to compare the complication rates or risk

15   ratios of Bard filters against those of

16   competitive filters?

17          A.     So I don't know what you mean

18   by "those of competitive filters."

19                 So I, as you know, I examined

20   the reported risk ratios of the newer Bard

21   filters to the SNF filters.  So you're asking

22   me if I compared those risk ratios to risk

23   ratios from other companies?

24          Q.     Yes, competitive filters,

1    companies that compete with Bard, Cordis that

2    you've testified against, Cook who you've

3    testified against.

4              MR. MANKOFF:  Object to form.

5         A.    So for Cordis, I did not

6    calculate any risk ratios.  My work in Cordis

7    was very different from this.  I did

8    comprehensive literature reviews.  And it's

9    just not -- I'm sorry, and respectfully, it's

10   just not a well-defined question that you're

11   asking.

12   BY MR. NORTH:

13        Q.    I must not being clear,

14   Dr. Betensky, because I think it's fairly

15   simple.  Let me see if I can say it better.

16              You have not -- you've compared

17   Bard's retrievable filters against the Simon

18   nitinol filter, right?

19        A.    Yes.

20        Q.    For this litigation against

21   Bard, you have not attempted to compare

22   Bard's filters against any other

23   manufacturer's filters?

24        A.    That's correct.

1    Q.    And the plaintiffs never asked

2    you to do that, did they?

3    A.    That's correct.

4    Q.    And in fact, the plaintiffs

5    specifically asked you to compare the Simon

6    nitinol filter with Bard's retrievable

7    filters, correct?

8    A.    Yes.

9    Q.    And the plaintiffs' attorneys

10   are the ones who decided what documents to

11   give you, correct?

12   A.    Yes.

13   Q.    And in fact, they provided you

14   with all of the adverse incident data that

15   you analyzed in this case, correct?

16        MR. MANKOFF:   Object to form.

17   A.    So they provided all of the

18   data from Bard on the adverse events and the

19   sales, yes.

20   BY MR. NORTH:

21   Q.    Well, you did not independently

22   go research the FDA MAUDE database, did you?

23   A.    I did not, because my

24   understanding was that Bard's data would be

1    more comprehensive and cleaner than the FDA

2    data, and that anything that Bard had would

3    be in MAUDE, so there didn't seem to be any

4    reason to go to MAUDE, given that Bard was

5    providing the data.

6        Q.    But you had to rely completely

7    on the plaintiffs' attorneys to decide what

8    Bard data to give you, right?

9        A.    My understanding was that they

10    gave me all of the data for these filters and

11    these time periods.

12        Q.    But you had no way to

13    independently verify that, did you?

14        A.    I had no reason to.

15        Q.    And you are not here in this

16    litigation to say that Bard filters are

17    defectively designed, correct?

18        A.    I am not saying they are --

19    actually I don't what you -- maybe you can

20    define what you mean by "defectively

21    designed."

22        Q.    You're not here to criticize

23    the design of Bard filters, are you?

24        A.    I'm not doing any criticism.

1    All I'm -- what I am doing is pointing out or

2    analyzing from a statistical point of view

3    differences in outcomes of adverse events.

4              Now, those may be due to design

5    issues as, you know, as clearly identified in

6    the Bard DFMEA documents as sort of the first

7    step in the sequence of events that leads to

8    adverse events.  So -- but I'm not

9    specifically commenting on specific design

10   issues.

11        Q.     And, in fact, that's outside of

12   your area of qualification, correct?

13        A.     That's right.

14        Q.     And you are not here to say

15   that Bard filters have an excessive

16   complication rate compared to other

17   manufacturers' filters, are you?

18        A.     I didn't hear the end of your

19   question.

20        Q.     You're not here to say that

21   Bard's filters have an excessive complication

22   rate compared to other manufacturers'

23   filters, are you?

24        A.     I am not -- I did not consider

1    other manufacturers' filters in this

2    analysis.

3          Q.      Now, Dr. Betensky, you are not

4    a medical doctor, correct?

5          A.      Correct.

6          Q.      And you do not treat patients,

7    correct?

8          A.      Correct.

9          Q.      And you are not an expert in

10   the physical manifestations of symptoms

11   connected to an adverse event with an IVC

12   filter, are you?

13         A.      That's correct.

14         Q.      And you're not an expert in the

15   physical symptoms of fracture associated with

16   a filter?

17         A.      Correct.

18         Q.      Or with migration?

19         A.      Correct.

20         Q.      Or with tilt?

21         A.      Correct.

22         Q.      Or with perforation?

23         A.      Correct.

24         Q.      Or with embolization?

1        A.      Correct.

2        Q.      And since you're not a medical

3    doctor, you're also not a radiologist, are

4    you?

5        A.      I am not.

6        Q.      And you would not consider

7    yourself an expert in human anatomy?

8        A.      Correct.

9        Q.      Now, prior to your involvement

10   in the litigation against Bard, Cook, and

11   Cordis involving IVC filters, have you ever

12   done anything professionally with those

13   medical devices before?

14       A.      No.

15       Q.      In fact, as you sit here today,

16   you have never actually seen an IVC filter,

17   have you?

18       A.      I've seen pictures of IVC

19   filters and diagrams and manuals.

20       Q.      But you've not seen the actual

21   device?

22       A.      No, I have not seen an actual

23   device.

24       Q.      And all of these publications

1  that you have authored over the years, not a

2  single one of those concern IVC filters, do

3  they?

4       A.     I don't believe they do, but I

5  can't rule it out.  There may be something

6  buried somewhere that I don't remember, but

7  certainly would not be a major part of my

8  publication list.

9       Q.     Well, you don't recall, as you

10 sit here today, any prior publications

11 involving filters, do you?

12      A.     I don't recall.  It's not to

13 say that in some study that I was involved in

14 it's possible that patients received filters

15 and there was some report in some table in

16 some paper about adverse events related to

17 filters, I can't rule that out, but it's not

18 a prominent part of my publication list.

19      Q.     To your recollection, have you

20 ever discussed IVC filters in any of your

21 classroom teaching?

22      A.     I don't believe I have.

23      Q.     In all the many presentations

24 you've given throughout this country and in

1    Europe over the years on statistical issues,

2    biostatistics, have you ever talked about IVC

3    filters?

4        A.    No.

5        Q.    Have you done any independent

6    research beyond reviewing the materials given

7    to you by the plaintiffs' attorneys regarding

8    IVC filters?

9        A.    I probably most likely did my

10   own searches for various things in the

11   literature at various points.  I can't

12   remember anything specifically at the moment.

13   But I probably did my own literature searches

14   at some point or another.

15       Q.    Well, do you recall any

16   specific articles or medical publications

17   that you independently researched and read

18   concerning IVC filters?

19       A.    I can't remember off the top of

20   my head, but I certainly did.

21       Q.    So you're testifying today that

22   you did do the research, but you cannot

23   recall anything you reviewed or read as a

24   result?

Do Not Disclose -- Subject to Further Confidentiality Review

1      A.      I wouldn't characterize it as

2   research.  I am just -- all I am saying is

3   that at some point in my involvement in this

4   case, I am sure that I looked something up, I

5   did some search, I looked something up, I

6   always do that.  Again, I don't characterize

7   that as a substantial part of what I did, but

8   I certainly did it.

9      Q.      So for the most part, your

10  analysis in this litigation was based only on

11  the materials that were provided to you by

12  the plaintiffs?

13     A.      I believe that is correct.

14     Q.      Dr. Betensky, you're not a

15  medical expert with regard to blood clots,

16  are you?

17     A.      No.

18     Q.      Or with hematology or

19  cardiology?

20     A.      I'm not a medical expert.

21     Q.      You've never worked with the

22  FDA, have you?

23     A.      No, I have not.

24     Q.      And you've never met with the

1    FDA on behalf of a drug or medical device

2    company, have you?

3         A.    I don't believe I have.

4         Q.    Have you ever read a 510(k)

5    submission for a medical device?

6         A.    I believe I have.

7         Q.    In what context?

8         A.    Possibly in the context of some

9    consultation that I may have done on a

10   medical device.

11        Q.    You have not read any 510(k)

12   application submitted by Bard, have you?

13        A.    I don't think so, no.

14        Q.    And have you ever reviewed a

15   premarket approval application for a medical

16   device?

17        A.    Again, quite possibly in the

18   context of some consultation.

19        Q.    Do you recall any specific

20   instance?

21        A.    I at one point worked on -- did

22   some -- a short-term consultation for a

23   company that was working on some -- I believe

24   it was an incontinence mesh kind of device,

1    so I may have read it in the context of my

2    work with them.

3          Q.     Any other time that you can

4    recall?

5          A.     I certainly have been to the

6    FDA website and have read documents on

7    devices.  I can't recall specific examples.

8          Q.     You've never written yourself

9    an application to the FDA of any sort, have

10   you?

11         A.     I have not been a primary

12   author of any application.  Again, I may have

13   participated as a statistician member of a

14   team for a clinical trial, for example.  I

15   believe I have been involved in various

16   applications in that role.

17         Q.     Do you recall any specific one?

18         A.     I was involved in various

19   stroke projects at Mass General Hospital, and

20   we had a clinical trial on high-intensity

21   oxygen delivery for stroke patients, and we

22   definitely had to prepare documents for the

23   IND -- sorry, for the FDA for that clinical

24   trial that we conducted.

1       Q.      You have never done any work
2    with Bard, have you?
3       A.      I don't believe so, no.
4       Q.      And to your knowledge, you've
5    never done any work with any company that
6    manufactures IVC filters, have you?
7       A.      I don't think so, no.
8       Q.      And to be clear, while you do
9    have a doctorate in biostatistics, you do not
10   hold a degree in epidemiology, do you?
11      A.      I -- my postdoctoral
12   fellowship, which we talked about many hours
13   ago, was actually in the Division of
14   Epidemiology at Stanford, Stanford Medical
15   School, and my advisor was a professor of
16   epidemiology, so I do have postdoctoral
17   training with an epidemiologist.
18              I will also say that there is a
19   great deal of overlap between the fields of
20   statistics, biostatistics, and epidemiology,
21   so that is my background.
22      Q.      Well, and I appreciate that,
23   but that was not my question.  I understand
24   you have training in epidemiology.

 1                  The question is, do you have a
 2    degree in epidemiology?
 3         A.     Well, I mean, I completed a
 4    postdoctoral fellowship.  In fact, I was --
 5    came across just recently an actual
 6    certificate that I have from Stanford
 7    regarding my postdoctoral fellowship in
 8    epidemiology, so I don't know what you want
 9    to call that.  So I do have a formal Stanford
10    University with a seal certificate.
11         Q.     You don't know the course of
12    treatment for a patient who receives a
13    permanent Simon nitinol filter, do you?
14         A.     Well, my understanding is that
15    patients receive the filter for many
16    different indications, so I would think that,
17    depending on the indication, there are
18    different courses of treatment.
19         Q.     But you're not an expert in
20    those, correct?
21         A.     I'm not a medical doctor.
22         Q.     And you don't know in detail
23    the course of treatment for a patient with a
24    retrievable filter, right?

Do Not Disclose - Subject to Further Confidentiality Review

```
 1                 MR. MARTIN:  Object to the
 2         form.
 3         A.      So, again, course of treatment
 4   seems vague in this context, because course
 5   of -- the underlying medical condition gets
 6   whatever course of treatment it gets, and so
 7   I don't know if that's what you're referring
 8   to or --
 9   BY MR. NORTH:
10         Q.      Again, you're not a medical
11   doctor, so you are not that familiar with the
12   medical details of how patients are treated
13   with retrievable filters, correct?
14         A.      So do you mean how they're
15   treated with respect to their filter, or do
16   you mean -- is that what you're asking?
17         Q.      Their whole course of
18   treatment, the decision to implant the
19   filter, how long it's going to stay
20   implanted, if and when it's going to be
21   retrieved, things of that nature.
22         A.      I'm not a medical doctor.  I've
23   read papers on studies of retrievable
24   filters, and I've learned a bit about what
```

1    happens in real life, in practice, with
2    retrievable filters.  So, for example, many
3    of them are not retrieved, is my
4    understanding from the literature.  So I have
5    read some studies on retrievable filters.
6         Q.     Now, you mentioned that you did
7    not consult the MAUDE database maintained by
8    the FDA for this particular case, correct?
9         A.     That's correct.
10         Q.     And you also -- well, have you
11    ever accessed the MAUDE database in any of
12    your work?
13         A.     I have.
14         Q.     On how many occasions?
15         A.     Possibly -- well, certainly
16    one.  I don't remember if it's more than one.
17         Q.     Have you ever extracted data
18    yourself from the MAUDE database?
19         A.     Yes, I have.
20         Q.     On that one occasion that you
21    recall?
22         A.     Yes, certainly from then.
23         Q.     And was that related to
24    litigation?

1    A.    Yes.

2    Q.    So in your professional work

3  outside of working as a litigation

4  consultant, you've never accessed the MAUDE

5  database?

6    A.    That's correct.

7    Q.    Now, what's your understanding

8  of the purpose of the MAUDE database?

9    A.    So the MAUDE database is

10  intended for reports of adverse events

11  associated with medical devices.

12    Q.    And the reports made to the

13  MAUDE database are retrospective, meaning

14  that they are made after the event occurs,

15  correct?

16    A.    By necessity.

17    Q.    You cannot determine the

18  frequency with which an adverse event occurs

19  based on the MAUDE database alone, can you?

20    A.    That's correct.

21    Q.    And the MAUDE database doesn't

22  give you a denominator for determining a

23  rate, does it?

24    A.    That's correct.

1          Q.     And all it tells you is how

2    many adverse events have been reported

3    retrospectively --

4                  MR. MANKOFF:  Object to form.

5    BY MR. NORTH:

6          Q.     -- concerning a particular

7    device?

8          A.     That's correct.  Although I'm

9    not understanding the retrospective aspect of

10   your question.

11         Q.     Well, let's take that out.

12                You don't give a denominator

13   because you don't know how many devices are

14   out there, that information is not on the

15   MAUDE database, correct?

16         A.     That's not in the MAUDE

17   database, correct.

18         Q.     So while -- and you also don't

19   know if the incidents reported to the MAUDE

20   database are all of the universe of incidents

21   out there, correct?

22         A.     Correct.

23         Q.     Now, in this particular case,

24   you are not estimating or even attempting to

Do Not Disclose — Subject to Further Confidentiality Review

1    estimate complication rates themselves, are
2    you?
3         A.      I am not.
4         Q.      And you were not looking,
5    therefore, in this case at the frequency with
6    which adverse events may occur with these
7    filters?
8         A.      I did not look at frequencies.
9    Those -- I mean, those are inputs to my
10   calculations, though by necessity, in order
11   to calculate the reporting risk ratios, I
12   need estimates of what you're calling the
13   rates, so the number of adverse events
14   divided by the number of filters.  So those
15   are inputs, but I didn't look at them in
16   isolation, I just looked at ratios of them.
17              MR. NORTH:  Jim, are you able
18         to bring up the Guidance for Industry
19         that I sent you?
20              THE VIDEOGRAPHER:  One second.
21   BY MR. NORTH:
22         Q.      Dr. Betensky, are you familiar
23   with this?  And we'll call this Defense
24   Exhibit 1 for now.

 1                 (Whereupon, Defense Exhibit

 2          Number 1 was marked for

 3          identification.)

 4          A.     I believe I am.

 5   BY MR. NORTH:

 6          Q.     It's a guidance put out by the

 7   FDA, correct?

 8          A.     Yes.

 9          Q.     And it's talking about

10   pharmacovigilance practices.  What are those?

11          A.     Pharmacovigilance is the

12   monitoring and surveillance of adverse events

13   in practice, so it's -- so, yeah, so it's

14   monitoring of adverse events for a variety of

15   drugs or devices.

16          Q.     If we could turn to page 11 of

17   this article, or guidance.  In looking at the

18   next to the last paragraph -- you've read

19   this guidance before, haven't you,

20   Dr. Betensky?

21          A.     So I have read a guidance from

22   the FDA, and I've quoted various things from

23   it.  I don't know if it's exactly the same as

24   this one, though.

1                    MR. NORTH:  Jim, I'm sorry, I
2           mean page 11 of the actual document,
3           that's page 8.  There we go.  The next
4           to the last paragraph.
5           Q.     Doctor, would you mind reading
6    the sentence that begins "As a result" midway
7    through that paragraph?
8           A.     Sure.  So "As a result, FDA
9    suggests that a comparison of two or more
10   reporting rates be viewed with extreme
11   caution and generally considered exploratory
12   or hypothesis-generating."
13          Q.     And the FDA is essentially
14   saying here that conducting an analysis such
15   as what you did comparing reporting risk
16   ratios should be considered exploratory or
17   hypothesis-generating, correct?
18                 MR. LOPEZ:  Objection.  Form.
19          A.     So you're starting in the
20   middle of the paragraph.  That is what they
21   say after the very first sentence in the
22   paragraph where they say that the comparison,
23   such as what I did, can be valuable.
24                 ///

1    BY MR. NORTH:

2        Q.      Right.   That can have some

3    value that can be hypothesis-generating or

4    provide a signal, but they must be viewed

5    with extreme caution, correct?

6        A.      That is what they say here,

7    yes.

8        Q.      And that's referring to the

9    exact sort of analysis you conducted in this

10   case?

11       A.      This is -- it's taken out of

12   context, and I would have to understand what

13   exactly they're referring to, because there

14   are many different types of analyses that are

15   done from the MAUDE database or the FAERS

16   database, which is the comparable database at

17   the FDA for drugs.  Some of them use

18   denominator data, some of them don't, so this

19   is a little bit out of context.  So I don't

20   think I can comment on it without reading

21   more of the context in the setting here.

22       Q.      Let's read the next sentence.

23   The FDA states, "Reporting rates can by no

24   means be considered incidence rates, for

1    either absolute or comparative purposes."

2    Correct?

3         A.    That's correct.  And that

4    actually was a part of my report and my --

5    you know, my work in this was to make sure

6    that it was clear to everybody that I am not

7    presenting incidence rates.  Incidence rates

8    require person time exposure which I don't

9    have.  And so I have never stating, and have

10   not ever stated that a reporting risk ratio

11   is an incidence rate ratio.

12              MR. NORTH:  Jim, if we could

13        look at -- bring up the exhibit the

14        MAUDE database page from the FDA

15        website.

16              (Whereupon, Betensky Exhibit

17        Number 2 was marked for

18        identification.)

19   BY MR. NORTH:

20        Q.    Have you reviewed this page of

21   the FDA website before?

22        A.    Some version of it, I believe I

23   have.

24        Q.    Now, just so we're clear,

Do Not Disclose -- Subject to Further Confidentiality Review

1    Dr. Betensky, you would agree with me that

2    the Bard data you used for your analysis was

3    derived in large part from the MAUDE

4    database?

5              MR. LOPEZ:   Objection.   Asked

6         and answered.   Mischaracterizes the

7         prior testimony.

8         A.     So my -- the data that I used

9    was directly from Bard.   My understanding is

10   that it's not identical to what is in MAUDE,

11   and there may have been more reports made to

12   Bard than to MAUDE, so I don't -- I do not

13   know or believe that it's identical to what

14   is in MAUDE.

15   BY MR. NORTH:

16        Q.     Well, even if there were more

17   reports than are contained in MAUDE, those

18   are the same sort of records -- reports of

19   adverse incidents than the MAUDE database

20   contains, correct?

21        A.     I don't know.   I don't know the

22   differences in the reports to Bard versus the

23   reports to MAUDE.

24        Q.     So you don't have any

1    information about the sorts of reports Bard

2    was using in its calculations that you then

3    used to perform your analysis?

4         A.    So let me --

5              MR. LOPEZ:  Objection.  Form.

6         A.    Let me clarify.  My

7    understanding is that the Bard data were --

8    may have included the MAUDE data, but may

9    have included more than what was in the MAUDE

10   data, and that it was a better source of data

11   regarding adverse events, and it's what they

12   trusted for their own internal analyses.

13   BY MR. NORTH:

14        Q.    If we could look at the first

15   bullet point in this discussion here.  On the

16   MAUDE page on the FDA's website, the FDA

17   says, "MDR data alone cannot be used to

18   establish rates of events, evaluate a change

19   in event rates over time or compare event

20   rates between devices."

21              Is that correct, Doctor?

22        A.    That is correct.

23              I want to point out that "event

24   rate" has a technical meaning.  And again,

1    event rate, most commonly, and I assume here

2    as well, is synonymous with incidence rate,

3    which would again have to do with taking

4    account of person time of exposure.

5        Q.    Well, and the agency further

6    says in that same paragraph, "The number of

7    reports cannot be interpreted or used in

8    isolation to reach conclusions about the

9    existence, severity, or frequency of problems

10   associated with devices."

11            Did I read that correctly?

12       A.    Yes.

13       Q.    And would you agree with that

14   statement?

15       A.    Yes.  Certainly they cannot be

16   used to make any conclusions about frequency

17   because there's no denominator, as we've

18   said, and as well there are limitations, and

19   should be used, should be examined as the FDA

20   notes, but not in isolation.

21       Q.    Dr. Betensky, when you were

22   deposed -- well, let me back up.

23            Most of the opinions, or a lot

24   of the opinions you gave today in answering

1    Mr. Mankoff's questions concerned your

2    calculation of a reporting risk ratio, is

3    that correct?

4              MR. MANKOFF:   Object to form.

5         A.    Yes.

6    BY MR. NORTH:

7         Q.    Now, when you were deposed in

8    this case, you could not identify a single

9    paper in the world's published literature

10   where anyone calculated a reporting risk

11   ratio like you did based on an analysis of

12   MAUDE data, could you?

13             MR. LOPEZ:  Objection.  Form.

14        Mischaracterizes her testimony.

15        A.    Yes.  So are you referring to

16   today's deposition, or what are you referring

17   to?

18   BY MR. NORTH:

19        Q.    No, I'm talking about your past

20   deposition.

21        A.     I don't remember my past

22   deposition, but I don't -- I mean, I believe

23   you.

24             Q.    Can you identify a single paper

1    in the world's published literature where

2    someone calculated a reporting risk ratio

3    based on an analysis of MAUDE data?

4              MR. LOPEZ:  Objection.  Form.

5              She's told you five, eight

6         times she didn't use MAUDE data.

7         Beyond the scope of her direct

8         examination.

9              MR. NORTH:  Mr. Lopez, let's go

10        see Judge Campbell if you're going to

11        start testifying again.  State your

12        objection, and then let the witness

13        answer the question.

14        A.    Shall I go ahead?

15   BY MR. NORTH:

16        Q.    Do you recall the question?

17        A.    I cannot come up with a paper

18   from the literature that used reporting risk

19   ratios from MAUDE data, but there may be such

20   papers, there may very well be such papers.

21        Q.       You cannot name one for us now

22   as you sit here, correct?

23        A.       I cannot.

24                 Although, actually let me back

1    up for a second.  I know that there -- there

2    are some papers, actually, that used the

3    MAUDE database.  I don't -- you know, within

4    statistics there are often many different

5    approaches that can be taken.  There isn't

6    usually just one way of doing an analysis.

7              So I'm remembering papers by

8    Angel and by Andreoli, I think those are the

9    names of the authors, that did analyze the

10   MAUDE database for adverse events.  I don't

11   remember the actual statistical analysis that

12   they did.

13        Q.    But the Andreoli paper did not

14   once mention the term "reporting risk ratio,"

15   did he?

16        A.    I would have to see the paper.

17   It's been a while since I've read it.  And

18   it's possible that they weren't clear in

19   their language.  But, in fact, what they had

20   was a reporting risk ratio, I don't remember

21   the paper to be able to answer your question,

22   though.

23        Q.    Do you recall in a previous

24   deposition being asked whether the term risk

1    ratio, reporting risk ratio, appeared in that

2    article, and you said it did not?

3                    MR. LOPEZ:  Objection.  Form.

4         A.    I don't remember.

5    BY MR. NORTH:

6         Q.    The same thing with the Angel

7    article, it does not contain the phrase

8    "reporting risk ratio," does it?

9                    MR. LOPEZ:  Objection.  Form.

10        A.    I don't know if it does or

11   doesn't.  But again, that doesn't mean that

12   it shouldn't have.  I just don't remember

13   what was done in those papers.

14                  Papers are not perfect.  As you

15   saw this morning, you know, I'm involved in a

16   lot of editorial work, and just because a

17   paper is published does not mean it's

18   100 percent correct, and does not mean it's

19   perfect.

20   BY MR. NORTH:

21        Q.    Now, I think you've already

22   stated in -- well, let's talk now about the

23   data you reviewed and the data you were

24   given.

1          There was very little, if any,

2     data concerning the Simon nitinol filter

3     prior to the year 2000, was there?

4          A.     That's correct.

5          Q.     And again, you relied totally

6     on the plaintiffs' attorneys for the data

7     that you were given, correct?

8          A.     I did, as well as the reports

9     from the Bard internal analyses that,

10     likewise, used data from 2000 forward.

11          Q.     Did you at any time try to make

12     an independent determination whether Bard had

13     provided the plaintiffs' attorneys with data

14     concerning the Simon nitinol filter that

15     predated 2000?

16          A.     No.

17          Q.     And as we sit here today, we

18     have no idea how many fractures occurred with

19     the Simon nitinol filter between the years

20     1990 and 2000, do we?

21              MR. LOPEZ:  Objection.  Form.

22          A.     No, I believe there is a

23     document that we looked at, I was shown

24     earlier, that showed eight fractures between

1    launch and 2011, I think, for the Simon

2    nitinol filter.

3    BY MR. NORTH:

4         Q.     You interpreted that document

5    to be toward -- to be measuring the number

6    from launch to 2011, but that's your

7    interpretation of Bard's document, correct?

8              MR. MANKOFF:  Object to form.

9         A.     It's really the only

10   interpretation that makes sense, given that

11   there were something like six filters listed

12   in that table.  So a single word "launch" in

13   the presence of six filters, I think anybody

14   would come to the conclusion that that refers

15   to launch of each filter.

16   BY MR. NORTH:

17        Q.     But that's your interpretation

18   of the document, correct?

19        A.     Okay.

20        Q.     Now, even if that document was

21   accurate and meant what you interpreted it to

22   mean, that would only be the number of

23   fracture incidents reported to Bard, correct?

24        A.     Yes.

```
 1          Q.    And my question, then, was not
 2     about how many were reported, but how many
 3     occurred in patients.  We have no idea how
 4     many fractures of Simon nitinol filters
 5     occurred in the universe of filters being
 6     used between the years 1990 and 2000,
 7     correct?
 8               MR. LOPEZ:  Objection.  Form.
 9          A.    Well, between 1990 and -- you
10     don't have to stop at 2000.  Any time.
11     BY MR. NORTH:
12          Q.    Now, it's your understanding,
13     isn't it, that the Simon nitinol filter was
14     introduced to the market in 1990?
15          A.    Yes.
16          Q.    Do you have any idea how many
17     migrations of the Simon nitinol filter
18     occurred between 1990 and 2000?
19          A.    No.
20          Q.    Do you have any idea how many
21     migrations were reported to Bard regarding
22     the Simon nitinol filter between 1990 and
23     2000?
24          A.    No.  Those data were not
```

1    provided, and Bard also didn't seem

2    interested in those data for their internal

3    analyses of migration in the SNF filter as

4    they began in 2000 as well.

5         Q.    You have no idea how many

6    embolizations occurred with the Simon nitinol

7    filter prior to 2000, do you?

8         A.    No.

9         Q.    And you have no idea how many

10   embolizations were reported to Bard prior to

11   2000 with the Simon nitinol filter, correct?

12        A.    Correct.

13        Q.    And you do not know how many

14   perforations with the Simon nitinol filter

15   either occurred or were reported to Bard

16   between 1990 and 2000?

17             MR. LOPEZ:  Objection.  Form.

18        A.    Correct.

19   BY MR. NORTH:

20        Q.    And you have no idea how many

21   incidents of tilt occurred or were reported

22   to Bard with regard to the Simon nitinol

23   filter between 1990 and 2000?

24             MR. LOPEZ:  Objection.  Form.

1          A.          Correct.

2     BY MR. NORTH:

3          Q.          So other than that one document

4     talking about fractures since launch, you

5     didn't do any analysis of pre-2000 adverse

6     event reports or sales with regard to the

7     Simon nitinol filter, correct?

8          A.          No.   I do know about deaths,

9     and I do know that there was a single death

10    from a Simon nitinol filter in 1997.

11         Q.          Okay.   Other than that and the

12    fracture number you gave us, you weren't able

13    to do any analysis of complication data with

14    the Simon nitinol filter for events that

15    occurred prior to 2000, were you?

16         A.          Correct, same as Bard's

17    analyses.

18         Q.          Now, with regard to Bard's

19    retrievable filters, you had the complication

20    report, or reports of complication data, from

21    the moment the products were launched,

22    correct?

23         A.          The data that I have are

24    cumulative at different points in time, so I

1    don't know what exactly the lag was between

2    the first report and the actual launch.  I

3    presume a couple months, several months, I'm

4    not sure.

5         Q.    But it's your understanding

6    that you had access to all reports of

7    complications with the retrievable filters

8    that were received after the launch of the

9    product?

10        A.    I assumed that I had all of the

11   data that Bard had with regard to those

12   adverse events, imperfect as they were, yes.

13        Q.    But you did not have all of the

14   data for the first ten years that the Simon

15   nitinol filter was being sold, correct?

16             MR. LOPEZ:  Objection.  Form.

17        A.    I don't know if I did or not.

18   So, you know, I don't know what kinds of

19   adverse events occurred before 2000.

20   BY MR. NORTH:

21        Q.    But the only data you have is

22   that number you're interpreting from that one

23   document concerning fracture and the one

24   report of death that you referenced in 1997?

```
 1                   MR. LOPEZ:  Same objection.

 2    BY MR. NORTH:

 3         Q.     Other than that, you did not

 4    have data of complications with the Simon

 5    nitinol filter for the first ten years after

 6    it was launched, correct?

 7                   MR. LOPEZ:  Objection.  Form.

 8         A.     Right.  So the same as the Bard

 9    analyses, I had data from 2000.

10    BY MR. NORTH:

11         Q.     Now, earlier you talked about

12    one potential limitation to your analysis

13    being the Weber effect, is that correct?

14         A.     Yes.

15         Q.     And the Weber effect, as I

16    understand it, is a tendency for events or

17    adverse incidents to be reported more

18    frequently when a new product is introduced

19    to the market, is that correct?

20         A.     My understanding is that it's

21    when that particular product is newly

22    introduced to the market.

23         Q.     Right.

24         A.     Yes.
```

1      Q.      And that's something that could

2    have happened, for example, with the Recovery

3    filter, which was one of the first

4    retrievable filters introduced to the market?

5      A.      Potentially.

6              MR. LOPEZ:  Objection.

7    BY MR. NORTH:

8      Q.      And because we don't have

9    access to the data for the Simon nitinol

10   filter in the years 1990, let's say,

11   through 1993 when it was first introduced, we

12   don't know if there was a bigger number of

13   events reported then because of the Weber

14   effect or not, do we?

15     A.      We don't, and that would not be

16   relevant to the analysis that I did anyway.

17     Q.      Well, if there were more

18   incidents reported, that would affect your

19   analysis, wouldn't it?

20     A.      Well, given that there were so

21   many years passed from 1990 to 2003 when

22   Recovery was launched, any, you know, blip in

23   reporting would be washed out by that time,

24   and I would expect the SNF risks, reporting

1    risks, to be pretty stable and well beyond

2    that uptick due to a Weber effect, if such a

3    thing existed.

4         Q.    Let's talk about another

5    limitation you mentioned in response to one

6    of Mr. Mankoff's questions.

7              I believe you said that

8    publicity could generate an uptick in reports

9    of adverse incidents, is that correct?

10        A.    Potentially it could.

11        Q.    And I think you also testified

12    that there was nothing, to your knowledge,

13    before 2014 that could have generated some

14    sort of publicity about these retrievable

15    filters, correct?

16        A.    Yes.

17        Q.    So, Dr. Betensky, you are not

18    familiar with the FDA's public health

19    notifications around 2010 about the risks

20    associated with all retrievable filters, are

21    you?

22        A.    I may have -- I may have been.

23        Q.    But you made no effort to

24    analyze whether that publicity surrounding

1    that public notification in the medical

2    community may have caused an uptick in

3    reports of adverse events with the

4    retrievable filters?

5         A.    Well, that's 2010, and most of

6    my analyses are prior to 2010, so that would

7    not have an effect.

8         Q.    Well, your analyses included

9    two filters, the Meridian and the Denali,

10   that were not even introduced to the market

11   until after 2010, correct?

12        A.    That's correct.

13        Q.    And in fact, when was the

14   Eclipse that you talked about introduced?

15        A.    I don't recall.  Sometime after

16   2010.

17        Q.    So three of the five models of

18   filters you've discussed were introduced

19   after the FDA issued a public notification

20   regarding retrievable filters, weren't they?

21             MR. LOPEZ:  Objection.  Form.

22        A.    So I'm not sure -- so yes, in

23   terms of the calendar dates, that is correct.

24   I'm not sure if that FDA document would

1    constitute the kind of publicity that would

2    generate increased reporting or not.

3                Again, I address this to some

4    extent in my analysis of comparisons of

5    adverse events across -- sorry, in my

6    comparisons of reporting risk ratios across

7    adverse events in which I did see differences

8    within calendar years.

9                So again, I don't know one way

10   or another whether that FDA document was

11   enough to lead to increased reporting,

12   although it didn't translate into an increase

13   for other filters, and so I suppose that

14   would be an argument against a publicity

15   effect because that should affect all

16   retrievable filters, and it did not appear to

17   be the case.  Some of the longer -- some of

18   the filters that had been on the market for

19   longer really seemed to stabilize to some

20   extent by that time.

21        Q.    Again, you have made no effort,

22   or not attempted to analyze what impact the

23   FDA notification may have had, correct?

24                MR. MANKOFF:  Object to form,

1              and mischaracterizes the testimony.

2        A.     So I have thought -- I have

3    given thought to the patterns of these

4    reported risk ratios, and my conclusion is

5    that the patterns and their trajectories over

6    time don't appear to be consistent with a

7    publicity effect.

8    BY MR. NORTH:

9        Q.     Being told about the public

10   health notification here today, you have made

11   that comment and given that analysis.  But

12   prior to today, you have not attempted to

13   analyze any impact that the FDA notifications

14   could have had on your calculations, correct?

15       A.     I don't think that's correct.

16   The only way to do such an analysis is to

17   look at the numbers, to look at the reported

18   risk ratios, and to think, from the vantage

19   point of my statistical expertise, to think

20   about whether they could be reflective of any

21   of these external kinds of events.  And it

22   did not appear to me that there was any

23   strong indication of that, and, you know, for

24   a variety of reasons that I've mentioned.

```
 1          Q.     You've made no effort to review
 2     the medical literature to see how many
 3     medical articles there are that specifically
 4     referenced and discussed the public health
 5     notification of the FDA, have you?
 6          A.     I have not researched that 2011
 7     FDA notification.
 8          Q.     And do you -- as you sit here
 9     today, do you even know what the FDA said in
10     that notification?
11          A.     I don't.  I don't remember.
12          Q.     Now, because we don't have
13     complete information concerning reports of
14     adverse events with the Simon nitinol filter
15     between 1990 and 2000, we can't say what
16     impact, if we had that data, it would have
17     had on your calculations, can we?
18          A.     Right.  We can't say what -- we
19     can say something about fracture if we
20     believe the data in the document that lists
21     eight fractures since launch, we can say
22     something about death given that there was
23     one death prior to 2000.  And you're right, I
24     don't know what the numbers would be if I had
```

1   had all of the other data going back to 1990.

2        Q.      And, in fact, if you had all

3   the data, the risk ratio could have gone up,

4   couldn't it, and it could have gone down?

5        A.      That's right, it could have --

6   it could have gone up or down, that's right.

7        Q.      And so we simply cannot say how

8   that data, if available, would have impacted

9   your calculation of relative risk ratio,

10  reported risk ratio?

11           MR. LOPEZ:  Objection.  Form.

12       A.      Well, again, I think we can say

13  something about fracture, and I did do the

14  analysis of fracture with the sensitivity

15  that partially at least accounted for

16  pre-2000 fracture.  So I think we can say

17  something about fracture.

18           And with regard to the other

19  events, we do have the data after 2000, and

20  so I suppose, you know, we don't know the --

21  we do not know the actual numbers prior to

22  2000.  I mean, it could probably be, might be

23  able -- we might expect it to be more stable

24  and giving us a better estimate the longer

1    that it's out there, but we don't know the

2    actual numbers, what they would be if we had

3    that data prior to 2000 for migration, for

4    example.

5    BY MR. NORTH:

6         Q.    Dr. Betensky, if you had the

7    data, complete data, for 1990 to 2000, you

8    obviously would have used it in your

9    calculations, correct?

10        MR. LOPEZ:  Objection.  Form.

11        A.    I actually would have done two

12   analyses.  My primary analysis might have

13   been exactly what I did to be comparable to

14   what Bard did, because I know that Bard made

15   a choice, they chose to ignore the data prior

16   to 2000.  And so I think my primary analysis

17   would be exactly what I did beginning at

18   2000.  As, you know, a good statistician I

19   would have done a good sensitivity analysis,

20   and I would have included all the data going

21   back to the beginning, but I think it would

22   have been important to me to try to

23   understand and to replicate what the company

24   knew, which is -- and what the company was

1    considering internally, which was data after

2    2000.

3              MR. NORTH:  I'm going to move

4         to strike the portions of that answer

5         that tries to discuss Bard's state of

6         mind without foundation.

7    BY MR. NORTH:

8         Q.    Dr. Betensky, even if --

9              MR. LOPEZ:  Object to the

10        motion.

11   BY MR. NORTH:

12        Q.    -- you would done the same

13   analysis you did already, you also would have

14   performed an analysis with the data from 1990

15   to 2000 to see what that told you if you had

16   access to it, wouldn't you?

17        A.    I'm sorry, I didn't hear the

18   beginning part of your question.

19        Q.    Even if you would have still

20   performed the analysis that you've done in

21   this case, if you had access to the data

22   between 1990 and 2000, you would have done

23   another analysis to see what impact that had,

24   wouldn't you?

Do Not Disclose - Subject to Further Confidentiality Review

1          A.      As I mentioned, I would have

2    made my primary analysis, the actual analysis

3    that I did from 2000, again, to match Bard's

4    internal analyses and what they chose to

5    analyze, which was starting at 2000.  And

6    additionally, I would have done an analysis

7    using the data from 1990.

8                    MR. NORTH:  I think we need to

9            take a break.  We've been going almost

10           an hour and 40 minutes.

11                   Could we go off the record,

12           please?

13                   MR. LOPEZ:  Sure.

14                   THE VIDEOGRAPHER:  By agreement

15           of counsel, going off the record.  The

16           time is approximately 4:53 p.m.

17                   (Whereupon, a recess was

18           taken.)

19                   THE VIDEOGRAPHER:  With the

20           approval of counsel, back on the

21           record.  The time is approximately

22           5:08 p.m.  This marks the beginning of

23           recording media number 6.

24                   ///

```
 1    BY MR. NORTH:
 2         Q.    Dr. Betensky, let's talk about
 3    the process of reporting adverse events.  And
 4    you're generally familiar with that in your
 5    work, correct?
 6         A.    Generally, yes.
 7         Q.    Well, you would admit that
 8    three things must occur for there to be a
 9    report, let's say with the MAUDE database,
10    with Bard, with the FDA.  First of all, the
11    adverse event must occur; second, it must be
12    detected; and third, it must be reported,
13    correct?
14         A.    Yes.
15         Q.    And it's possible for an
16    adverse event to occur but not be detected,
17    right?
18         A.    Yes.
19         Q.    And it's entirely possible that
20    an adverse event, even if it is detected,
21    might not be reported?
22         A.    Correct.
23         Q.    Let's talk a little bit about
24    the difference between the Simon nitinol
```

1    filter and the later Bard filters.

2              You understand that Simon

3    nitinol was a permanent filter, correct?

4         A.    Yes, I understand that,

5    although I also understand that it could be

6    removed.

7         Q.    But it was designed or intended

8    for permanent implant, correct?

9         A.    Yes.

10        Q.    And you also understand that

11   the other filters that you compared with the

12   Simon nitinol are optional or retrievable

13   filters, right?

14             MR. LOPEZ:  Objection.  Form.

15        A.    Yes.

16   BY MR. NORTH:

17        Q.    And those filters could be

18   percutaneously retrieved, couldn't they?

19             MR. LOPEZ:  Objection.  Form.

20        A.    They could be retrieved.  In

21   many cases they were not, is my

22   understanding, but they could be.

23   BY MR. NORTH:

24        Q.    But do you understand what I

1    mean when I say percutaneous retrieval?

2         A.    I believe I do.

3         Q.    Well, for example, through the

4    jugular vein with a catheter to remove the

5    filter?

6         A.    Yes.

7         Q.    And are you aware of the fact

8    that Simon nitinol filter was not designed to

9    be retrieved percutaneously?

10             MR. LOPEZ:  Objection.  Form.

11        A.    I don't know the details about

12   the mode of retrieval for the Simon nitinol

13   filter.

14   BY MR. NORTH:

15        Q.    If there were to be differences

16   in the detection and reporting of adverse

17   events in a permanent filter versus the

18   detection or reporting of adverse events in

19   optional or retrievable filters, that could

20   render your reporting risk ratio a biased

21   estimate, correct?

22             MR. LOPEZ:  Objection.  Form.

23        A.    It could, and that is why I

24   undertook an analysis to compare adverse

1    events -- sorry, to compare reporting risk

2    ratios across adverse events for a given

3    calendar time.  The idea being that if the

4    reporting risk ratio were due primarily to

5    reporting and detection as you suggested,

6    those should be pretty similar given that

7    these are serious adverse events, the

8    reporting risk ratios would then be pretty

9    similar.

10                So in other words, if truly

11    there is no difference in risk, but there is

12    an apparent difference or a bias, as you

13    mentioned, due to reporting or detection,

14    that should be seen across adverse events.

15                But I found in a statistical

16    analysis that those reporting risk ratios are

17    significantly different, or some of them are

18    significantly different from each other,

19    which suggests that the reporting risk ratio

20    that we're observing is not entirely due to

21    issues of reporting and detection.

22    BY MR. NORTH:

23        Q.    And as I understand what you're

24    saying, and I believe you put this in one of

1    your reports, you believe it should be pretty

2    constant across the data for the more serious

3    complications, correct?

4         A.    So what I believe is that among

5    adverse events that are somewhat similar in

6    their, you know, in their severity, that in

7    other words, that might be asymptomatic to

8    the same extent and symptomatic to the same

9    extent, then I would expect them to have

10   similar reporting risk ratios if the

11   difference in the reporting risk ratio from

12   one is primarily due to reporting detection.

13        Q.    And you made the assumption, as

14   I understand it, because it seemed obvious to

15   you as far as it being a constant effect

16   across the filters?

17        A.    Well, I mean, it's really --

18   it's really a statistical argument, or a

19   mathematical argument that -- so my

20   presumption is suppose the reporting risk

21   ratios are truly 1, suppose there really is

22   no difference, but here we are seeing

23   something, observing something that's

24   different from 1, if that is due to reporting

1    and detection, I would presume that that

2    would be constant across adverse events.

3         Q.     But you have not consulted with

4    any medical professional to see if they would

5    agree with that assumption, have you?

6         A.     I don't believe I have.  You

7    know, my understanding, again, from the Bard

8    DFMEA arguments is that these various adverse

9    events are similar in their potential

10   outcomes of the critical health hazards as

11   being the worst outcome, and so they are in

12   the same class, so to speak, in terms of

13   these potential outcomes.

14        Q.     Now, you would agree that

15   you're not a medical expert when it comes to

16   analyzing the different factors that may

17   result in differential detection or reporting

18   of events with a permanent filter versus a

19   retrievable filter, correct?

20        A.     I'm not a clinical expert who

21   understands those aspects of reporting.

22        Q.     And because you're not a

23   clinical expert, you don't know how often a

24   Simon nitinol filter that's been implanted in

1    a patient is subsequently imaged versus how

2    often that occurs with a patient with a

3    retrievable filter, do you?

4         A.    I don't know that, but I have

5    read papers, again, that have found that a

6    high percentage of patients with retrievable

7    filters actually do not have them retrieved,

8    so I have read the literature on that, and

9    have seen those statistics.

10        Q.    My question did not have to do

11   with retrieval.  I'm asking about imaging.

12             Do you have any medical

13   expertise or knowledge about the potential

14   differential between how often Simon nitinol

15   patients are imaged subsequent to the implant

16   versus how often retrievable filter patients

17   are?

18        A.    No, I do not know that.

19        Q.    And you said that you've read

20   literature that indicates a lot of people do

21   not get retrievable filters removed.  Can you

22   quantify that percentage?

23        A.    It's -- from memory, which

24   could be faulty, I'm remembering something

1    like 70, 80 percent do not have them

2    retrieved.

3          Q.     Do you know what percentage

4    patients with permanent filters do not have

5    them retrieved?

6          A.     I don't know.

7          Q.     And so you cannot make any

8    calculations as to how that might impact the

9    reporting risk ratio, the difference between

10   how often one filter is retrieved versus the

11   other, can you?

12         A.     So it would make no difference

13   at all for symptomatic adverse events.  So

14   some portion -- and putting death aside

15   obviously -- of the non-death adverse events,

16   some proportion of them are symptomatic, and

17   the ones that are symptomatic would not make

18   any difference at all whether it's receivable

19   or non-retrievable.  The patient has a

20   complaint, and that, you know, that would be

21   investigated.

22               So this is really -- so the

23   question is really just about the

24   asymptomatic subset of events which may be

1    detected through retrieval or through

2    imaging.

3              But again, those shouldn't

4    present a difference across adverse events,

5    and yet I am seeing a difference across

6    adverse events.

7        Q.    But again, you have not made

8    a -- been able to calculate the impact of the

9    permanent filter retrieval rate versus the

10   retrievable filter retrieval rate to see how

11   that might impact your calculations?

12       A.    So in a sense I have set myself

13   up, and in a sense I have done that through

14   writing in, you know, in -- you know, sorry,

15   writing in formulaic terms what the reporting

16   risk ratio represents, as Dr. Fisted did as

17   well in his -- one of his reports.  And it

18   can be broken down into the various pieces,

19   and from there it can be seen, you know, what

20   potential effect retrieval versus

21   non-retrievable has.

22             But again, it's not just

23   retrieval.  Retrieval has no impact at all if

24   it's symptomatic, if an event is symptomatic.

1    You know, whether it's retrievable or

2    permanent makes no difference at all in the

3    presence of symptomatic events.

4           Q.      But it does in the presence of

5    asymptomatic events, doesn't it?

6           A.      It does.  But again, its effect

7    should be constant across events.  If you're

8    retrieving a filter, you're going to see that

9    migration just as clearly as you're going to

10   see that fracture, so there shouldn't be a

11   difference across adverse events due to

12   asymptomatic events that are just found

13   through retrieval.

14          Q.      Do you know the average age of

15   a patient implanted with a Simon nitinol

16   filter over the years?

17          A.      No.

18          Q.      Do you know the average age of

19   a patient implanted with a retrievable filter

20   over the years?

21          A.      I believe it is somewhat

22   younger than the Simon nitinol filter age due

23   to its use for, in some people, for very

24   short-term related to different types of

1   surgery.

2        Q.     But if the average age of a

3   recipient of a retrievable filter is

4   significantly less than the average age of a

5   patient receiving a permanent filter, that

6   could impact the reporting risk ratio,

7   couldn't it?

8              MR. LOPEZ:  Objection.  Form.

9        A.     It could in either direction.

10  It could have -- it could increase it; it

11  could decrease it.

12  BY MR. NORTH:

13       Q.     Do you have any information

14  about the number of asymptomatic

15  complications that are discovered during a

16  retrieval of a retrievable filter?

17       A.     I have -- I vaguely know this.

18  So you brought up my work on the Cook case

19  previously, and in that case I was -- I

20  actually went through some reports, and I

21  did, again, a sensitivity analysis in which I

22  removed asymptomatic reports from my analysis

23  just to investigate if that did play a role

24  or have an impact, and I found that it

1    didn't.  I don't remember the number, but I

2    do remember that the results were essentially

3    the same, so the findings were the same in

4    that situation, even once I removed

5    asymptomatic events.

6           Q.    Dr. Betensky, it's fair to say

7    that you, and you just discussed a number of

8    them, made several assumptions about what may

9    or may not impact differential reporting of

10   adverse events in permanent filters versus

11   retrievable filters, correct?

12               MR. LOPEZ:  Objection.  Form.

13          A.    I'm not sure if -- I don't

14   believe I've tried to explain differential

15   reporting.  I mean, I guess I've addressed

16   differential detection which may arise due to

17   symptoms or may arise due to followup.  I

18   don't believe I've addressed reasons for

19   differential reporting.

20   BY MR. NORTH:

21          Q.    I stand corrected.  I meant to

22   phrase that question in terms of differential

23   detection.

24               You've made a number of

```
 1    assumptions that you've discussed about what
 2    may or may not impact differential detection
 3    of adverse events in permanent filter
 4    patients versus retrievable patients,
 5    correct?
 6              MR. LOPEZ:  Objection to form.
 7         It also mischaracterizes her
 8         testimony.
 9    A.       So the assumption that I have
10    made is that some adverse events will be
11    apparent -- would be apparent if a filter is
12    retrieved, that might not be apparent if they
13    are asymptomatic and the filter is not
14    retrieved or imaged.
15    BY MR. NORTH:
16    Q.       You have not consulted any
17    medical professional about those issues and
18    what may impact differential detection, if
19    anything, between permanent filter patients
20    and retrievable filter patients, have you?
21    A.       So I've read papers in the
22    medical literature on this issue.  I haven't
23    spoken -- I don't believe I've spoken to a
24    medical expert on this topic.
```

1          Q.      Sorry.  One second here.

2                  Now, you've talked and

3      testified and answered a number of questions

4      about your review of the DFMEAs, correct?

5          A.      Yes.

6          Q.      And tell me again what that

7      acronym stands for.

8          A.      Define failure mode effects

9      analysis.

10         Q.      Prior to your retention as an

11     expert in this litigation, had you ever

12     before reviewed a DFMEA?

13         A.      No.

14         Q.      Did you know what a DFMEA was

15     before you became involved in this

16     litigation?

17         A.      No.

18         Q.      The DFMEAs that you reviewed

19     were all provided to you by the plaintiffs'

20     attorneys, correct?

21         A.      Yes.  From Bard, yes.

22         Q.      And you do not know whether

23     those are the entire universe of DFMEAs that

24     Bard may have produced in this litigation,

1    correct?

2         A.    Correct.  I do know that they

3    are the DFMEAs that Bard produced at the

4    times of launch of the various products.

5         Q.    Now, since you weren't even

6    familiar before being involved in this

7    litigation with what a DFMEA is, you've

8    obviously never drafted one, have you?

9         A.    I have not.

10        Q.    And you're not an expert on FDA

11   regulatory requirements for risk assessment

12   or risk mitigation, are you?

13        A.    So I would say that some of

14   that does intersect with statistical

15   expertise, and so to that extent I would be

16   an expert.

17        Q.    The question was posed with

18   regard to regulatory requirements.

19             Are you an expert in FDA

20   regulatory requirements for risk assessment

21   and risk mitigation?

22             MR. LOPEZ:  Objection to form.

23        A.    I would say yes, that risk

24   assessment has a very large statistical

1    component to it, so I don't claim to be an

2    expert in every aspect of that, but certainly

3    in the statistical aspects of it.

4    BY MR. NORTH:

5        Q.    So you're familiar with the FDA

6    requirements for that?  That's the question,

7    the FDA requirements.

8        A.    So an expert in those

9    statistical requirements, I don't know --

10   we're talking at a very high level right now,

11   and so I don't know exactly what you're

12   referring to.  But to the -- you know,

13   whatever statistical components that they

14   involve, I would consider myself an expert in

15   those.

16       Q.    Do you know whether the FDA

17   requires the completion of a DFMEA for a

18   medical device?

19            MR. LOPEZ:  Objection.  Form.

20       A.    I don't know.  I don't know.

21   BY MR. NORTH:

22       Q.    Are you an expert on industry

23   standards for risk management or risk

24   mitigation?

1      A.      No.

2      Q.      You testified that you were not

3   familiar with DFMEAs and had not reviewed any

4   prior to your involvement in this litigation.

5   Have you reviewed any DFMEAs except in this

6   litigation afterwards?

7      A.      I don't believe so.

8      Q.      Now, you testified repeatedly

9   this morning, or today, as I understood it,

10  that Bard's calculations or predictions in

11  its DFMEA were generally consistent with what

12  the complication -- reports of complications

13  showed later, correct?

14     A.      So qualitatively speaking, they

15  were consistent.  And in some cases they were

16  lower than the actual rates that they

17  calculated.  And I explained that the reason

18  why they might have been lower is that their

19  probabilities included not only the failure

20  and the adverse event, but the ultimate

21  result of the critical health hazard, whereas

22  the reports in their spreadsheets didn't all

23  include the end result of the critical health

24  hazards, so those would have a higher rate of

1    occurrence.

2         Q.    I believe you used this phrase

3    in response to a number of questions that the

4    actual reports were pretty much, more or

5    less, in line with the predictions from the

6    DFMEA, correct?

7         A.    I may have used those terms.

8    And by "in line," in the back of my mind I

9    meant adjusting for the fact that those are

10   necessarily smaller likelihoods than would be

11   expected to be reported to the company, again

12   for the reason that they are a smaller subset

13   of those adverse events as they only included

14   the final end critical health hazard.

15        Q.    So it's clear that the Bard

16   engineers at the outset in designing the

17   product anticipated that these adverse events

18   would occur to some extent with these

19   products, correct?

20        A.    They predicted higher -- yes,

21   they predicted higher probabilities of these

22   events, as I showed, as compared to what they

23   knew about the SNF.

24        Q.    Now, you're aware that a DFMEA

1    is not a static snapshot, correct?

2         A.     Yes.

3         Q.     And in fact, the data changes

4    over time, correct?

5         A.     Yes.

6         Q.     And are you aware of the fact

7    now that DFMEAs are often revised with regard

8    to product?

9         A.     Yes.

10        Q.     You did not review all the

11   revisions of the DFMEAs for any of the

12   filters that you analyzed, did you?

13             MR. LOPEZ:  Objection.  Form.

14        A.     So I was interested in the

15   DFMEAs at the time of launch, that was an

16   interesting and an important time point

17   rather than subsequent times even, because

18   that showed what Bard knew and felt and

19   believed about those new products as they

20   were putting them on the market.  So knowing

21   that they had higher probabilities of

22   critical health hazards, they knew that when

23   they were putting them on the market.

24             ///

1    BY MR. NORTH:

2         Q.      Dr. Betensky, the DFMEA you

3    reviewed for the Simon nitinol filter was

4    performed in 2006, correct?

5         A.      Yes.

6         Q.      And that's more than 15 years

7    after the launch of that product, isn't it?

8         A.      Yes.

9         Q.      And so you were comparing, for

10   example, with a Recovery filter a DFMEA

11   prepared at the time of the launch of the

12   product with the Simon nitinol filter and a

13   DFMEA prepared 15-plus years after the

14   launch, correct?

15        A.      Yes.

16        Q.      And the same is true with the

17   G2, and the Eclipse, and the Meridian, and

18   the Denali, correct?

19        A.      Yes.  I mean, my assumption is

20   that 15 years would probably be not much

21   different from 10 years or 12 years, and I

22   wouldn't expect likelihoods of events to

23   change between 12 years and 15 years.  And

24   really, it's the comparison at the time of

1    the launch of, let's say, Recovery in 2003,

2    but even -- but other filters later than

3    2003, it's the concurrent comparison that, to

4    me, seems the most relevant.

5        Q.    But you do not know how the

6    Simon nitinol filter DFMEA changed in the

7    15 years between the launch of the product

8    and the time you got to see one, correct?

9        A.    That actually makes no

10   difference to me whatsoever, at least for any

11   filter launched after 2006.

12            And the question is regarding

13   filters launched a few years before 2006, I

14   am making the assumption that the DFMEA for

15   Simon nitinol filter in 2006 is most likely

16   not that much different from what it looked

17   like two years prior.

18       Q.    But it could have been a lot

19   different from what it looked like 15 years

20   prior, correct?

21       A.    But that doesn't matter.

22   That's, you know, irrelevant to the analysis

23   that I was doing.  I don't -- I wasn't

24   interested in comparing launch versus launch.

1    What was of interest was comparing launch of

2    the new versus current, concurrent, or

3    approximately concurrent knowledge of the

4    existing.

5         Q.    So the Recovery filter DFMEA

6    that you reviewed was dated October 2003,

7    correct?

8         A.    I believe so.  I believe you,

9    yes.

10        Q.    And you didn't review any of

11   the later revisions of that one, did you?

12             MR. LOPEZ:  Objection.  Asked

13        and answered.

14        A.    No.

15   BY MR. NORTH:

16        Q.    And you reviewed none of the

17   later revisions of the G2 DFMEA that you

18   reviewed?

19             MR. LOPEZ:  Objection.  Form.

20        Also assumes facts not in evidence.

21        A.    I don't believe so.

22   BY MR. NORTH:

23        Q.    And you only reviewed one

24   version of the Eclipse DFMEA?

```
1            A.     I think that's right.

2            Q.     And only one version of the

3     Meridian and Denali DFMEAs?

4            A.     I think so.

5            Q.     Do you know how many DFMEAs the

6     company performed over the years with regard

7     to the Simon nitinol filter?

8            A.     No.

9            Q.     Do you know how many they

10    performed with regard to Recovery filter?

11           A.     No.

12           Q.     What about the G2?

13           A.     I don't know.

14           Q.     What about the Eclipse?

15           A.     I don't know.

16           Q.     Meridian or Denali?

17           A.     I don't know.

18                  MR. NORTH:  Gentlemen, it's

19           5:36.  I'm at a good stopping place,

20           so I would suggest we conclude for the

21           night.

22                  MR. LOPEZ:  Okay.

23                  Jim, could you put us in a

24           private room at the end for about ten
```

Do Not Disclose - Subject to Further Confidentiality Review

1         minutes?

2              THE VIDEOGRAPHER:  We're going

3         to go off the record.

4              With the approval of all

5         counsel, this concludes today's video

6         deposition.  Today's deposition

7         consists of six recorded files.  The

8         time is approximately 5:37 p.m.  We

9         are now off the record.

10             (Whereupon, the deposition was

11        adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    CERTIFICATE
 2
                      I, MAUREEN O'CONNOR
 3      POLLARD, Registered Diplomate
        Reporter, Realtime Systems
 4      Administrator, and Certified Shorthand
        Reporter, do hereby certify that prior
 5      to the commencement of the
        examination, REBECCA A. BETENSKY, PhD,
 6      was remotely duly identified and sworn
        by me to testify to the truth, the
 7      whole truth, and nothing but the
        truth.
 8
                      I DO FURTHER CERTIFY that
 9      the foregoing is a verbatim transcript
        of the testimony as taken
10      stenographically by and before me at
        the time, place, and on the date
11      hereinbefore set forth, to the best of
        my ability.
12
                      I DO FURTHER CERTIFY that
13      I am neither a relative nor employee
        nor attorney nor counsel of any of the
14      parties to this action, and that I am
        neither a relative nor employee of
15      such attorney or counsel, and that I
        am not financially interested in the
16      action.
17      _____
18
19      MAUREEN O'CONNOR POLLARD
        NCRA Registered Diplomate Reporter
20      Realtime Systems Administrator
        Certified Shorthand Reporter
21      Notary Public
22      Dated:  December 16, 2020
23
24
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3           Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  It will be

10    attached to your deposition.

11              It is imperative that you return

12    the original errata sheet to the deposing

13    attorney within thirty (30) days of receipt

14    of the deposition transcript by you.  If you

15    fail to do so, the deposition transcript may

16    be deemed to be accurate and may be used in

17    court.

18

19

20

21

22

23

24
```

```
1                    - - - - - -

                  E R R A T A

2                    - - - - - -

3     PAGE   LINE   CHANGE

4     _____  _____  _____

5        REASON: _____

6     ____   _____  _____

7        REASON: _____

8     _____  _____  _____

9        REASON: _____

10    _____  _____  _____

11       REASON: _____

12    _____  _____  _____

13       REASON: _____

14    _____  _____  _____

15       REASON: _____

16    _____  _____  _____

17       REASON: _____

18    _____  _____  _____

19       REASON: _____

20    _____  _____  _____

21       REASON: _____

22    _____  _____  _____

23       REASON: _____

24
```

Do Not Disclose - Subject to Further Confidentiality Review

1
2              ACKNOWLEDGMENT OF DEPONENT
3
4        I, _____, do
   Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.
8
9

   _____
10 REBECCA A. BETENSKY, PhD           DATE
11
12
13
14
15
16

   Subscribed and sworn
17 To before me this
   _____ day of _____, 20_____.
18
   My commission expires: _____
19
20 _____
   Notary Public
21
22
23
24

```
1                        LAWYER'S NOTES

2      PAGE   LINE

3      _____  _____   _____

4      _____  _____   _____

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____
```