IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MIXSON, et al.,

        *Plaintiffs*,

v.

C. R. BARD, INC., et al.,

        *Defendants*.

Case No.: 1:21-cv-00030-AW-GRJ

**PLAINTIFFS' OPPOSITION TO BARD'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MEMORANDUM OF LAW IN IN SUPPORT**

Plaintiff Joseph Catlin Mixson submits this Opposition to Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("Bard") motion for judgment as a matter of law and memorandum of law in support.

## I. Introduction

This Court should reject Bard's Motion for Judgment as a Matter of Law arguing that Plaintiff has proffered insufficient evidence to establish a jury question as to whether Bard was negligent in designing its G2 Filter. There is ample evidence[1]

---

[1] Plaintiff incorporates by reference his trial brief arguing that he is not required to meet strict liability standards (Doc. 215) yet if required, has proffered appropriate evidence to create a jury question when apply the risk-utility test, consumer expectations test, and negligent design.

for the jury to find Bard was negligent in designing the G2, that its risks outweighed the benefits[2], and the defective filter was the proximate cause of Plaintiff Mixson's injuries. An overview includes:

- Bard failed to test for caudal migration risk until after the filter was on the market. Tr. 1111.

- Bard's testing failed to incorporate the environment of use of the filter; its testing was only up to 32 mm, even though the IVC could expand to as wide as 42 mm. Ex. 2017, p. 12; Doc. 190-1, p. 7.

- Bard rushed the G2 filter to the market, Ex 1451, without testing the extent to which the G2 Filter might migrate, fracture, and perforate. It developed multiple additional tests and determined, after it was on the market that the G2 migrated, fractured and perforated more than expected, and more than other filters, which constituted an unacceptable risk. Ex. 191, 204, 229, 2117.

- Expert testimony at trial coupled with Bard's witnesses establish Bard omitted a design feature to reduce caudal migration. Tr. 241:14-242:16; Tr. 957:13-958:6.

- Dr. McMeeking testified Bard should have tested the resistance of the

---

[2] Plaintiff understands the Court's decision not to apply the consumer expectation test, yet respectfully maintains for the record it is the appropriate test.

G2 Filter to resist downward/caudal migration but did not, and that a reasonable company should have anticipated this failure and tested for it. Tr. 205:16 – 208:16). He further testified about what a reasonable medical device company should do in order to test and design a filter. 207:16 – 210:1.

- Bard determined internally that the G2 Filter's risk of migration was unacceptable. Ex. 191, and that its testing was not realistic (Ex. 193) knowing the sample filters fractured after 600 cycles, a serious problem. Tr. 227, 230.

- Dr. Muehrcke testified there was no documented benefit provided from the G2 filter preventing clots in Mr. Mixson, and, in fact, the filter can promote the development of clots. Tr. 402:11-403:1. A filter that migrates downward has no utility as it provides no protection. Doc. 190-5, p. 17; 190-2, p. 16.

- Expert physicians, treating physicians, and Bard's own witnesses did not expect the G2 filter to be irretrievable, for major complications to occur, and did not expect a failing filter injuring a patient to continue to provide benefit. (Goei Tr. 366; Dr. Muehrcke Tr. 404, 555; Van Vleet; Tr. 954; Dr. Grassi agreed. Tr. 1020).

- Plaintiff's expert Dr. Muerhcke testified Mr. Mixson's failed G2 filter

caused his injuries. Tr. 429:8-19; 435:5-10-436:3.

## II.   Legal Standard

Defendants' motion for judgment as a matter of law can only be granted if there is absolutely no "legally sufficient evidentiary basis for a reasonable jury to find" for the Plaintiff on the issue. *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (citing Rule 50). Under Rule 50(a), a directed verdict is proper only where "there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). Plaintiff Mixson has proffered enough evidence to create a question for the jury as to whether Bard negligently designed its G2 Filter.

Plaintiff is not required to prove every element of his case, only show a sufficient evidentiary basis. *Lipphardt*, 267 F.3d at 1186. Defendants cite no law as to the absolute requirement that a risk-utility jury instruction include any factors Plaintiff is required to prove, much less prove each and every factor they list in order to reach the jury. The risk-utility factors Defendants list are merely factors a jury may consider in making its final determinations as to whether Plaintiffs have surmounted their burden of proof on the issues. Even so, Plaintiff has evidence supporting a design defect under the factors enumerated by Bard.

## III.   Negligence

The parties agree that the jury must decide whether Bard was negligent in the

4

design of the G2 filter, and whether it proximately caused Mr. Mixson's injuries. Doc. 140-1, p. 48. Bard, however, has not argued any deficiency in this evidence, only attempts to assign sole responsibility for evidence as to risk-utility on one single witness, rather than the totality of the evidence admitted at trial. Even if Bard's motion somehow preserves this issue, the evidence establishes Bard's negligence.

**A. Risk versus utility**

Under the risk utility test, Plaintiff must show that the risks outweigh the benefits in the design. Among other factors, a jury may[3] consider the following factors Bard lists: 1) usefulness of the filter, 2) the availability of other products to meet the same need, 3) public expectation of the danger, and 4) Bard's ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive. Doc. 140-1, p. 33. More succinctly, "[t]he proper test of 'unreasonable danger' is whether a reasonable manufacturer would continue to market his product in the same condition as he sold it to the plaintiff *with* knowledge of the potential dangerous consequences." *Auburn Mach. Works Co. v. Jones*, 366 So. 2d 1167, 1170 (Fla. 1979).

While the evidence may be considered objectively, as Bard argues, the jury may consider common knowledge and normal public expectation with reference to

---

[3] Bard concedes that the jury "may" consider certain factors, Doc. 213, p. 4, but later argues that Plaintiff must offer evidence to establish factors the jury "must" consider, without citation to authority. *Id.* at 6. This is incorrect.

5

evidence in this case. In proving that the risks outweigh the benefits, a Plaintiff may provide evidence that the design increases the risk of failure, which has been done here. The evidence here is very similar to that in *Eghnayem*, which Bard does not cite. *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1319-20 (11th Cir. 2017). In *Eghnayem*, a directed verdict was denied where expert testimony established only that the implantable medical device "may experience oxidative degradation, which causes it to lose its physical and mechanical properties in a way that causes injury; and the crosshatched design of the mesh makes it very difficult, if not impossible, to remove if there is a problem with the mesh." *Id.*

Similarly, here, the G2 filter design causes it to tilt and perforate, with one failure leading to another. Tr. 210:4-9. The defects cause injury (here, scarring, narrowing of the vena cava, osteophyte, and pain), and difficulty, if not impossibility to remove it. Even if Bard is correct that Plaintiff weigh risks of failure with purported benefits, it is clear that the G2 filter contained risks that could have been avoided, and that did not provide any benefit over filters that did not have the same risks.

Specifically, filter was not proven to carry out its purpose, particularly when tilted; there are other devices available that are safer; the G2 performance did not meet public expectations; Bard could have reduced the risk with design changes, and that it was redesigning the filter almost as soon as it placed it on the market, which

6

is circumstantial evidence that it would NOT continue to market the product in the same condition once it had knowledge of the risk. Bard eventually took the G2 filter off the market. Tr. 805.

> 1. Features to reduce or eliminate risk

Mr. Van Vleet testified that Bard was aware that caudal anchors would reduce or eliminate the risk of downward migration. Tr. 957:13-958:6. In fact, not only were caudal anchors an option, but as of April, 28, 2006, Bard knew that another manufacturer had "dealt" with caudal migration by flipping two hooks to "prevent" the problem. Ex. 204, p. 3. The evidence further indicates that after the Greenfield filter design was fixed, the G2 filter was the only filter that had this problem, particularly in combination with tilt, perforation, and subsequent fracture (all of which would have been fixed with caudal anchors, and/or penetration limiters). Tr. 208:17-210:18; 241:14-242:16. Similarly, design features from the SNF filter, would also have reduced or eliminated problems with the G2 filter. 236:4-239:22. Moreover, while Bard argues that the SNF filter as a whole is not a valid comparison. Mr. Carr testified that Bard kept the Recovery filter on the market *because* it was retrievable, even though the G2 filer was on the market. Tr. 1177:13-1178:3.

> 2. Lack of benefit

The evidence also establishes that there is limited proven benefit for the G2 filter. It cannot be shown to have prevented clots, and, in fact, promotes the

7

development of clots. Tr. 402:11-403:1. A filter that migrates downward as it did in Mr. Mixson can result in no protection from clots. Doc. 190-5, p. 17; 190-2, p. 16. Similarly, Bard was concerned that tilt would cause the filter not to work. Doc. 190-2, p. 10, 16. The evidence also establishes that the G2 filter was no better—in fact worse—than other filters at preventing clots. *Compare* Ex. 2133 (0.3% PE reported, so up to 3%) *with* Ex. 204, p. 10 (0% PE for Tulip, Optease).

The touted removable benefit of the G2 filter was also illusory for two reasons. First, filters that tilted like Mr. Mixson's, often could not be removed. Second, when Bard started the EVEREST study, it considered the filter to be permanent after it had been implanted for 6 months. Ex. 169, p. 2 ("At what point must the filter be considered permanent? 6 months."). Bard filters also had a high rate of retrieval complications compared with other filters. Tr. 552:23-553:10.

3. Risks

The evidence establishes also that G2 filters had high complication rates compared to other filters. It fractured after 600 cycles, a serious problem. Tr. 227, 230. Bard also knew that the test was not realistic. Ex. 193. The G2 had more perforation and downward migration than the Recovery and SNF filters. Doc. 190-2, p. 6; Doc. 190-5, p 16. With reported migrations at 0.13%, the actual rate was up to 13%, or one in 7 filters, Ex. 204, p. 6, even before adjusting for the fact that approximately 12,000 sales across thousands of hospitals means thousands of filters

8

are on shelves, and many were implanted relatively recently. *Id.* Looking just at sales in a given month versus reported migrations, as many as 20% of filters sold were migrating. *Id.* at 7. In a series of 8 reports of downward migration, 63% tilted. Ex. 210, p. 8. Bard determined itself that the risk of migration was unacceptable. Ex. 191. All of this was borne out in a clinical trial, the results of which, were available when Mr. Mixson received his filter. The migration rate was 12.2%, but "instability" was much higher. Ex. 245, p. 6; Doc. 201-4, p. 8, 43.

It is valid to compare the G2 filter's performance to other filters, as one element in evaluating whether it is defective. It is the G2's poorer performance in combination with the availability of alternative design features to reduce or eliminate risk, and alternative filters with the same or greater benefit, combined with lack of benefit of the G2 that proves it has a defective design. Also, because the G2 did not perform as well as the Recovery filter, its failure rates are also relevant.

With respect to the Recovery filter, Bard relies on an admittedly unrealistic test to claim that the G2 fractures less than Recovery, so a fair inference is that it has not shown that the G2 filter will not perform better than the Recovery on this metric. The Recovery filter fracture rate was double competitor filters. Doc 190-5, p. 14. Fracture, perforation, tilt, and migration occurred 3-4 times more than other filters. Doc. 190-2, pp. 6-7; Ex. 121. In comparison, there were zero reports of fracture with the Tulip retrievable filter, Ex. 208, p. 4, and 1/10th as many for the retrievable

OptEase filter. Similarly, these filters were reported to migrate 7 to 14 times less frequently than the Recovery. *Id.* at 23. Rates for Tulip and Optease of perforation, tilt, and PE were also zero (other than a single tilt). Ex. 204, p. 10. The combination of failures exhibited with the G2 are generally not in evidence for other filters. *See, e.g.*, Ex. 254, pp. 14-15.

### 4. Physician expectation

Plaintiff argues for the record that the consumer expectation test could be met if applied, which, in any event, Bard lists as a relevant factor to consider under the risk utility test. *See* Doc. 215. As outlined in Doc. 215, the evidence shows that doctors, including Dr. Goei, expected better performance than demonstrated by the G2 filter. For example, Mr. Mixson testified that he heard Dr. Goei tell him that he "did not expect [Mr. Mixson] to experience major complications." Tr. 366. Dr. Goei testified himself that he expected any design problem to be fixed. 190-3, p. 10. Dr. Muehrcke testified that doctors expected the G2 to be retrievable, and that it would withstand a surgical procedure. Tr. 404, 555.

Bard's own witness, Mr. Van Vleet, testified that if a filter is injuring a patient, it might not be providing a benefit expected by doctors, and that doctors expected it to act like a permanent filter and remain stable for the duration of a patient's life. Tr. 954. Dr. Grassi agreed. Tr. 1020. Doctors and Bard also did not expect the filter to move downward. Tr. 1131, 1132. Dr. Kandarpa testified that doctors did not expect

10

adverse events related to the G2 filter. Doc. 201-4, p. 4. He also suggested that doctors did not expect downward movement. Doc. 201-4, p. 6. The rate of reported migrations exceeded the rate expected by Bard, which was based on conversations with doctors. Doc. 190-5, p. 23-24; Ex. 120, p. 10, 12. Bard documented that doctors regarded the Greenfield filter as the "gold standard", and the evidence supports the claim that it does not fail as often as or in the manner as the G2 filter; doctors also "desire" a filter "durable enough to be a permanent filter." Ex. 28, p. 3. (notably referring to doctors as "consumers" and "customers"). "Customers" also wanted/expected a filter that could be safely removed, would continue to trap clots, resist migration and tilt only minimally. *Id.* Bard initially described the filter as "centering," Ex. 61. Bard's "Filter Expert Panel" reported that the expected perforation rate was 0-1%; 0.1% fractures was "high", and should be more like 1 in 10,000. Ex. 2117, pp. 1-2. Migration rates in the literature in 2006 were reported as 0-5% in one study and 0.12% in another. Ex. 188, p. 3 (in contrast, the G2 migration rate was 12.2% in the EVEREST study, or up to approximately 50%, depending on how you count, *e.g,* Ex. 245, p. 6; Doc. 201-4, p. 20). The G2 filter, therefore did not perform as reasonable physicians would expect.

### B. Reasonable Care and Proximate Cause

Dr. McMeeking testified about what a reasonable medical device company should do in order to test and design a filter. 207:16 – 210:1.

Dr. Muehrcke testified that the failed filter caused injury to this specific plaintiff, Mr. Mixson, including a filter that could not be removed, and injury to his IVC, duodenum, aorta, and spine where osteophytes have been created representative of injury to the spine. Tr. 435:5-10-436:3; 429:8-19. He also testified that he could find no other causes of the filter failures other than the design defects described by Dr. McMeeking. Tr. 432:3-15.

Dr. McMeeking testified that Bard's negligence was foreseeable and preventable. Tr. 231:4-233:6. He also testified that Bard should have tested the resistance of the G2 Filter to resist downward/caudal migration but did not, and that a reasonable company should have anticipated this failure and tested for it. Tr. 205:16 – 208:16).

### III.   Circumstantial Evidence

Even if the Plaintiff had not presented sufficient expert testimony and other direct evidence to establish the risks of the G2 filter outweighs its benefits, the facts in this case—which include the harmful failure of the G2 filter to perform properly when used as intended and a unique combination of failures not seen in other filters—creates an inference of a defect in the design of the filter that renders a directed verdict inappropriate. *See Barrow v. Bristol-Myers Squibb Co.*, CASE NO. 96-689-CIV-ORL-19B, 1998 U.S. Dist. LEXIS 23187, at *162 (M.D. Fla. Oct. 29, 1998) (applying inference to strict liability design defect case involving breast

12

implants; citing *Cassisi v. Maytag Co.*, 396 So. 2d 1140, 1148 (Fla. Dist. Ct. App. 1981). The ultimate issue of whether the risks associated with the G2 Filter outweighed the benefits of the device is a question for the jury to decide if Florida's risk-utility analysis is applied.

In addition to the expert testimony presented by the Plaintiffs, the jury heard substantial circumstantial evidence to support a finding on both the elements of negligent design and causation. The Eleventh Circuit has held that Florida law allows the elements of "defect and causation to be proven by circumstantial evidence." *Worsham v .A.H. Robins Co*., 734 F.2d 676, 683 (11th Cir. 1984) (affirming denial of directed verdict).

## IV. Conclusion

For the reasons set forth above, Bard's motion should be denied.

DATED April 3, 2023  Respectfully submitted,

*/s/ Joshua Mankoff*
Joshua M. Mankoff
(Admitted pro hac vice)
**LOPEZ MCHUGH, LLP**
214 Flynn Ave.
Moorestown, NJ  08057
Telephone: (856) 273-8500
Facsimile: (856) 273-8503
Email: jmankoff@lopezmchugh.com

Ramon Rossi Lopez
(Admitted pro hac vice)
rlopez@lopezmchugh.com

13

LOPEZ MCHUGH LLP
120 Vantis Drive
Suite 430
Aliso Viejo, CA 92656
(949) 737-1501
(949) 737-1504 – Fax

*/S/ Mark S. O'Connor*
Mark S. O'Connor
(Admitted pro hac vice)
BEUS GILBERT MCGRODER PLLC
701 N. 44th Street
Phoenix, AZ 85008-6504
Telephone: (480) 429-3019
Facsimile: (480) 429-3100
Email: moconnor@beusgilbert.com
*Counsel for Plaintiffs*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Local Rule 7.1(F), counsel certifies that this Motion contains 3,061 words, based on the word count function of the word-processing software used to draft this response.

## CERTIFICATE OF SERVICE

I hereby certify that, I caused to be served through the ECF system a true and legible copy of the foregoing document upon counsel of record.

*/s/ Joshua Mankoff*
Joshua M. Mankoff

14